The **GENERAL TIRE & RUBBER COMPANY, Plaintiff,**

v.

The **FIRESTONE TIRE & RUBBER COMPANY, Defendant.**

The **FIRESTONE TIRE & RUBBER COMPANY, Plaintiff.**

v.

The **GENERAL TIRE & RUBBER COMPANY, Defendant.**

Civil Nos. 36799, C 67–206.

United States District Court.
N. D. Ohio, E. D.

June 26, 1972.

As Amended Sept. 10, 1972.

Judgment Order Oct. 3, 1972.
See 351 F.Supp. 872.

See also, D.C., 349 F.Supp. 333.

Merriam, Edward M. O'Toole, Carl E. Moore, Jr., Chicago, Ill., Edward B. Beale, Clyde V. Erwin, Beale & Jones, Washington, D. C., Cletus G. Roetzel, Richard E. Guster, Wise, Roetzel, Maxon, Kelly & Andress, Akron, Ohio, for General Tire & Rubber Co.

Jones, Day, Cockley & Reavis, Victor DeMarco, Robert W. Poore, and James E. Courtney, Patrick F. McCarten, Robert J. Hoerner, Cleveland, Ohio, Stanley M. Clark, David A. Thomas, Akron, Ohio, for Firestone Tire & Rubber Co.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

This is a rather complex patent case, perhaps the most protracted in existence anywhere in the world.[1] At issue is a patent on the invention of tire treads and tread stock made from very tough synthetic rubber to which large amounts of oil have been added to increase the yield and to improve processability. Since 1950 it has been known in the trade as oil-extended rubber (OER). The issues in this case are set out in Findings 13–16. Three representative stocks (Stock A, Blend 2, and Blend 5) are charged with infringement of ten representative claims (1, 3–5, 7, 13, 14, 17–19, and 22). Firestone has defended on the grounds of non-infringement, invalidity, license, and unenforceability. As this opinion and the accompanying findings of fact and conclusions of law indicate, this Court has rejected each and

William C. McCoy, Jr., McCoy, Greene & Howell, Cleveland, Ohio, Charles J.

[1.] This controversy arose more than two decades ago. The reasons for this protraction are not to be found in any dilatory practices by counsel, whose performance throughout has been largely exemplary; rather they lie in the intractability of the parties themselves, in the fraud practiced by Firestone in Baltimore, and in the depth to which various issues have had to be examined. As an indication of the mammoth size of this case, the transcript alone runs to 44,773 pages, of which 38,299 pages were inherited from the trial in Baltimore; to this must be added, as well, over 100,000 pages of depositions and evidence. In such a case, it is obvious that it would be unwise for the Court to depart from the exposition and development of the issues formulated by the parties themselves in their briefs. The Court has been persuaded by the logic of General's arguments presented in its brief and by the cogent answers given there to Firestone's defenses; accordingly, this opinion will be seen to follow broadly the format of that brief. It need hardly be added, however, that every case cited in both briefs has been carefully examined by the Court, and that most of them were discussed thoroughly by counsel during the week of final arguments.

every one of Firestone's defenses; and judgment will be entered in favor of the General Tire and Rubber Company.

Findings 17–21 set out the history of the patent in the Patent Office and the proceedings before Judge Holtzoff. General Tire & Rubber Co. et al. v. Watson, 184 F.Supp. 344 (D.D.C.1960). This patent was originally allowed by the Patent Office examiner whose area of expertise was directly related to the subject matter of the invention, *viz*, pneumatic tire treads. Invention was found by Judge Holtzoff after a full adversary attack on the invention, not only by the Patent Office but also what appears to be an unprecedented attack by the Department of Justice.

■■ A statutory presumption of validity attaches to a patent upon its issuance and the burden of establishing invalidity is imposed upon the party attacking it. It is Firestone's burden to overcome this presumption by clear and convincing evidence, and every reasonable doubt should be resolved in favor of a finding of validity. 35 USC § 282; Cantrell v. Wallich, 117 U.S. 689, 695–696, 6 S.Ct. 970, 29 L.Ed. 1017 (1885); The Barbed Wire Patent, 143 U.S. 275, 285, 36 L.Ed. 157 (1891); Mumm v. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Frohock-Stewart, Inc. v. Reed-Cromex Corp., 254 F.Supp. 120, 122–123 (N.D. Ohio 1966); Simplicity Mfg. Co. v. Quick Mfg., Inc., 355 F.2d 1012, 1014 (6th Cir. 1966); H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 163 USPQ 106, 114 (N.D.Ohio 1969), aff'd 168 USPQ (6th Cir. 1971); Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 106 F.2d 554, 557 (6th Cir. 1939).

■ This presumption is strengthened by the fact that invention was found after extended prosecution in the Patent Office and thereafter a full federal court adversary proceeding. Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S.Ct. 20, 66 L.Ed. 112 (1921); Cincinnati Butchers' Supply Co. v. Walker Bin Co., 230 F. 453, 454 (6th Cir. 1916); Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828, 837 (6th Cir. 1956), cert. den., 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956); United States Plywood Corp. v. General Plywood Corp., 230 F.Supp. 831, 837 (W.D.Ky.1964), aff'd, 370 F.2d 500 (6th Cir. 1966), cert. den., 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed.2d 71 (1967). Judge Holtzoff heard many of the same witnesses, considered the primary prior art references, and the main prior use defenses presented here by Firestone. None of this prior art was found to be an anticipation or to make the invention obvious.

Findings 22–62 describe the art to which the invention relates. They describe the technology and terminology necessary to the understanding of the invention and the prior art. They also describe the man who is skilled in the relevant art and the state of the art at the time of the invention. In short, they provide the proper starting point for the resolution of technical issues and the determination of invention. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); American Stove v. Cleveland Foundry Co., 158 F. 978, 984–985 (6th Cir. 1908); Kohn v. Eimer, 265 F. 900, 902–903 (2d Cir. 1920); Nickerson v. Bearfoot Sole Co., 311 F.2d 858, 869–870 (6th Cir. 1962), cert. den., 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963); Sanford v. Kepner, 99 F.Supp. 221, 226 (D.Pa.1951), aff'd 195 F.2d 387 (3rd Cir. 1951), 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952); Minnesota Mining & Mfg. Co. v. Carborundum Co., 155 F.2d 746, 749 (3rd Cir. 1946).

Findings 63–79 set out the circumstances surrounding the invention and its advance over the prior art. These circumstances not only contradict Firestone's allegations that the invention was derived from others and falsely presented to the Patent Office, but are themselves evidence of unobviousness. They have provided valuable assistance in the determination of invention. Judge Hand expressed this fact in Safety Car Heating

& Lighting Co. v. General Electric Co., 155 F.2d 937, 939 (2d Cir. 1946):

"Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable. No objective standard is practicable. . . Courts, made up of laymen as they must be are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention."

Judge Holtzoff was of this view. While he recognized that the manner in which an invention is made is not determinative of patentability (35 U.S.C. § 103), he stated, at 184 F.Supp. at 347:

"The fact, however, that the discovery was made accidentally by a person skilled in the art, while others had been working to find other ways and means to achieve the same objective, namely, to increase the supply of usable rubber, would seem, to some extent at least, to negative the contention that the invention was obvious."

█ The reaction of the industry to the invention is well known. Their reaction strengthened the statutory presumption of validity and negated. Firestone's allegations that the invention was obvious and that its product was inferior to the prior art. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 56, 43 S.Ct. 322, 67 L.Ed. 523 (1922); Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 106 F.2d 554, 558 (6th Cir. 1939); Ekco Products Co. v. Chicago Metallic Mfg. Co., 321 F.2d 550, 553–554 (7th Cir. 1963), cert. den., 375 U.S. 970, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964). Indeed, Firestone was among the leaders in first expressing doubt, then extolling the surprising virtues of the invention. As Mr. Justice Graham said in his learned opinion in the English case (GX 2520, p. 60):

"It is indeed unusual, if not unprecedented, to find in a patent action such a tribute from a defendant to the excellence of a plaintiff's product and process."

█ As in United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), here we have the classic indicia of invention: (a) a novel combination of elements, each old in itself, but combined in a manner counter to and discouraged by the teachings of the art, to produce a surprising result; (b) initial disbelief and skepticism by those skilled in the art; (c) followed by universal adoption of the invention, revolutionizing the art and producing great economy.

The claimed invention against which the prior art is to be measured is set out in Findings 91–96. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

█ While the claims of a patent limit the invention, and the specification cannot be utilized to expand the patent monopoly, it is fundamental that the claims of a patent are to be construed in light of the specification and both are to be read with a view to ascertaining the invention. United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

The claimed invention is a product (tire treads and tread stock). It consists of the novel, interacting combination of elements. The controlling legal principles are straightforward:

Even if the elements of a combination are individually old, a combination constitutes a patentable invention when it is novel, the elements have a new or different interdependent functional and cooperative relationship, and the bringing together of the elements as taught by the patent in suit was unobvious in the light of the prior art. United States v. Adams, 383 U.S. 39, 51–52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Maytag Co. v. Murray Corp.

of America, 318 F.2d 79, 81 (6th Cir. 1963). A new combination of old elements whereby an unexpected result is obtained (or even an old result is obtained in a more economical or efficient way) constitutes patentable invention. Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177 (1882); Diamond Rubber Co. v. Consol. Rubber Tire Co., 220 U.S. 428, 443, 31 S.Ct. 444, 55 L.Ed. 527 (1911); National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224, 239 (6th Cir. 1959), cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960); Firestone v. Aluminum Co. of America, 285 F.2d 928, 930 (6th Cir. 1960); FMC Corp. v. F. E. Meyers & Bro. Co., 384 F.2d 4, 8–9 (6th Cir. 1967), cert. den., 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); Great Lakes Equip. Co. v. Fluid Systems, Inc., 217 F.2d 613, 617 (6th Cir. 1954).

As will be seen, all of Firestone's defenses cannot stand the light of day. Even more so is Firestone's argument to the effect that there is no invention. Firestone urges that there is no invention because an unpatented but new product (OER masterbatch) was used in known and exclusively used processes to obtain a known end product (tire treads and tire tread stock). This argument misses the point by a mile and is particularly specious, because no one knew that the end product—OER tire treads and tire tread stock—could be utilized feasibly and would result in a better synthetic rubber tire.[2] In this connection and for the technology involved, see Finding 95 which articulates Claim 14 defining the tire tread composition.

There is no real question of infringement. Firestone's defenses in this regard amount to no more than nit-picking semantics. See Robertson Rock Bit Co., Inc. v. Hughes Tool Co., 176 F.2d 783, 786 (5th Cir. 1949).

Firestone says it does not infringe because the Mooney of the rubber it used was not shown by analysis of a vulcanized tire tread. There is no basis in law for this assertion and, in fact, the Mooney cannot be directly shown by such analysis. General has proven directly, beyond doubt or even challenge, the Mooney of the rubber used by Firestone in making its infringing products. It is unreasonable to read the claims otherwise.

Firestone says that the rubber in its FR–S 184 has no raw Mooney because at all times prior to the addition of oil to the rubber it is in the form of a latex upon which no Mooney can be measured. With all respect, this argument is specious. Firestone regularly coagulates this latex and measures the Mooney of the coagulum as a part of its production controls for FR-S 184. Dr. Semon referred to the Mooney of latices in his testimony meaning, as he pointed out, the Mooney of the polymer when coagulated. This is obviously the intent of the claims.

Firestone says Dr. Semon's tests showed that its FR-S 184 did not meet the polymer characterization test set out in claim one.[3] This argument hardly need be discussed. Semon's preliminary tests using HAF black and a hydrocarbon oil showed the polymer of FR-S 184 to be well above the 60 Mooney limit set out in claim one. Even though Firestone took care not to repeat precisely any of the infringement tests performed by General,

2. Firestone admitted in final argument that the government, pursuant to the Rubber Reserve Act, did not intend to enter the tire business. Its interest extended only to the making of synthetic rubber masterbatches, leaving the building of tires, that is to say, subsequent compounding, to the tire manufacturing industry. Upon entering World War II, the natural rubber supply to the United States was cut off. President Roosevelt sought to assure that the United States would never again be compelled to rely on an external rubber supply, and thus the Rubber Reserve Act was enacted. See text at footnote 5, infra.

3. Claim one characterizes the toughness of the polymer by a test which involves mixing 100 parts of the polymer with 65 parts of a "high abrasion furnace carbon black" and 30 parts of a "hydrocarbon oil." If the mixture has a compound Mooney over 60, the toughness test is met.

the net effect of Semon's preliminary tests was to confirm infringement.

Firestone did not present any of Semon's preliminary tests to the Court. Those it did present were designed for failure, not fairness. Semon used oils that were not recommended for use in tread compounds and which he had never heard of as being so used. His blacks were not of the type called for in the claim one test. The tests, using high and low structure blacks which were not in existence until after 1960, were excluded at the trial. Those using high modulus furnace black are not in compliance with the claim one requirement that the black be high abrasion furnace black and are therefore irrelevant.

Firestone says it does not infringe Claims 18, 19, or 22 because they call for the rubber to be substantially unmasticated or unbrokendown. Again Firestone relies on semantics. It is clear from the patent that some working is necessary in order to incorporate the carbon black and other ingredients, but no more than was used in the prior art. In other words, according to this claim language and the invention, there should be and need be no excessive mastication or breakdown such as was used by the Germans to degrade the rubber to the point of processability.

Conspicuously, Firestone makes no attack on General's direct proof of the raw Mooney, oil content, black content, extrusion Mooney values, or mixing procedures used by Firestone. In most instances, these facts have been agreed to by Firestone. They are the facts which are material to and constitute proof of infringement.

■ The parties are at issue over the status of some 51 alleged prior art references as prior printed publications. The first category of disputed references consists of documents which originated under the government synthetic rubber program: the CD Reports, AU Reports, Technical Committee Reports, and Tire Test Reports. The AU Reports may be disposed of summarily. They originated in the government laboratories at Akron University and were found in the files of Rubber Reserve after this suit began. There is no showing that they were distributed, even to the other participants in the government synthetic rubber program. So far as has been shown, they were merely internal government papers, clearly not publications.

■ The CD Reports, Technical Committee Reports, and Tire Test Reports may be considered together. They were distributed to a limited number of named individuals participating in the government program, according to fixed distribution lists. They were not available to the general public, but were subject to secrecy agreements between Rubber Reserve and the participants in the rubber program.

■ A distribution to a limited group with an injunction to secrecy is not publication within the meaning of 35 U.S.C. § 102. In Badowski v. United States, 164 F.Supp. 252, 255 (Ct.Claims 1958), the Court held that:

"The statutory language, 'printed publication,' implies that numerous copies were printed and made accessible to the general public."

In Ex parte Suozzi, 125 USPQ 445, 446–447 (P.O.Bd.App.1959), it was held that a government report restricted to use for governmental purposes was not a disclosure to the public and therefore not a printed publication under 35 U.S.C. § 102:

"We will first refer to the aforementioned distribution list appearing on the last page of the reference report. From the tenor of said list, each of the entities named thereon would appear to be a regular governmental installation, or an individual in regular governmental service, either military or civilian, named as a recipient of a copy of the report because of some relation of the subject matter of the latter to work of said entity. Hence, it seems clear to us that the report is one of an internal organizational character and that each of the aforesaid entities, in receiving a copy of the report, would

be doing so in an official capacity and not as a part or member of the general public. On this basis we see no establishment of publication for the reference report merely by the distribution thereof, in and of itself, denoted on said list. . . .

"The distribution list of said report, and particularly when read together with the notation in question, shows that at the time of its formulation . . . said report was intended for and given but limited distribution, and this as we have pointed out only of an official nature. In the light of these circumstances, we can reasonably conclude only that the 'other requesters' of the involved notation were likewise to have some official capacity for access to a copy of the report."

In Dow Chemical Co. v. Williams Brothers Well Treating Corp., 81 F.2d 495, 499 (10th Cir. 1936), the Court held:

"The proof is convincing that this was a private report to one entitled to the services of the Institute; it was never published and is not therefore a 'printed publication.' See United Chromium v. General Motors Corporation, 11 F. Supp. 694 (D.C.Conn.), in which the authorities are gathered."

See also, Rayonier Inc. v. Georgia-Pacific Corp., 156 USPQ 110, 126 (W.D.Wash. 1967).

■■■ Documents which are the subject of secrecy agreements and classified as "Restricted" cannot be anticipatory prior art. In Ex parte Harris, 79 USPQ 439, 440 (1948), the Commissioner of Patents considered the status of reports circulated among participants in a wartime government-sponsored research program, and subsequently released to the public. He stated:

"It is immaterial that copies of the report were in the hands of members of the group at the time of declassification, the test is whether this material was freely available to the public at large immediately following the decision to declassify. . . ."

In Harris, as here, the participants in a government-sponsored research program (there penicillin, here rubber) were subject to contractual obligations against divulging technical information generated under the program to the general public. There is no showing here that these contractual obligations terminated prior to the filing of General's patent application.

None of the CD, Tire Test, or Technical Committee Reports meets the legal standards required of printed publications. None is prior art under 35 U.S.C. § 102.

■■■ The second classification of disputed references is the microfilms of captured German documents. The first question is whether they meet the statutory requirement that a reference be "printed" (35 U.S.C. § 102). The leading case, Application of Tenney, 254 F.2d 619, 627 (C.C.P.A.1958), has answered the question in the negative; a microfilm is not printed and not prior art:

"While microfilming furnishes a means of multiplying copies, there is no probability, from a mere showing that a microfilm copy of a disclosure has been produced, that the disclosure has achieved wide circulation and that, therefore, the public has knowledge of it. The nature of present day microfilm reproduction differs from normal printing methods. Though one would be more likely than not to produce a number of copies of printed material, one producing an item by microfilming would be as apt to make one copy as many. In the case of printing, unless a number of copies were produced, a waste of time, labor and materials would result; present day microfilming methods, on the other hand, are as well designed to produce one microfilm as well as many without waste.

"It is no doubt true that the present law is anomalous, as evidenced by our conclusion that the microfilm is not 'printed.' A foreign patent file, laid open for public inspection, is not a printed publication, because type-

written, while a printed publication, available to the public only in a Southern Rhodesian library, would be. The former is obviously more likely to reach the eyes of the American public than the latter. It is obvious, however, that unless we are to rewrite 35 U.S.C. § 102(b) for Congress, this must be the result reached. Our job is to interpret the law, not to make it."

■ Not only are Firestone's microfilm references not "printed," but there is no evidence of their publication. Publication is not shown by mere evidence of ability to mass produce. Browning Manufacture Co. v. Bros., Inc., 126 USPQ 499, 503 (D.Minn.1960). Directly in point are decisions which hold that German GM's (Gebrauchsmustern) are not publications although they are indexed, the index is published, and copies of the GM are available to the public on request. Permutit Co. v. Wadham, 13 F. 2d 454, 458 (6th Cir. 1926); Bendix Corp. v. Balax, Inc., 421 F.2d 809, 811–12 (7th Cir. 1970).

The German microfilms fail as prior printed publications. They are not prior art under 35 U.S.C. § 102.

■ Firestone relies on two German documents which are not microfilms. These documents, apparently captured from the Germans during or after the war, are completely without authentication. They were apparently found in a warehouse-like library in England where they had been dumped, unbound, into folders stored in boxes. They were unearthed after this suit began by searchers working on the English case. They are not printed. There is no evidence they were ever published or that they were made available to the public (or even were in the English library) prior to November 20, 1950. They are not prior printed publications, nor prior art under 35 U.S.C. § 102.

■ The third classification of disputed references is the preliminary and final mimeographed reports of the Wilmington Chemical Company. At least one of these reports was distributed to several individuals in the rubber industry. However, each was marked "Confidential." There is no evidence that dissemination to the general public was intended, nor that the public had access to the reports. See, Ex parte Deaton and Kirkland, 146 USPQ 549, 550–51 (P.O.Bd.App.1965); Stamicarbon N.V. v. Escambia Chemical Corp., 300 F.Supp. 1209, 1215 (N.D.Fla.1969), mod. on other grounds 430 F.2d 920 (5th Cir. 1970).

These reports fail as prior printed publications. They are not prior art under 35 U.S.C. § 102.

■ The large number of references cited against the patent is in itself evidence of lack of anticipation and lack of obviousness. Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912, 917 (4th Cir. 1936); Ric-Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 404 (7th Cir. 1950), cert. den. 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369 (1950); Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments Inc., 298 F.2d 36, 38 (7th Cir. 1961); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 268 (2d Cir. 1967). Typical of the language in these cases is the following from *Hoeltke,* 80 F.2d at 917:

"Defendant has cited 33 patents as basis for its contention that complainant's invention is lacking in novelty; and this in itself is some evidence of the weakness of the contention. Such a citation of so many prior patents almost inevitably means either that none of them is nearly like the invention of the patentee and that the attempt is being made to invalidate the patent because the patentee has brought together for the purposes of his invention devices to be found in prior patents of different character, or that prior attempts to solve the problem with which he was confronted have not met with success."

35 U.S.C. § 102 sets out conditions for patentability. It states that a person shall be entitled to a patent unless, inter alia, the invention was previously patent-

ed or described in a printed publication. A patent held invalid under this provision is referred to as being anticipated by a prior art reference.

 The standards of anticipation are strict. The invention must be disclosed within the four corners of a single reference. If a reference is silent or ambiguous with respect to an element or feature of the invention, that gap cannot be filled by an assumption or by combining one reference with another. An anticipating reference must teach the invention; it is not sufficient to point to its silence or ambiguity after the invention and argue that the invention could be made out from the reference. This thought was well expressed by Judge Learned Hand in Asbestos Shingle, S & S Co. v. H. W. Johnsmanville Co., 184 F. 620, 626 (2nd Cir. 1910) where, in referring to an alleged prior art reference, he said:

> "The defendant's theory is that Sachs must have meant, by cements, hydraulic cements; that by the manufacture of cardboards he must have meant the use of the usual machines; and that by the suggestion which he made of the uses of his substance he therefore disclosed completely all that Hatschek did. That is not enough; the art must be enriched by more than fruitful intimations, untested suggestions, or pregnant surmise before the subsequent comer who has elaborated and proved the invention may be deprived of his right."

See also, American Graphophone Co. v. Leeds & Catlin Co., 170 F. 327, 331 (2d Cir. 1909).

 Prior publications and uses must do more than point to the goal. They must mark the path. See Grubman Engr. & Mfg. Co. v. Goldberger, 47 F.2d 151, 153 (2d Cir. 1931). It is clear that anticipation cannot be found unless all of the elements of the invention are disclosed in a single prior art reference. Firestone v. Aluminum Co. of America, 285 F.2d 928, 929–930 (6th Cir. 1960); H. K. Porter Co., Inc. v. Goodyear Tire

& Rubber Co., 163 USPQ 106, 114–5 (N.D.Ohio 1969), aff'd, 168 USPQ 449 (6th Cir. 1971); Preformed Line Products Co. v. Fanner Mfg. Co., 328 F. 2d 265, 271 (6th Cir. 1964). A patented combination cannot be anticipated piecemeal by finding individual features separately in the prior art. Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1880); Bates v. Coe, 98 U.S. 31, 48, 25 L.Ed. 68 (1878); Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 298 F. Supp. 435, 442 (W.D.Mich.1969), aff'd 430 F.2d 221 (6th Cir. 1970). The fact that a prior art reference might, by modification, be considered to disclose the invention is insufficient to establish anticipation if it were neither designed, adapted, nor actually used in the performance of the invention. Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658 (1892); Trabon Engr. Corp. v. Dirkes, 136 F.2d 24, 26 (6th Cir. 1943); Spring-A-Way Displays of California, Inc. v. Ad-Rack, Inc., 249 F.Supp. 368, 370 (S.D.Ohio 1965).

 An anticipating reference must bear within its four corners adequate directions for the practice of the invention. If it offers no more than a starting point for further experiments; if its teaching will sometimes succeed and sometimes fail; if it does not inform the art, without more, how to practice the new invention—it has not correspondingly enriched the store of common knowledge and it is not an anticipation. Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989–990 (2d Cir. 1942); Lincoln Stores v. Nashua Mfg. Co., 157 F.2d 154, 160 (1st Cir. 1946); Munising Paper Co. v. American Sulphite Pulp Co., 228 F. 700, 703–4 (6th Cir. 1915); Gordon Form Lathe Co. v. Walcott Mach. Co., 32 F.2d 55, 58 (6th Cir. 1929); Morgan Const. Co. v. Wellman-Seaver-Morgan Co., 18 F.2d 395, 399 (6th Cir. 1927). Prior art involving an inoperative disclosure or one which fails to achieve its intended result (e. g., the Rostler, German, Government, and McMillan references) does not constitute an anticipation. United States v. Adams,

383 U.S. 39, 50, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Trabon Engineering Corp. v. Dirkes, 136 F.2d 24, 26 (6th Cir. 1943).

■ Disclosures in foreign prior art (e. g., the Rostler British patent and the German microfilm references) are strictly construed and are restricted to what is clearly and definitely disclosed therein. National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224, 236 (6th Cir. 1959), cert. den., 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960); Morgan Const. Co. v. Wellman-Seaver-Morgan Co., 18 F.2d 395, 399 (6th Cir. 1927); General Tire & Rubber Co. v. Watson, 184 F.Supp. 344, 349 (D.D.C.1960).

Faced with these strict legal principles, Firestone has not seriously asserted anticipation. Nevertheless, it has referred to certain groups of references as if they were anticipations.

Firestone concentrates on the similarities (real or imagined) between its references and its version of General's invention. In analyzing prior art references too, it is the differences that are relevant, and there are significant differences with respect to each significant reference corresponding to Firestone's own classification.

Firestone has alleged some eight prior use defenses. Only two need be discussed. One is the alleged prior knowledge or use by the Wilmington Chemical Company. The other is the alleged prior knowledge, use or sale associated with Tire Test 123.

■■ 35 U.S.C. § 102 bars a patent if it was "known or used by others in this country" before the invention or if it was "in public use or on sale in this country" more than one year prior to the date of the application for the patent in suit. As in the case of a prior printed publication, a prior use, knowledge, or sale does not anticipate unless it be of the same perfected invention as that of the patent. Each element or feature of the invention must be found in the alleged prior knowledge, use, or sale to invalidate the patent. Goodwin v. Borg-Warner Corp., 157 F.2d 267, 272 (6th

Cir. 1946); Winslow Mfg. Co. v. Peerless Gauge Co., 202 F.Supp. 931, 936 (N.D.Ohio 1958).

■■ The proof of the asserted prior public use, sale, knowledge, or invention must be established by evidence that is so clear, convincing, and cogent as to admit of no reasonable doubt. Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7–8, 54 S.Ct. 752, 78 L.Ed. 1453 (1934); The Barbed Wire Patent, 143 U.S. 275, 284, 36 L.Ed. 157 (1892); Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Preformed Line Products Co. v. Fanner Mfg. Co., 225 F.Supp. 762, 768 (N.D.Ohio 1960), aff'd, 328 F.2d 265 (6th Cir. 1964); National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224, 231 (6th Cir. 1959); Austin Machinery Co. v. Buckeye Traction Ditcher Co., 13 F.2d 697, 700 (6th Cir. 1926); H. K. Porter Co. Inc. v. Goodyear Tire & Rubber Co., 163 USPQ 106, 115 (N.D.Ohio 1969), aff'd 168 USPQ 449 (6th Cir. 1971); General Tire & Rubber Co. v. Watson, 184 F.Supp. 344, 350 (D.D.C. 1960).

■ The alleged prior use must be public, perfected, not experimental, and not abandoned. Goodwin v. Borg-Warner Corp., 157 F.2d 267, 273–274 (6th Cir. 1946); cert. den. 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683 (1946); FMC Corp. v. F. E. Meyers & Bro. Co., 384 F.2d 4, 9 (6th Cir. 1967), cert. den., 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 135–136, 24 L.Ed. 1000 (1878); The Barbed Wire Patent, 143 U.S. 275, 285, 292, 36 L.Ed. 157 (1892); Warren Bros. Co. v. City of Owosso, 166 F. 309, 315–316 (6th Cir. 1909), cert. den., 214 U.S. 525, 29 S.Ct. 703, 53 L.Ed. 1067 (1909).

■ The alleged sale or offer to sell must be a bona fide commercial transaction for profit and be a sale of the perfected device. A sale for experimental purposes, even if profitable, is not an anticipation. Goodwin v. Borg-Warner

Corp., 157 F.2d 267, 273–274 (6th Cir. 1946), cert. den. 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683 (1946); Ushakoff v. United States, 327 F.2d 669, 671–672, 164 Ct.Cl. 455 (1964).

The defense of alleged prior use by Wilmington Chemical Company was presented to Judge Holtzoff and rejected. It was interposed again before Judge Watkins in Baltimore, then specifically dropped and finally resurrected before this Court.

The Wilmington Chemical report which purports to set out the work alleged as a prior use has been shown to fail as a prior printed publication and as an anticipation. The evidence of the work itself fares no better. No high Mooney rubber was shown; the amount of oil in the masterbatch is uncertain; no tire tread, or any other compound, was shown to have been made from the masterbatch. Firestone admits that the only attempt at compounding the material failed utterly. This work was unproved, not public, and at most an abandoned, unsuccessful experiment, never repeated.

The alleged prior use of the Test 123 was also before Judge Holtzoff (by way of the testimony of Dr. Reynolds of Phillips). The government's final report of Tire Test 123 (urged here as an anticipating reference by Firestone) was put before Judge Holtzoff by General as evidence of unobviousness. As with the Rostler work, it was undisputed that Tire Test 123 was an experiment. Again, as with the Rostler work, there can be no dispute that the Tire Test 123 work on the allegedly high Mooney rubbers was an abandoned experiment. Either of these reasons, standing alone, is sufficient to overcome the defense.

Information relating to Tire Test 123 was not available to the public. It qualifies, therefore, neither as prior public knowledge nor prior public use. It is clear that there was no "sale" or offer of sale with respect to the tires of Tire Test 123 within the meaning of 35 U.S.C. § 102(b). This work was not proved by evidence of what was actually done, nor did it constitute an anticipation of the invention of the patent in suit. It was at most an abandoned experiment which led away from the invention by recommending the use of 50 Mooney cold rubber with two parts of softener as the direction in which the industry should proceed.

Firestone's main defense of invalidity is based on 35 U.S.C. § 103, which provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

Exercising the human inclination to hindsight Firestone assembled its 144 references and selected from them bits of information which it pieced together to form a mosaic *now* said to point like an arrow directly to the invention. This approach is not permitted by 35 U.S.C. § 103 or the case law.

In applying the test of obviousness, the Court must determine the pertinent art and the level of ordinary skill possessed by the person in that art. The scope and content of the prior art and the differences between that art and the claimed invention must also be determined. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 168 USPQ 449, 450–51 (6th Cir. 1971).

The claims and specification are to be read together, with a view to ascertaining the invention against which the prior art is to be applied, United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). This application must be carried out not by hindsight, but with foresight applied as of the date of the invention. Goodyear Tire

& Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944); Diamond Rubber Co. v. Consol. Rubber Tire Co., 220 U.S. 428, 434–435, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034 (1909); Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177 (1892); Simplicity Mfg. Co. v. Quick Mfg. Co., 355 F.2d 1012, 1015 (6th Cir. 1966).

In assessing the prior art, the Court must have regard for all of the signposts contained in it. It must consider the passages and references which point away from the invention as well as those said to point toward it. Known disadvantages in old devices which would naturally discourage search for new inventions may be taken into account in determining unobviousness. United States v. Adams, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). What would have been obvious to one skilled in the art at the time the invention was made is determined in view of the sum of all the relevant teachings in the art, not in view of first one and then another of the isolated teachings of the art. Application of Kuderna, 426 F.2d 385, 389 (C.C.P.A.1970). Mr. Justice Graham, in England, expressed this principle succinctly, as applied to the U.K. counterpart of the patent in suit, at GX2520, pp. 63–64:

> "The whole of the relevant prior art must be assumed to be in the mind of the skilled addressee and this may well produce, and would produce here, as the history of the matter shows, quite a different result from that which would be produced if a careful selection from prior art is made, having the invention which is sought to be attacked in mind."

The above cases set the legal framework within which the Court is to determine obviousness or unobviousness. These bare bone principles are not always easy to apply, however, since they tend to treat as objective a test which is fundamentally subjective. Consequently, courts have developed certain empirical

signposts of invention, not in derogation of the statutory test of invention, but in implementation of it. Judge Learned Hand was one of the first to clearly express this concept. In Safety Care Heating & Lighting Co. v. General Electric Co., 155 F.2d 937, 939 (2d Cir. 1946), he said that, insofar as the information was available, courts had best appraise invention:

> ". . . by the circumstances which preceded, attended and succeeded the appearance of the invention. Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after: and—perhaps most important of all—the extent to which it superseded what had gone before. We have repeatedly declared that in our judgment this approach is more reliable than *apriori* conclusions drawn from vaporous, and almost inevitably self-dependent, general propositions."

More recently, the Supreme Court has spoken on this subject, holding in *Graham, supra*, 383 U.S. at pp. 17–18, 86 S.Ct. at 694:

> "Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject sought to be patented. As indicia of obviousness or unobviousness, these inquiries may have relevancy."

In United States v. Adams, 383 U.S. 39, 51–52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), the Supreme Court expanded upon the secondary considerations enumerated in *Graham*. Among the considerations relied upon in the Court's finding of unobviousness were: the obtaining of unexpected results arising from a novel, interacting combination of old elements; the initial expressions of disbelief by those skilled in the art, followed by widespread adoption of the invention; and

the fact that the combination of elements was made in the face of respected and long-accepted teachings in the art which would naturally discourage the combination.

The patentees' overcoming of a "technological block" (that large quantities of oil could not be used in quality products such as tire treads) which those skilled in the art had not previously eliminated also constitutes cogent evidence of invention. Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034 (1909); Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944); National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224, 240 (6th Cir. 1959), cert. den., 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960); Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828, 838 (6th Cir. 1956); H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 163 USPQ 106, 114–15 (N.D. Ohio 1969), aff'd, 168 USPQ 449 (6th Cir. 1971); Schnell v. Allbright-Nell Co., 348 F.2d 444, 447 (7th Cir. 1965), cert. den., 383 U.S. 934, 86 S.Ct. 1062, 15 L. Ed.2d 851 (1966).

Courts have also held that while lack of commercial recognition of a reference may not be relevant to the issue of anticipation (compare Tillotson Mfg. Co. v. Textron, Inc., Homelite, 337 F.2d 833, 837 (6th Cir. 1964) and Kaiser Industries Corp. v. McLouth Steel Corp., 400 F.2d 36, 45 (6th Cir. 1968), with Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435, 446 (W.D.Mich. 1969), aff'd, 430 F.2d 221 (6th Cir. 1970), the failure of such reference to get recognition in the trade is relevant to a showing of unobviousness. Campbell v. Mueller, 159 F.2d 803, 808–809 (6th Cir. 1947); Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 298 F. Supp. 435, 446, aff'd, 430 F.2d 221 (6th Cir. 1970). These cases are pertinent in evaluating work such as that of McMillan, Rostler, the German art, Tire Test 123, and the rest of Firestone's references, since none was commercially significant.

All of the indicators of unobviousness approved by the courts are present: the reaction of disbelief and skepticism by those skilled in the art, followed by surprise, praise, and total adoption; the revolutionary commercial success; the enormous savings gained by using the invention; the fact that every significant tire manufacturer, except Firestone, has taken a license; the long-felt need, unsolved by others working on the problem with great incentive, both from the standpoint of economics and national security; and the solution by the inventors, reached in part by accident and flying in the face of long-accepted teachings against the combination of the invention.

After the fact, Firestone has assembled dozens of references from which they argue obviousness, yet they cannot explain why the industry did not think to use this "obvious" invention to effect great savings and alleviate the shortage of rubber-producing capacity in 1950. After the fact, Firestone presented witnesses who say it had all been known before, yet they cannot explain where the pioneers were when the invention was made. Dr. Semon was presented as one of the outstanding men in the rubber industry, with over 100 patents and many high awards. His skill was above that of the man of "ordinary" skill in the art, yet the invention was unobvious to him. After the fact, counsel for Firestone disparaged the invention, yet Firestone had praised it, and even now says that it could not operate its tire factories without using it (GX2687, pp. 5–9). General's invention is proved unobvious by the genuine, contemporaneous reactions of those skilled in the art.

Firestone asserts a royalty-free license (said to have been given it by the government which is said to have obtained it under the provisions of General's Research Contract) as a defense to General's charge of infringement in the manufacture of tire treads and tread stocks. The first relevant inquiry, therefore, should be whether the express terms of that Research Contract (said to

be unambiguous by Firestone) provide for any license to tire treads or tread stocks. The answer is clearly, no; the clear, unambiguous language of the contract excludes the license Firestone seeks. Paragraph 3 limits the scope of authorized research (and accompanying license) to the production of rubber and carbon black masterbatches. It was never further extended in any material respect. Paragraph 6, the only paragraph which could provide for the submission of information (and an accompanying license) beyond the scope of Paragraph 3, specifically excludes *"subsequent compounding,"* that is, the process of making a tire tread or other end-products from rubber.

 If there were any doubt, the history of the Research Contract makes it clear that the plain meaning of its terms was the intended meaning.[4] It shows that prior to the passage of the Rubber Act of 1948, the government expressly authorized research and acquired license rights in the fields of rubber compounding and end-products. This was accomplished by agreements such as the Cross-License, Compounding, and Patent Agreements Relating to Research Work (none of which was entered into by General). The Rubber Act did not authorize such research, however; it limited government research to the improvement of synthetic rubber per se. This Act necessitated the renegotiation of the research arrangements previously in effect, with the result that all reference to research or license rights with respect to compounding, tires, treads, tread compounds, or other end-products was eliminated. See 11 O.Jur.2d 410, Contracts § 163.

 Another relevant factor in the construction of the Research Contract (if construction is deemed necessary) is General's Operating Agreement, of which it is a part. The Operating Agreement

clearly related only to the production of synthetic rubber, made to government specifications in the government-owned plant at Baytown, Texas. It had nothing to do with compounding, tire treads, or end-products. Section 3(i), which provided for research expenditures, to the extent approved in advance by Rubber Reserve, was specifically limited to "processes used or intended to be used" in the "manufacture of Synthetic Rubber." Correspondingly, any license rights granted to the government by Section 8 of the Operating Agreement were limited to the "manufacture of Synthetic Rubber." While General did not engage in any research provided for under the Operating Agreement, its Research Contract, when entered into, was specifically stated to be in implementation of and pursuant to Section 8 of the Operating Agreement. It is, therefore, clear that the research authorized and rights acquired by the Research Contract could be no broader than those under the Operating Agreement of which the Research Contract was a part:

"... A contract should be construed in the light of a previous contract which is evidently designed to control the relations of the parties for a period covered by the latter contract, unless the latter contract is manifestly an abrogation of the former.

"When a written agreement consists of more than one distinct writing or contract, the different provisions of all should be given due weight in ascertaining the intended meaning of any portion of the same. . . 11 O. Jur.2d 395, Contracts § 149."

The patent does not claim any invention made as a result of or as part of the work done by General under the Research Contract. The invention was made privately, at General's own expense. It was completed before any work at Baytown on oil-extended rubber is

4. Both Firestone and General say that the contract is unambiguous, but disagree as to its meaning. Its history may, therefore, be relevant to show the variance between that history and the meaning Firestone now says should be given to its language.

even alleged to have taken place. In fact, no invention (patented or otherwise) is charged to have been made by General as a part of the government-reimbursed research, nor is it charged that General failed to provide the government with all information relating to its reimbursed work. Firestone has not even charged that it uses any information generated by General under the Research Contract in the manufacture of its infringing products.

■ It is apparent that Firestone does not have an expressed license covering the invention of the patent in suit. Its main theory on this issue is one of implied license, based on the premise that the main, but by no means only, use of synthetic rubber is in tires. Therefore, Firestone argues, it must follow that the government, which was interested in establishing a viable synthetic rubber industry, would demand a license to the rubber's chief end-product as well as to the rubber itself, and that the Research Contract should be read as if it had done so.[5] Andrews v. Deering Milliken, Inc., 382 F.2d 799, 803 (6th Cir. 1967).

This argument is unsound because it asks the wrong question. The question is not why the government did what it did, but what did it do. The fact is that the plain language of the contract, never modified, does not authorize research or grant licenses in the fields of compounded goods or end-products for rubber. If a "why" is of interest, the Rubber Act provides the answer, as discussed above.

There are many factors negating any implied license to tire treads or tread stocks. Perhaps the most striking is the parties' mutual understanding of the key terms of the contract, expressed during the negotiations.

On December 7, 1949, Mr. Knowlton, General's chief negotiator and General Counsel, wrote to Mr. Hadlock, the Government's negotiator and Executive Director of Rubber Reserve, regarding the meaning of paragraph 7 (the license paragraph) of the proposed Research Agreement furnished with Hadlock's letter of November 23, 1949. Messrs. Knowlton and Hadlock discussed this paragraph by phone on December 9 and each made notes, Hadlock's on the original and Knowlton's on the retained copy of the December 7 letter. In addition, Mr. Knowlton made a separate memorandum on December 9, wrote a letter to Mr. McCoy, General's outside counsel, on December 13, and wrote a confirming letter to Hadlock on December 16. The clear intent of both parties is summarized in the December 16 letter which states that the words "without limitation" in paragraph 7(1) of the agreement refer:

"... to the kind of use that RFC may make of the invention and the resulting information relative to production [of synthetic rubber], and do not refer to the subsequent use of the product in other patentable combinations."

Thus, the understanding of both parties at the time the agreement was executed conformed with the plain meaning of the agreement—that no license rights with respect to end-products were to be conveyed.

■■ It is elemental that a license cannot be implied when there is an expressed license which is explicit. Hazen Mfg. Co. v. Wareham, 242 F. 642, 647 (6th Cir. 1917); Henry J. Kaiser Co. v. McLouth Steel Corp., 175 F.Supp. 743, 749 (E.D.Mich.1959), aff'd, 277 F.2d 458 (6th Cir. 1960). A license cannot be implied contrary to the intent of the parties to an express agreement covering the subject matter. Negotiations leading up to the express agreement are clearly (and necessarily) to be considered in determining this intent of the parties and, where the terms are in dispute, in construing the contract. Corbett v. Winston Elkhorn Coal Co., 296 F. 577, 579 (6th Cir. 1924); Owensboro Ditcher &

---

5. Firestone admitted in oral argument that the government was not interested in and had no intention of entering the tire-making business.

Grader Co. v. Markham, 32 F.2d 564, 566 (6th Cir. 1929).

■■ While the sale of a product which has only one use may carry with it an implied license to use it in the intended way, such license does not attach where, as here, it is stipulated that the product has other important uses. Further, the right to "use" a product such as a rubber masterbatch refers to the right to use the masterbatch itself, so long as it retains its separate identity. It does not extend to uses in other patentable combinations. Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co., 232 U.S. 413, 34 S.Ct. 403, 58 L.Ed. 663 (1914); Nachman Spring-Filled Corp. v. Kay Mfg. Corp., 78 F.2d 653, 657 (2d Cir. 1935); See also, Aralac, Inc. v. Hat Corporation of America, 166 F.2d 286, 293 (3rd Cir. 1948). *Rubber Tire Wheel* held that Goodyear's rights in its rubber, one use of which was in a patented tire combination, did not extend to the use of the rubber in that combination. The Supreme Court held that Goodyear's rights in the rubber attached to it as an article of commerce:

" . . . and it continues only so long as the commodity to which the right applies retains its separate identity. If that commodity is combined with other things in the process of the manufacture of a new commodity, the trade right in the original part as an article of commerce is necessarily gone." 232 U.S. at 418–419, 34 S.Ct. at 405:

Since the government had no license, the question whether Firestone obtained it from the government need hardly be argued. It is apparent from these findings that the government had no authority, intent, or justification for giving away valuable patent rights relating to tires in connection with the sale of its synthetic rubber plants. By Firestone's own estimates, this would have been a multimillion dollar bonanza, completely without consideration to the government (DX 1836). Certainly, it cannot be assumed that the Disposal Commission had authority to give away valuable government rights.

■ In order to constitute a waiver, there must be an intentional relinquishment of a known right. The facts show no such intent or action on General's part. Further, there is no evidence that either the government or Firestone were misled or relied upon any of General's actions. American Locomotive Co. v. Chemical Research Corp., 171 F.2d 115, 121 (6th Cir. 1949); Everhart v. State Life Ins. Co., 154 F.2d 347, 356 (6th Cir. 1946); Joyce v. Gentsch, 141 F.2d 891, 897 (6th Cir. 1944); In re Euclid Doan Co., 104 F.2d 712, 715 (6th Cir. 1939).

■ Firestone's estoppel theory is self-defeating. If the government were not entitled to a license, then everything General is accused of was perfectly proper and consistent with there being no license. If the government were entitled to a license, then any action by General in attempting to avoid the license would have been ineffective and, hence, irrelevant.

■■ Firestone has raised certain miscellaneous defenses, including a charge that the patent is invalid for failure to comply with the requirements of 35 U.S.C. § 112; that the patent is invalid because of an alleged fraud on the Patent Office; and that the patent is unenforceable because of an alleged misuse. These allegations, dubious from the outset, were shown to be without substance or relevance at the trial.

It is clear that the patent in suit is valid, infringed, enforceable, and not licensed. According to pretrial agreement, the amount and measure of damages arising from Firestone's infringing acts need not be argued or decided now. This issue will be left to a subsequent proceeding, after appellate procedures have been exhausted.

Similarly, the amount of any award arising from the Court's ruling on the question of "costs, attorneys' fees, and punitive damages," deferred in this Court's Memorandum and Order of June 22, 1970 (revised as of June 26, 1972),

349 F.Supp. 333 can properly be left to a proceeding subsequent to appellate review of the finding of fraud pursuant to Rule 54(b), F.R.Civ.P. and so it shall be.

Therefore, it is hereby ordered that U. S. Patent 2,964,083 is valid, enforceable, infringed, and not licensed. This holding (but not the accounting) is specifically directed to the infringement of representative Claims 1, 3–5, 7, 13, 14, 17–19, and 22 by representative Stock A, Blend 2, and Blend 5 (and tires whose treads are made therefrom) in view of the pretrial order limiting trial to those representative stocks and claims.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

*The Parties, Actions, and Jurisdiction.*

1. This is a patent infringement action involving The General Tire & Rubber Company (hereafter "General"), an Ohio corporation whose principal place of business is in Akron, Ohio, and The Firestone Tire & Rubber Company (hereafter "Firestone"), also an Ohio corporation whose principal place of business is in Akron, Ohio.

2. The patent in suit, U. S. Patent No. 2,964,083 entitled "Pneumatic Tires and Tread Stock Composition," was issued to General on December 13, 1960, and is and has been owned by General since that date.

GX2516 [1] par. 1

3. The history of litigation with respect to this patent has been complex and protracted. Infringement actions on the patent have been brought in this Court by General against Firestone, Goodyear, Uniroyal, Goodrich, Mohawk, Dunlop, Mansfield, Denman, McCreary, and Seilon. With the exception of Firestone, these actions have been settled. In addition, General has entered into li-

cense agreements under the patent with Armstrong, Carlisle, Cooper, Gates, Hercules, and Schenuit. Foreign counterparts of the patent in suit have been or are being litigated in at least England, France, South Africa, and Mexico.

| | | |
|---|---|---|
| FX2897 | FX2946 | GX2519 |
| GX2675 | FX2947 | FX2948 |
| GX2520 | GX2518 | |

4. For practical purposes, the controversy has narrowed to one between General and Firestone. Its entry into the legal arena began on March 30, 1961, when Firestone and coplaintiff, McCreary Tire & Rubber Company, filed a declaratory judgment complaint against General in Baltimore, Maryland. That action (hereafter the "Baltimore case") sought a declaration that the patent in suit was invalid, not infringed, and licensed to Firestone royalty-free. General responded on April 4, 1961, by filing an infringement action against Firestone in this Court (hereafter the "Cleveland case"), thus joining Firestone to the ranks of Goodyear and Uniroyal (then U. S. Rubber) whom General had sued for infringement in this Court on December 13, 1960, the day the patent issued. Also, on October 23, 1961, General filed a counterclaim for infringement in the Baltimore case.

Complaint (C67–206)
Complaint (36,799)
Counterclaim (C67–206)

5. General's prosecution of the Cleveland infringement action against Firestone was enjoined by the Baltimore Court, and trial of the Baltimore case commenced April 15, 1964. That trial continued until January 11, 1967, during which time a record of some 38,000 pages of transcript and over 2,000 identified exhibits was amassed.

130 U.S.P.Q. 138, 139
B1
B38,267

6. On January 11, 1967, the United States Court of Appeals for the Fourth

---

[1]. Throughout, the following code will apply: "DX"—General Baltimore exhibit; "PX"—Firestone Baltimore exhibit; "GX"—General Cleveland exhibit; "FX"—Firestone Cleveland exhibit; "B1000"—Baltimore transcript page; "C1000"—Cleveland transcript page.

Circuit, acting upon a petition for writ of mandamus filed by General, entered an opinion, and the next day a formal order, directing the Baltimore Court to transfer the Baltimore case to this Court. The reasons for this transfer and a detailed history of the Baltimore case appear in the opinion of the Court of Appeals reported at 373 F.2d 361.

*Writ, January 12, 1967*

7. The transfer became final once the Supreme Court denied Firestone's petition for certiorari; this Court then dissolved the injunction prohibiting General from proceeding in the Cleveland case and the parties began preparation for trial. During the course of that preparation they were required to submit detailed outlines of their cases, including lists of issues, witnesses, documents to be relied upon, and evidence expected to be elicited. In addition, some 16 pretrial conferences were held. Following the guidelines set out in the Handbook of Recommended Procedures for the Trial of Protracted Cases adopted by the Judicial Conference of the United States and, later, the Manual for Complex and Multidistrict Litigation, the Court and the parties expended substantial efforts to clarify and narrow issues and to set ground rules prior to trial to the end that the trial would not be unduly protracted.

386 U.S. 960, 87 S.Ct. 1031, 18 L.Ed.2d 109 (1967)
Pretrial Conf. June 14, 1968, pp. 28–32

8. On June 22, 1970, this Court, acting upon General's motion, entered a memorandum opinion and order dismissing Firestone's declaratory complaint in the Baltimore case for fraud and unclean hands and as being unnecessary for the full protection of Firestone's rights in defending against General's infringement action. That memorandum and order also consolidated all other litigable issues in the Baltimore case with General's infringement complaint in the Cleveland case and deferred consideration of the question of costs, attorneys' fees, and punitive damages arising from the Court's determination of fraud.[2]

*Memorandum Opinion and Order, June 22, 1970, pp. 12–15*

9. In its memorandum and order of June 22, 1970, the Court also denied Firestone's motion to dismiss both the Cleveland and Baltimore cases for an alleged patent misuse by General.[3] The memorandum and order of June 22, 1970, constitutes this Court's Findings of Fact and Conclusions of Law with respect to the issues therein decided.

*Memorandum Opinion and Order pp. 24–25*

10. Trial of the Cleveland case and all litigable issues from the Baltimore case commenced September 30, 1970, and concluded January 22, 1971, after some 45 days of trial. The Cleveland record comprises nearly 6,000 pages of transcript and over 600 identified exhibits. The entirety of the Baltimore record, except insofar as portions of it were struck or limited on motion of one or the other of the parties, also has been made a part of the record of this action.

C1
C5904

11. The findings and conclusions made herein are applicable to both the Cleveland case and all remaining litigable issues in the Baltimore case, including the previously reserved questions of costs, attorneys' fees, and punitive damages arising from the prior finding of fraud.

12. This Court has jurisdiction of the parties and subject matter. Venue in this District is proper.

*The Issues.*

13. The claims of the patent in suit fall into two main groups: those directed to pneumatic tires (claims 1–12) and

---

2. Firestone's appeal from this order was dismissed. 431 F.2d 1199 (6th Cir. 1970), cert. den. 401 U.S. 975, 91 S.Ct. 1196, 28 L.Ed.2d 325 (1971).

3. Firestone's petition for writ of mandamus with respect to this order was denied. 431 F.2d 1199 (6th Cir. 1970).

those directed to a vulcanizable rubber tire tread stock (claims 13–22).

GX2516, par. 2

14. Paragraph 34 of Agreed Statement of Facts No. 1 charts some 20 Firestone tire tread stocks which are charged with infringement of tread stock claims 13–22 and, when applied as the vulcanized tread portion of a pneumatic tire, with infringement of all but claims 9 and 10 of the pneumatic tire claims.

GX2516, par. 2 & 34

15. For purposes of limiting the length of trial, the number of claims in issue was reduced to 11 representative claims (1, 3–5, 7, 13, 14, 17–19, and 22) and the number of tread stocks to three representative stocks (Stock A, Blend 2, and Blend 5).

Memorandum Opinion and Order, Sept. 23, 1970

16. Firestone denies infringement, asserts invalidity of the patent, and claims a royalty-free license under the patent arising out of a research agreement entered into between General and the United States. Ancillary to its claim of license, Firestone also contends that the patent is unenforceable for unclean hands due to an alleged violation by General of its fiduciary duties to the United States and that General has waived its right to enforce the patent due to other alleged breaches of its obligations to the United States. Finally, Firestone has raised the defense of patent misuse against the enforceability of the patent. These defenses will be considered individually below.

Firestone Pretrial Brief

*The Patent.*

17. The application for the patent in suit was filed November 20, 1950, in the names of Emert S. Pfau, Gilbert H. Swart, and Kermit V. Weinstock. At that date Mr. Swart was General's director of research; Mr. Pfau was a polymerization chemist and Mr. Wein-

stock was a research compounder, both working under Mr. Swart.

Pfau, B709–12 Weinstock,[4] DX1367 pp.
Swart, B7255–58, 33–34
 7281 GX2680, pp. 7–8
DX1001

18. The course of the application in the Patent Office was unusual and protracted. It was assigned originally to Division 45, a Patent Office examining unit which deals with tires. The application was allowed by the appropriate examiner in Division 45 on December 10, 1954. The applicants promptly paid the required final fee, leaving only the mechanical task of printing to be accomplished before the patent would issue. On December 28, 1954, however, another examiner (assigned to Division 50, a unit which deals with synthetic rubber) requested that the application be withdrawn from issue and transferred to his unit. This request was granted by the appropriate authorities. The Division 50 examiner eventually rejected the application, and his rejection was upheld by the Patent Office Board of Appeals.

PX1001 184 F.Supp. 344, 346
DX1002

19. Following the rejection by the Patent Office, suit was brought against the Commission of Patents in the federal district court for the District of Columbia pursuant to 35 U.S.C. § 145 to secure an adjudication that General was entitled to a patent. Trial of that action was had in June, 1960, before Judge Holtzoff. The Commissioner of Patents was represented by counsel for the Patent Office and, in what appears to have been an unprecedented action, also by counsel from the Department of Justice. Judge Holtzoff heard testimony from 19 witnesses (including 6 deposition witnesses).

184 F.Supp. 344 DX1393
DX1002

20. After considering the evidence, Judge Holtzoff entered his opinion and findings that General was entitled to a

---

4. Weinstock died prior to trial. His depositions, previously taken in the Baltimore case and in the Goodyear case, were marked and received as physical exhibits.

patent. Prosecution then resumed in the Patent Office where certain other claims were added and allowed, and the patent issued on December 13, 1960, ten years after the application had been filed.

> 184 F.Supp. 344 PX1001
> DX1002

21. It is apparent from the above history of the prosecution of the patent in suit that the question of invention has undergone not only the careful scrutiny of the Patent Office, *ex parte*, but has also been subjected to the adversary processes of the federal court system, prior to its presentation to this Court. Because the patent was granted after such adversary proceedings, the Court finds that the presumption of validity attaching to the issuance of the patent is strengthened substantially.

> PX1001 DX1002
> DX1393

*The Art.*

22. The invention, to use the words of the patent, "relates to pneumatic tires having extruded tread portions of an exceedingly tough synthetic rubber." In order to understand the context and the subject matter of the invention, it is necessary first to understand the relevant art at the time of the invention.

> DX1001, Col. 1, lines 18–19

23. The basic ingredient in a pneumatic tire tread is rubber. Prior to World War II, natural rubber, procured in the form of a milk-like latex from rubber trees, was used for this purpose. During the war, however, both Germany and the United States were cut off from the major sources of natural rubber and both were forced to turn to the production of synthetic rubber as a substitute.

> GX2516, par. 6, 13 & 14 DX1288, pp. 17–23

24. Germany had developed a number of types of synthetic rubbers prior to 1940, including one which had commercial promise for the making of tire treads. In anticipation of the possibility of war, the Germans had taken an early lead in the commercial production of this rubber, made from the chemicals butadiene and styrene, and known as "Buna S." While information concerning Buna S was available in the United States before the war and the product was familiar to some of our scientists on a laboratory basis, it had not been produced here commercially.

> GX2516, par. 13 & 14 DX1288, pp. 17–23

25. In the early 1940's the United States began the commercial production of butadiene-styrene synthetic rubber under the control of, and in plants owned by, the Government. This rubber was also called Buna S, even though its characteristics were quite different from the German Buna S (as will be discussed later). In 1942, the Government issued a directive that the American butadiene-styrene rubber should be called GR-S (government rubber-styrene), but for some time thereafter the American rubber was referred to in this country by both designations. After the Government relinquished control of the rubber program, it became known by its present designation, SBR (styrene-butadiene rubber).

> GX2516, par. 14 & 15 Gruber, C134–40, 150
> PX1988 tab B DX1752, p. 1
> PX1993

26. The GR-S rubber produced in the United States prior to 1955 was made in government-owned plants controlled by a government agency known as the Office of Rubber Reserve but operated by private companies. The normal manufacturing procedure was as follows: liquid butadiene, a conjugated diolefine having four carbon atoms, was mixed with a water emulsion of styrene in the presence of the necessary chemicals to start and control the polymerization reaction.[5] One of the added chemicals was known as a modifier. Its function was to "modify" the reaction to produce a poly-

---

5. Polymerization refers to the joining of molecules in a chain which can be visualized as the fastening together of a chain of paper clips. The product of a polymerization reaction is called a polymer. The building blocks, butadiene and styrene, are called monomers.

mer of a given plasticity. The more modifier added, the shorter the molecular chains and more plastic or workable the rubber.[6] At the desired time, usually when the polymerization reaction was about 70% complete, another chemical, called a "shortstop," was added to terminate the reaction.

GX2516, par. 15 Gruber, C133–141
DX1288, pp. 17–39, 270–75

27. This polymerization reaction produced a latex of extremely small rubber particles dispersed in water. The rubber particles were then precipitated out of the dispersion (coagulated) by the addition of an acid, and the resultant rubber, looking somewhat like cottage cheese, was then washed, dried, and compressed into bales weighing about 75 pounds. This bale of rubber was the end product of the American synthetic rubber plants. A few plants, such as the one operated by General at Baytown, Texas, added carbon black prior to the coagulation of the latex and thus produced as an end product a bale of rubber and carbon black known as a carbon black masterbatch.

GX2516, par. 16 GX2522, p. 672

28. The bales of rubber from the polymer plants were then sold to various manufacturers of rubber products, most notably tire makers.[7] Tire makers in the United States insisted upon a synthetic rubber with a plasticity such that it could be processed in the same manner, on the same equipment, and in the same times as had been usual for processing natural rubber. This led the Government to specify that all standard GR-S be modified to a plasticity which would al-

low the rubber to be processed in the time and equipment usual for natural rubber (about 50 Mooney).[8]

GX2516, par. 14 GX2522, p. 373
DX1288, pp. 53–58, 69–89

29. Thus, in this country, plasticity became one of the most important controls in the production of synthetic rubber, and, in 1942–43, the Mooney plastometer (named after Dr. Melvin Mooney) came into use as the standard measurement for this plasticity. A Mooney machine measures the resistance to rotation of a serrated metal disk embedded in a rubber sample heated to 212° F and registers this resistance to shearing forces on a dial in Mooney units. The higher the Mooney reading of a given rubber, the less plastic and more difficult it is to process.

GX2516, par. 3 & 4 Soday, C3486–87

30. Two types of disks or rotors may be used in the Mooney machine—large and small. The shorthand notation for the Mooney reading indicates which rotor was used: "ML–4"—large rotor reading after 4 minutes of rotation (not counting a 1 minute initial warmup period); "MS–4"—small rotor after 4 minutes.[9] Large rotor Mooney readings above 120 may be unreliable since the specimen may slip or tear as the rotor turns, thereby giving a reading which is lower than it should be. The small rotor reduces the shearing force and overloading of the machine and is generally considered to provide more reliable readings on the tougher rubbers, although it too is subject to increasing unreliability as the toughness becomes extreme. It is generally accepted that small rotor units

6. The polymerization reaction can be varied to produce a product which varies from a honey-like liquid to a hard solid, including all ranges of plasticity between these extremes. As a general statement the tougher or less plastic the rubber, the longer the molecular chain and, accordingly, the better the abrasion resistance of the rubber.

7. While most SBR rubber is used by the tire industry, there are other substantial

uses such as in belting, hose, automotive parts, shoe soles and heels, sporting goods, coated fabrics, molded parts, household and mechanical goods, rubber mats, and flooring.

8. "Mooney" is described in Findings 29–30.

9. Where no shorthand notation appears, it is understood that the large rotor is referred to.

may be converted to large by multiplying the small rotor reading by 1.8.

GX 2516, par. 3 & 4 Baker, B520, 5549–50
 Niemeyer, B11,284–85

31. At an early date, the standard government plasticity specification for GR-S rubber was set at 50 Mooney. Prior to this, some GR-S had been made at 60 Mooney or possibly 65, but the tire makers complained that even at this figure they had difficulty processing the rubber because it was "too tough" and accordingly the Mooney was adjusted to 50–5.[10]

GX2516, par. 5 & 14 Baker, B5157, 6635–41
DX1152 tab 25–F Alliger, C418–19
GX2522, pp. 375,806

32. Butadiene-styrene rubber having a Mooney of about 100 (known as GR-S 85) was available in this country from about 1943. Although GR-S 85 was used to some extent for asbestos packing, it was not used for tire treads, despite its known superior properties. The compounding committee of Rubber Reserve, made up of representatives of Goodyear, Firestone, Goodrich, and U. S. Rubber, declined even to test a GR-S in this Mooney range.

DX1272 tabs F & H Soday, C3497–3502

33. A major difference between the synthetic rubber produced in America and Germany was that the Germans added little or no modifier in their polymerization reaction. As a result their rubber, as shipped from the polymer plant, had little plasticity and could not be used by the tire makers until after it had been put through a special treating process. This process, known as heat treatment or heat degradation, involved heating the rubber in large ovens in the presence of air or oxygen, causing the long-chain molecules to break and the rubber to become more plastic.

PX1221, tabs A & B GX2522, pp. 373, 937–86
DX1288, pp. 17–23

34. In other words, a German polymer maker produced a form of rubber which its tire-producing customer could not process without first installing expensive and massive equipment to heat the rubber in the presence of air, thereby oxidizing and softening it. This heat degradation had to be carried out at the tire factory rather than at the polymer plant because the heat softened rubber returned to an unworkable plasticity if not used within a few days of the heat softening operation and could not be re-softened. This was in contrast to the rubber produced by the American polymer plants, which, because its plasticity had been modified, was ready for use by the tire maker without any treatment to make it more plastic.

PX1221, tabs A & B GX2683, tabs 136A, 138
DX1288, pp. 17–23 GX2522, pp. 373, 937–86

35. Even with heat degradation the German tire plants were not able to use their existing equipment, designed for processing natural rubber, without both slowing the equipment and extending the processing times.

PX1221, tabs A & B

36. The Germans did not use the Mooney machine, nor measure plasticity as such, but measured the hardness of their rubber with an instrument known as the "defo" machine. This machine measured the weight required to produce a given vertical compression of a standard sized rubber sample in a given time and its recovery in a given time after removal of the weight, unlike the Mooney machine which measured the shearing resistance of a sample to the rotation of a disk which is embedded in it.[11] There is no generally recognized correla-

---

10. Natural rubber has a Mooney of about 120, but unlike synthetic rubber, it quickly becomes more plastic when worked (reducing its Mooney to about 50) and causes no processing difficulty. It was necessary, however, to increase its plasticity by subjecting the natural rubber alone to a milling operation prior to the incorporation of carbon black.

11. Other devices which have been used to measure plasticity include the Scott, Williams, and Hoekstra machines. While all plasticity measuring instruments have their shortcomings, the Mooney machine is considered to provide the most useful measurement of plasticity. It is now used throughout the world as the standard plasticity measurement.

tion between defo-type values and Mooney values.

GX2522, p. 939 Schadendorff, B35,379–80
GX2516, par. 3 & 4
GX2682, tabs 470, 958

37. The German and American rubbers were both polymerized at a temperature of about 122° F. In 1947–48, however, the Americans began to use what proved to be an improved GR-S which was polymerized at a temperature of about 41° F. This rubber was called "cold" rubber and the other was thereafter referred to as "hot" rubber. During the period 1948–52, cold rubber gradually replaced hot rubber as the rubber used for tire treads. As with hot GR-S, its plasticity specification was set by Rubber Reserve at about 50 Mooney, although the early commercial production was somewhat higher, in the range of 55–65 Mooney.

GX2516, par. 17 & 18 Baker, B6159–61
PX1129, p. 775

38. Depending upon the nature of the polymerization reaction, synthetic rubbers (particularly hot rubbers) characteristically contained gel structures in various amounts. Gel-molecules of rubber which are cross-linked in a manner somewhat similar to the vulcanization process was avoided where possible, because it often led to processing difficulties. One reason the polymerization process was not carried beyond about 70% completion was that the amount of gel increased rapidly beyond that point.[12]

DX1288, pp. 35–36 Semon, C3912–14, 3896
Alliger, C396 Swart, B7391–97

39. Neither natural nor synthetic rubber is useful in a tire tread unless it is mixed with a reinforcing ingredient. Further, in order to form a vulcanizable compound, sulfur (the vulcanizing agent) and chemicals such as accelerators (which speed up vulcanization) and anti-oxidants (which prevent oxidation and deterioration) are added. Except for the reinforcing ingredient, carbon black, none of these need be discussed in detail.

GX2516, par. 6 & 7

40. Carbon black is a standard ingredient added to tread compounds to improve certain important properties such as strength. Not all carbon blacks have this property. Those which do are called reinforcing blacks, the degree of reinforcement depending upon the surface area per unit weight and the structure of the carbon black particles.

GX2516, par. 7

41. Before 1940, the best available carbon blacks were the channel blacks, which in essence were lampblacks made by the incomplete burning of natural gas in close proximity to a cold metal channel (I-beam) upon which the black was deposited. One useful type of channel black was known as EPC (easy processing channel).

GX2516, par. 7

42. During World War II, furnace blacks began to be produced. These blacks, made by cracking natural gas in a furnace, had about the same particle size as the channel blacks, but had a different particle structure, were alkaline rather than acid, and were more difficult to work into the rubber. An improved furnace black, known as Philblack O, was developed by Phillips Petroleum about 1946–47 and went into commercial use about 1948. Other things being equal, this black produced improved abrasion resistance over EPC in both hot and cold rubber tread recipes.

GX2516, par. 7

43. Philblack O and blacks of this type made by others became known as HAF (high abrasion furnace) blacks.

---

12. There are two types of gel, macro and micro. Macro gel is the material left after rubber is dissolved in benzene and passed through a fine screen. The character of macro gel is further defined by a "swelling index" which is the percent of solvent which can be held by the gel. A gel having a swelling index of 50 or less is considered a "tight" gel. Gels with a higher swelling index could normally be made soluble by slight working on a mill. "Micro gel" is not caught on the gel screen.

There are many commercial HAF blacks which can be used interchangeably. For example, Firestone uses Statex-R (Columbian Carbon Company), Philblack O (Phillips Petroleum Company), Aromex HAF (J. M. Huber Corporation), and Vulcan 3 (Cabot Carbon Company) all interchangeably.

GX2516, par. 7

44. Subsequent to the introduction of the high abrasion furnace blacks, reinforcing furnace blacks of smaller particle size came into commercial production. These became known as ISAF (intermediate super abrasion furnace) and SAF (super abrasion furnace) blacks. After 1960, HS and LS (high structure and low structure) furnace blacks began to be produced and used commercially. These types are designated by hyphenations, such as HAF-HS, HAF-LS, and ISAF-HS. Another type of furnace black used commercially, but not shown to be used for tire treads, is HMF (high modulus furnace) black.

GX2516, par. 7 & 34 Alliger, C436–37
GX2521, p. 17 GX2522, pp. 399–404
DX1288, pp. 245, 266

45. The amount and type of carbon black used depends upon the degree of reinforcement and other physical properties desired. With both natural and synthetic rubber, the amount of carbon black used in tread compounds was about 50 parts black to 100 parts rubber.[13]

GX2516, par. 7

46. The preparation of a tire tread compound involves the mixing (compounding) of synthetic rubber made by the polymer plants with carbon black, sulfur, and other ingredients provided by other suppliers, under carefully controlled conditions. The determination of what ingredients to use, the proportions of each, and the mixing times, procedures, and equipment to use to obtain the desired product end properties and required manufacturing efficiencies is crucial to the commercial manufacture of tire treads. This determination is arrived at through an interplay of the factory manager, who has the responsibility for the actual mixing, and the research department, which is responsible for innovations. Situated between the research department and the factory manager is the product development compounder. He has both scientific training and practical experience, and he is the referee between research and the factory. His position is similar to that of a master chef; he has the final decision with respect to the use of new rubbers and other materials, and the combinations and proportions thereof. This man is the person to whom the patent in suit is addressed and his is the art against which the invention is to be measured. Of the witnesses who testified, Mr. Baker of General and Mr. Brandau of Firestone most nearly approach this man.

GX2682, tab 111 Alliger, C450–51
Baker, B506–08 Brandau, B10,340–43

47. In 1950, the exact nature of the interactions between rubber, carbon black, sulfur, and the other ingredients was not fully understood by either the laboratory researcher or the compounder. The skilled rubber compounder knew how to make a good tread compound but he did not know with certainty why it was good. As a result, he was a very conservative person.[14] Based on past experience, the skilled compounder would not accept the suggestions of a laboratory chemist, unproved by actual road tests of tires made from the suggested composition. This was particularly true when the suggestions ran counter to the accepted expertise of his art. In short,

13. In rubber compounding, the proportions of ingredients are expressed in relation to 100 parts of rubber.

14. If he were to make a mistake it might not appear for some months after the tires were produced, by which time the mistake would have been repeated in many tires.

the art of rubber compounding was not a precise or scientifically exact art.

Baker, B3883–88; 6155–71; 6642–47
Alliger, C299; 330–31

48. In processing rubber tire treads before World War II, as now, the machinery used in America normally consisted of Banbury mixers and mills (rolls). The basic techniques now used in the tire factories for handling or processing rubber, and from it building pneumatic tires, were also developed prior to World War II. These techniques did not change materially with the advent of synthetic rubber, cold rubber, and improved carbon blacks, nor with the advent of the invention of the patent in suit.

GX2516, par. 19–22, 35 B19,058–59
DX1285 Niemeyer, B10,252–55
FX2739, pp. 11–15 & Exhibit A

49. In a typical processing procedure just prior to the invention, the rubber and carbon black, with possibly some other ingredient (but none which would cause vulcanization) were worked in the Banbury for about four and one-half minutes at a temperature of about 300° F.[15] The Banbury mixer resembled a giant dough mixer in that it had intermeshing blades which counter-rotated within a closed housing. It was (and is) a massive and expensive piece of equipment, standing over one story high.[16] It commonly mixed single batches of about 400 pounds.

GX2516, par. 19 Baker, B3650, 4516–17
 GX2521, p. 118
FX2739, pp. 11–15 & Exhibit A

50. The product as it came from the Banbury was called a masterbatch (a masterbatch being rubber plus some, but less than all, compounding ingredients). Upon removal from the Banbury, the masterbatch was formed into a sheet on a mill and set aside to cool.

It was then passed to a second Banbury, where the remaining ingredients were added and mixed for about two and one-half minutes to form the final stock. These ingredients included sulfur and chemicals to aid vulcanization. It was also customary to add a small amount of a softening oil, usually about 5 parts by weight, to facilitate processing. This oil was usually added in two parts—one in the first Banbury mixing and one in the second.[17]

GX2516, par. 19
FX2739, pp. 11–15 & Exhibit A
Baker, B6155–71; 6493–6505
Weinstock, GX2680, pp. 117–118, 130–131

51. The mixing operation is delicate. The mixing had to be thorough so that all of the ingredients were blended into a cohesive, homogeneous mass, yet this had to be accomplished at a temperature which would not scorch or prevulcanize the rubber and without excessive power demands or strain on the equipment. It also had to be done quickly, since excessive time spent in producing a batch could result in a commercially unfeasible procedure. For example, if the time required to mix a batch of rubber were doubled from six to twelve minutes, the practical effect would be that the plant capacity would be cut in half.

Baker, C5791–93
Brandau, B10,343

52. After cooling, the final stock was normally placed on a "warm-up" mill before further processing. A mill was a pair of large, smooth, metal rolls between which the rubber mixture was passed. One roll normally ran somewhat slower than the mating roll, thereby producing a pulling or shearing action on the rubber. The separation between rolls could be varied, and the width of separation determined how much work was done on the mixture; an open mill

---

15. The operating temperature of the mills and Banbury can be controlled by the flow of cooling water through cavities within the equipment.

16. A much smaller Banbury is used for laboratory mixing, of course.

17. With the advent of synthetic rubber, the amount of processing oil was generally increased to 8–12 parts, but it was kept as low as possible because of the compounder's fear of an adverse effect of the oil on the properties of the finished tire tread.

did practically no work, while a tight mill did considerable work.

GX2516, par. 19　　Baker, B601–04; 4544–48;
GX2521, "mill"　　　C5806–07

53. The warm-up mills and the mills used to form the Banbury batches into sheets (called "sheet-off" and "batch-off" mills) were set at an opening setting. Tight mills were used when ingredients were to be incorporated on the mill or when it was desired to soften the rubber by mechanical working.

GX2516, par. 9　　Baker, C5806–07

54. From the warm-up mills, the final tread stock was moved to the extruder, a screw-fed device provided at its exit end with a die of the proper shape, in cross-section, for the extrusion of a tire tread. The treads were extruded in a continuous strip and cut to the proper lengths on an angle so that the ends could be overlapped on the tire to form a smooth joint or "splice." Treads at this state were referred to as "green" treads and the compound at this stage was called a tread stock.

GX2516, par. 20 & 21　　Baker, B639–46

55. The green tread was subsequently wrapped about a previously-constructed carcass and the assemblage (at that point resembling an open-ended drum) was called a "green" tire. In order to secure the tread splice, a cement composition was employed and the meeting ends of the tread were usually mechanically pressed (stitched) together.

GX2516, par. 21

56. The green tire was then placed in a mold and heated for a predetermined time, sufficient to vulcanize the tire in its final shape. The terms "vulcanize" and "cure" were used synonymously in the tire making industry.

GX2516, par. 22
GX2521, p. 28

57. Various tests were employed to determine the physical properties of the vulcanized rubber compound. The more important ones from the standpoint of this case were tensile strength, elonga-

tion, modulus, and hysteresis or heat build-up. The American Society for Testing Materials (ASTM) has established procedures for these tests which are followed in principle by the various rubber and tire companies. This organization is also the publisher of a "Glossary of Terms Relating to Rubber and Rubber-Like Materials."

GX2516, par. 8–12
GX2521

58. Tensile strength is measured by the pulling force required to produce rupture of a standard specimen.

GX2516, par. 8

59. Elongation is the percentage by which an original marked distance on a rubber specimen will increase under a given pulling force. Ultimate elongation is the percentage at the moment of rupture.

GX2516, par. 9

60. Modulus is the force necessary to produce a stated percentage elongation. For example, modulus at 300% is the force required to produce 300% elongation.

GX2516, par. 10

61. When rubber is deformed and released, it generates heat. This property, known as heat build-up or hysteresis, is an important quality in a tire tread because, even under normal driving conditions, treads are subjected to repeated deformations. The amount of rise in temperature depends on the hysteresis characteristics of the tread, which are a function of the rubber itself and the amount and type of other compounding ingredients, particularly carbon black. If the heat build-up becomes too great, it could cause a failure or blow-out of the tire; the lower the heat build-up, the better the tread, all other things being equal. Various methods of measuring heat build-up were employed, all involving repeated deformation of a vulcanized specimen of rubber. The Goodrich Flexometer was widely used to measure the rise in temperature of a vulcanized specimen subjected to a prescribed num-

ber of rapid compressions in a specified time.

GX2516, par. 11 Semon, C4404–10

62. In summation, the conventional commercial manufacture of the tread portions of pneumatic tires at the time of the invention of the patent in suit was as follows: Butadiene-styrene rubber with a plasticity of about 50 Mooney was mixed with about 50 parts of carbon black and about 8–12 parts of hydrocarbon oil (both based on 100 parts of rubber) and mixed in a Banbury for a total of about seven minutes, then extruded to form the tread portion of the tire. The equipment, procedures, and times employed were basically the same as those that had been used for processing natural rubber prior to World War II.[18] The use of high Mooney rubber (90 Mooney and above) was avoided because it was too tough to process commercially into a tire tread or tread compound, even though it had been known from the early 1940's that its abrasion-resistant properties were superior. The use of amounts of oil beyond 8–12 parts was also avoided, even though it had been known for years that oil was a softener for rubber, because it was thought that more oil was incompatible with the maintenance of the high physical properties demanded of a tread rubber. It was in the context of this art that the inventors began their work.

GX2516, par. 19 & 22 Baker, B6493–97
FX2739, pp. 11–15 & C5790–91
 Exhibit A Niemeyer, B11,232–36

*The Invention.*

63. The work which culminated in the invention of the patent in suit was initiated by the Ohio Rubber Company's

request to Swart for assistance in developing a cheap compound for making rubber mats, such as automobile floor mats. This request was made sometime before March 15, 1949. Pfau, a former employee of Goodrich who had been recently hired to bolster General's research department (then consisting of no more than 15 technically-trained people), was assigned to this project by Swart by memo of March 21, 1949.

DX1044 Pfau, B709–11
DX1109 Weinstock, DX1367, pp. 36–46
Swart, B7279–80 GX2680, p. 8

64. Since mat stocks did not demand high quality physical properties, Pfau first approached the problem by adding large quantities of oil (50 parts) and 50 parts of clay (a non-reinforcing filler pigment) to a butadiene-styrene rubber having a Mooney of 105. The theory of this approach, worked out by Swart and Pfau, was that:

"The inherent strength and toughness of the high Mooney polymer plus its ability to absorb and retain the oil was expected to give a product of good strength and easy processability for application in such products as light colored floor matting."

DX1044 Pfau, B761–62
DX1048 (A071785) Swart, B7283

65. The work with clay proved to be a failure because the resulting compound was too soft and sticky to handle at curing temperatures. Nevertheless, work continued on this project, designated project number 104. Its obective was stated to be the "addition of high oil loadings to high Mooney GR-S to give a cheap processable stock." [19]

DX1048 (A049989) Pfau, B768–69
Swart, B7280–82 Weinstock, DX1367, p. 57

18. The premastication employed to reduce the Mooney of natural rubber from 120 to about 50 was not needed since the synthetic rubber was of 50 Mooney to begin with. Such premastication was not a commercially feasible means of treating synthetic rubbers having a Mooney about 60 because they do not readily become more plastic as a result of such treatment.

19. The patentee's work leading up to the filing of the patent application is largely

reflected in Pfau's monthly progress reports beginning with the one covering the period April, 1949. The reports for April, 1949 through October, 1950 appear in DX1048–55, 1056–57, 1059–60, 1063–64, 1066, and 1068–72. Pfau testified that he was persuaded by Weinstock to include Weinstock's work on compounding in Pfau's reports and those reports do reflect at least a portion of Weinstock's work. Swart wrote no progress reports but kept a file of those prepared by his staff.

66. In June, 1949, the inventors added 100 parts of oil to a series of butadienne-styrene copolymers, ranging from at least 71 to 169 Mooney. Convinced by then that they would have to use a filler other than clay, the inventors added carbon black as a reinforcing filler (100 parts EPC). Surprisingly, good physical properties were obtained on these compounds, and the inventors "decided to work out a rubber/oil-black masterbatch since the largest potential market should be in the field where carbon black reinforcement would be essential."

BX1050 (AO75050) Pfau, B838–40
Weinstock, DX1367, Swart, B7283–84
pp. 63–68

67. In June or July, 1949, the inventors met with Mr. L. M. Baker and, based on the physical properties they had obtained, requested that he set up a road test to evaluate their compounds "as a tractor tread or as a second line passenger tire tread compound."[20] Baker was General's Manager of Product Compounding and he was the person responsible for initiating, setting up, and evaluating road tests of new compounds, and the development and evaluation of improved tread compounds. Baker, a graduate chemist, was the man who had the responsibility for adoption of new tread compounds at General in this period—the referee between research and the factory referred to in Finding 46. In short, he was a good example of the man skilled in the art as of the date of the invention.[21] Baker turned down the inventor's request because General "did not have any particular need at that time for a second line tire."

Baker, B435–49; 498–507; 516–31; 2416–18; 6468–70

68. Work on evaluation of high Mooney rubber/oil/black masterbatches continued during July and August, 1949, with some difficulties, but with the result that very good physical properties were obtained from the compounds. During this period, the patentees had one or two further discussions with Baker. By August 15, 1949, with the help of Mr. Phillips, the man in overall charge of tire manufacturing, they had persuaded Baker to set up a development project designated by Baker as C-26. This project, entitled "Special Low Cost Wet Masterbatch for Tractor Treads and Second Line Passenger Treads," was designed to evaluate the very high Mooney-very high oil masterbatches upon which the inventors had been working.

DX1051 Weinstock, DX1367, pp. 66–74;
DX1052 102–106; 125–29
DX1102 GX2680, pp. 52–53;
Baker, B2422–34 79–82; 85–86;
 551–53
Pfau, B2649–52
Swart, B7284–85

69. Further masterbatches of varying high Mooney rubbers, oils, and carbon blacks were evaluated in September and October, 1949. In the fall of 1949, Weinstock combined the remnants of a number of these high Mooney masterbatches (none containing rubber of less than 150 Mooney and all containing at

---

20. Passenger tires were rated as premium, first line, second line, or sometimes third line. The first line tire (also sometimes called a 100 level tire) was the standard quality, the one sold for original equipment on new automobiles. Second and third line tires were sometimes made and sold. The main difference in quality between first, second, and third line tires was the rate of tread wear.

21. Baker had had extensive experience in development compounding. He had been in the tire industry since 1926 and had been involved in compounding since 1936. At Firestone, Baker worked on development compounding of passenger and racing tires. At Lake Shore he was in charge of tire compounding and construction. At Mansfield he was in charge of tire compounding. This work was prior to his coming to General.

Baker defines a compounder as a: "qualified professional chemist who knows the behavior of rubber and the materials in rubber, and understands the processing and understands too, fairly well, what we need in the final products, and who can design compounds using the materials to get the kind of properties you want in the product and to have it process satisfactorily to make them economically."

least 50 parts of oil) and, on his own time, took the compounds to the factory retreading shop where he made crude recaps for two of his own tires. These tires were run on his personal car in the Akron vicinity for about a month, during which time he took Pfau for a ride to demonstrate that the treads had normal traction on hills, and on wet and icy pavements. This "test" and the testimony of Weinstock and Pfau demonstrate that the inventors were aware that their suggestion to use their compounds for even second-line treads was radical, and that they were determined to verify for themselves, however roughly, that they were not advocating a position which would make them appear foolish before their colleagues.[22]

DX1053 Weinstock, GX2680, pp. 92–93;
DX1054 117–26
Pfau, B938–43 DX1367, pp. 104–23

70. Throughout November and December, 1949, work continued on selecting the proper amounts of oil and carbon black for the high Mooney rubbers Pfau was making. A relationship was noted between the plasticity of the rubber and the oil and carbon black loadings desirable for good processability and balanced physical properties. In some instances better physical properties were obtained by increasing the amount of oil used.

DX1056 Pfau, B909–925
DX1057

71. In January, 1950, rubber in latex form and having a Mooney of approximately 160–200, obtained in 55 gallon drums from Polymer Corporation in Sarnia, Canada, was masterbatched with 50 parts oil and 75 parts carbon black and made into a tread stock in General's laboratory.[23] The physical properties of the stock were excellent and the results were taken to Baker on January 24 by Swart and Weinstock. Baker copied the data onto a sheet in his own hand and that same day, referring to the excellent properties he had been shown, he revised and upgraded the C-26 project to test the tires for premium rather than second line tire treads.

DX1059 Baker, B2447–56
DX1105 Pfau, B2683
DX1104 Swart, B7285–90
DX1106

72. The experimental tires for this test (known as tire test 2614) were built in February, 1950, from a compound containing 60 parts oil and 85 parts carbon black to 100 parts of a butadiene-styrene rubber having a Mooney between 160–200. This test appears as Example 4 of the patent.

DX1060 Weinstock, DX1367, pp. 139–42;
DX1065 737–38
Baker, B2456 GX2680, pp. 130–32

73. It was intended that five tires be made for this test, but production difficulties caused three of the tires to be discarded.[24] Two tires were built, however, and sent to General's road test fleet in Colton, California, where the test was run, beginning March 22 and ending May 8, 1950. Preliminary results from this test (at 4,200 miles) showed that the test tires were 29% better in tread wear than the control tires which were

---

22. It was well known in the tire industry at that time that the ultimate test of a tread compound lay in actually making the tire and running it on an automobile for some thousands of miles to see what happened. Reliance on physical properties alone when evaluating a new material could be misleading.

23. As work reached the stage where factory evaluation was in order, larger quantities of rubber than could be conveniently made in the laboratory were required. Consequently, General obtained the polymer, made to its specification, from a commercial polymer plant in Canada.

24. It is not unusual in the rubber compounding art to have such initial production difficulties when working with a new material. Difficulties were encountered during the switch from natural to synthetic rubber, from hot to cold rubber, and from cold rubber to oil-extended rubber. Splice problems, that is, a tendency to a depressed area or sometimes to a hairline opening in the beveled joint formed by the joining of the ends of the tread as it is wrapped around the tire carcass are an example of one such problem.

made from the standard-Mooney hot-rubber recipe then in commercial use in General's premium tires. Some at General doubted this report and thought the test tires and the control had been mixed up, but oil extraction analyses performed by Weinstock on the treads proved that this was not so. At 12,600 miles, the test tires were still running 14% better than the controls and at 14,700 miles, when the test was discontinued because one of the control tires had worn smooth, the test tires were superior to the control in tread wear by 6%.

DX1060 Baker, B2456–72
DX1065 Weinstock, DX1367, pp. 134–44;
Pfau, B1072–73; 686–88; 731
 1223–27 GX2680, pp. 373–76

74. The final report of tire test 2614 recognized that further work was needed before commercial production would be practical, but the improved treadwear of the test tires was recognized as extremely significant. The recommendation was that further work be "expedited."

DX1065

75. In March, 1950, the patentees prepared two batches of rubber coagulated from latices obtained at Sarnia, Canada. One rubber, having a Mooney over 160, was mixed with 70 parts of oil and 85 parts carbon black. The other, having a Mooney of 120 was mixed with 35 parts of oil and 75 parts black. Test tires were made from each of these batches and run on General's test fleet as tire test 2845 starting May 11, 1950. This test is reported in Example 5 of the patent.

DX1063 DX1067
DX1065

76. The final report on tire test 2845 (dated July 25, 1950) showed that the test tread made from the rubber having a Mooney over 160 was 18% superior to the standard cold rubber control tire in treadwear and that the test tread made from the 120 Mooney rubber was 24% superior in treadwear, both after 18,900 miles. As with tire test 2614, the test was stopped when one of the control tires became smooth. The report concluded that the treadwear of the test tires was "extremely remarkable" and that splice difficulties still required work. The report recommended that: "This performance is so remarkable and the quality and cost potentialities are of such magnitude that projects C-69A and C-26 (high Mooney—high oil treads) must be completed without any delays."

DX1067 (A074704) Baker, B3633–43

77. Prior to the filing of the application for patent, other road tire tests were undertaken, including tire test 2914, a test conducted on tires made from a blend of a high Mooney oil masterbatch and ordinary Mooney rubber. This test is reported in Example 6 of the patent. Other tire tests were 2911 and 2930.

DX1116 Baker, B3667–76,
DX1117 3732–34
DX1125

78. During this time period the inventors initiated further studies with respect to the development of oil-extended rubbers for use in treads under arctic conditions, selection of plasticizers, solution of handling problems, and problems in characterizing the polymers whose Mooney was so high that it could not be measured accurately. This work is reflected in the monthly progress reports for the months of April to October, 1950.

DX1064 DX1068–72
DX1066 DX1077

79. The upshot of this work was the demonstration by the patentees that a quality tire tread could be made from the previously unusable high Mooney rubber by adding sufficient oil (and carbon black based on the rubber plus oil) to it to make it processable in the same time and manner as ordinary 50 Mooney rubber. While it had been known previously that oil could soften rubber and that high Mooney rubber was superior in physical properties, those skilled in the art did not think it possible to add the large amount of oil (and adjusted carbon black) needed to make high Mooney rubber (90–120 or higher) processable in the ordinary way and still maintain the high quality and properties demanded of tire treads since it was well known that oil had an adverse effect on physical prop-

erties. Further, it was well known (and published) that adding either excell oil (over 10 parts) or excess carbon black (over 50 parts) or both, to ordinary Mooney rubber caused an impermissible increase in hysteresis or elongation; but the addition and interaction of both with the high Mooney rubber, in accordance with the invention, had the surprising and very desirable effect of lowering hysteresis. The inventors had thus shown that the compounder could have both the benefit of superior properties and easy processability at a drastic reduction in cost. Oil costs about two cents per pound while synthetic rubber costs about twenty-three cents per pound.

Findings 66–69; 81–88
DX1001
DX1288, pp. 2, 19–20
PX1221, tab A, p. 569

Baker, B6155–73; 6493–505
Weinstock, GX2680, pp. 117–118; 130–131
Niemeyer, B11,232–36
PX1036
FX2595

*Reaction to the Invention.*

80. The reaction at General to the inventors' work was one of skepticism, at least until after road tests clearly had shown the quality of the high oil-high Mooney compounds. The inventors themselves had doubts, despite the good physical properties obtained. Well aware of the long-accepted belief that large quantities of oil should not be used in tire treads and afraid of appearing foolish for making the suggestion, they had made the rough, unofficial tire test on Weinstock's personal automobile as set out in Finding 69. Baker admitted to his skepticism of the project and agreed that the expression "Bottneck Baker" accurately described his initial attitude toward setting up to the project. Even at the stage where the test tires were being built, the inventors had difficulty in persuading, and in fact initially failed to persuade, the factory to add the quantities of oil required.

Weinstock, GX2680, pp. 79–82, 85–86
Baker, B4022, 6063, 6104–09, 6155–73

81. The initial reaction of others in the industry amounted to scorn. A high executive of U. S. Rubber Company (now Uniroyal) wrote General's president stating that he had "not yet bought the idea that mineral oil is rubber"; that he was "still wary of too much softener in tire treads"; and that in his opinion "the better the Bourbon, the less water you put in it."

PX1001, p. 324

82. The first reactions of Goodyear and Firestone were as emphatic. Mr. Vogt, Technical Superintendent of Goodyear, ridiculed oil-extended rubber for tire treads, telling Baker that he thought Baker had been in the rubber industry long enough to know that it was not possible to improve tread wear of tires by adding oil to the tread compound and that he was surprised that General would subscribe to that principle. Mr. Torrance, Chief Chemist at Firestone, told Baker he was also surprised that Baker would advocate oil-extended rubber tire treads.

PX1001, p. 321 Baker, B6099–6103

83. Perhaps most candid of all was the testimony of the compounder from Firestone (U.K.), Mr. Taylor, who testified on Firestone's behalf at the trial in England which involved the validity of General's corresponding U.K. patent and Firestone's infringement thereof. This testimony concerning the reaction to the announcement of General's invention is reported at pages 58–59 of the Judgment of the High Court of Justice, Chancery Division, rendered June 29, 1970, as follows:

Q. "Did you find anything technologically surprising in the development, as opposed to economically"?

A. "Yes; I must honestly say that we were surprised that one could use such quantities of oil."

Q. "Such big quantities"?

A. "Yes. . . We had got so accustomed to the oil loadings we had used for many years, that one regarded the levels we were using of 5 or 8 parts as being the normal. 45 parts of oil of course

seemed, you know, an astonishing amount to use, even if it was a high Mooney rubber."

GX2520, pp. 58–59

84. The initial skepticism and disbelief was quickly replaced by acceptance and adoption of the invention, however. All of the prior extensive work attempting to make high Mooney rubber processable for tire treads (such as heat softening and air Banbury breakdown) were promptly discontinued and never shown to be resumed. Firestone's answers to interrogatories show that by 1954, 95% of Firestone's passenger treads used oil-extended rubber.

| | |
|---|---|
| GX2681, tab 31(b) | B19,054–56 |
| DX1288, p. 2 | DX1080 |
| GX2516, par. 34 | DX1152, tab 45C |
| PX1221, tab A | DX1254 |
| DX1217 | GX2683, tab 136A, 138 |
| DX1272, tabs A–N | GX2566 |
| DX1249 | GX2567 |
| DX1250 | |
| DX1252 | |

85. In contrast to its early skepticism, Firestone's technical publication, SYNTHETIC RUBBER FACTS, published and distributed to the industry in 1958, after the invention but before the patent was obtained, contains several passages relative to the impact of oil-extended rubber treads. In its section on the history of synthetic rubber, Firestone lists, the first production of oil-extended rubber in 1951 as among the "important dates in the history of synthetic rubber."

DX1288, p. 23

86. This Firestone technical publication also described the advantages of oil-extended rubber treads, as follows:

"In 1951 production of oil-extended rubber was begun. This type of rubber is a homogeneous mixture of high Mooney (120 ML4 or higher) base polymer and a petroleum oil (usually 25 or 37.5 parts per 100 parts of polymer). The resultant material has a Mooney viscosity in the normal range (e. g., 45 to 60 ML4). It had been known for some time that high Mooney polymer had superior tread wear resistance, but this property could not be exploited because of the difficulty of processing the polymer. Oil-extension corrected this difficulty, making available a new and useful polymer type. Advantages of oil extension may be summarized as follows:

1. Satisfactory processability of very high molecular weight polymer permitting utilization of the desirable properties of this type of rubber,

2. Improved tread-wear and tread-crack resistance,

3. Lower cost of rubber,

4. Greater production of rubber from a given amount of monomer,

5. Improved hysteresis characteristics."

DX1288, pp. 19–20

87. It further described the impact of oil-extended treads as follows:

"In order to utilize the advantages offered by excessively high Mooney viscosity polymers, and to process these polymers on available rubber equipment, it was necessary to incorporate large amounts of processing oils. The addition of these oils decreases treadwear. However, this is more than compensated for by the increased wear from the higher Mooney polymer.

"Since the introduction of cold rubber and oil-extended cold rubber as replacements for natural rubber, the performance of passenger treads has been so outstanding that these polymers have become the standard of the industry."

DX1288, p. 271

88. In its U. S. Patent No. 3,019,207, filed in 1956, Firestone further extolled the virtues of oil-extended rubber for tire treads as follows:

"Oil-extended synthetic rubbers, especially oil-extended GR-S, have become very popular in recent years for a number of reasons. The oils employed commercially are much cheaper than the synthetic rubber itself, so that the oil-extended synthetic rubber is produced at a saving over the straight

synthetic rubber. Since the oil employed for extension of the rubber acts as a plasticizer for the rubber, it has been customary to employ stiffer synthetic rubbers for oil-extension than are employed in the absence of oil. For example, commercial GR-S has usually been manufactured with a Mooney plasticity of about 50 to 60 for use without oil-extension, whereas the GR-S employed for producing oil-extended polymers usually has an initial Mooney plasticity of at least 85 or 90, and generally exceeds 125. Tire treads produced from the oil-extended rubber of such high initial Mooney plasticity have exhibited very good abrasion resistance, *the wear ratings being much higher than would be predicted from a consideration of the diluting effect of the oil on the rubber.* Thus, the practice of utilizing oil-extended GR-S for tire treads has become very popular in recent years." (Emphasis added.)

DX1831

89. This Court must agree with the cogent remarks of Mr. Justice Graham, speaking for the English Court in reference to Firestone's Synthetic Rubber Facts Book (see Finding 83), that:

"It is indeed unusual, if not unprecedented, to find in a patent action such a tribute from a defendant to the excellence of a plaintiff's product and process."

GX2520, p. 60

90. It is clear that the work of Pfau, Swart and Weinstock constituted an extremely important contribution to the advancement of the tread compounding art and the tire making industry generally, and that its success was unobvious and surprising to those skilled in the art.

*The Claimed Invention.*

91. The claimed subject matter of the patent in suit is an article of manufacture, in two forms. One form (claims 1–12) is a vulcanized pneumatic tire, and specifically the tread portion of the tire. The other form (claims 13–22) is a vulcanizable (but unvulcanized) tread stock, this article being a tread slab which has not yet been applied to a tire carcass.

DX1001 DX1028–31
Baker, B636–38

92. The unusually exacting characteristics and qualities required of the article of manufacture are set out in the patent as follows:

". . . the rubber characteristics or qualities for tire treads are exacting and difficult to meet. Tire treads must be of uniform weight and cross-section; they must wear well and resist cracking both due to flexing and light; they must have substantial tensile strength and toughness. These qualities are had only in rubber compounds of the highest quality. Only highest quality rubber compounds are therefore used for good tires whereas in mechanical goods and especially in rubber footwear cost per unit of compound weight and not quality is the controlling factor."

DX1001, Col. 1, lines 39–49

93. The patent goes on to describe other essential characteristics of the article of manufacture as follows:

"Even though quality is of prime importance in tires, it is essential that tires be capable of being made in volume and to make tires in volume it is necessary that the rubber compounds used be capable of extrusion through an orifice (including calendering which is, in fact, extrusion through a die having rotating sides). It is only by such extrusion processes that tire treads have been made in volume and with uniformity."

DX1001, Col. 1, lines 50–57

94. The foregoing volume production of high quality tire treads according to the invention is said in the patent to be performed utilizing "the usual rubber machinery," and processing the tread compound "in the very short time commensurate with ordinary procedures" then in use for the ordinary commercial synthetic rubbers (which were about 50

Mooney). This ability to formulate the tread in such a way as to enable the compounder to use the ordinary equipment, times, and procedures is extremely important, since a decrease in production capacity or the requirement of huge capital outlays for new or additional equipment would be prohibitive to the adoption of a new compound.

> DX1001, Col. 1, lines 29–34;
> Col. 4, lines 34–43
> Brandau, B10,343

95. According to the invention, a high quality tire tread capable of being produced in commercial volume in the ordinary equipment, times and procedures used to process 50 Mooney rubber and at substantial savings in material costs comprises the novel interacting combination of:

(a) a tough butadiene-styrene synthetic rubber having a Mooney of at least 90. This rubber was previously known to be superior in physical properties, but considered unusuable for making tire treads because it was too stiff and tough to work on the ordinary equipment [25] and, therefore, the essential ingredients such as carbon black could not be uniformly mixed into the rubber within the normal times demanded for commercial production.

(b) a large quantity of softening oil (at least 20 parts) incorporated into the tough synthetic rubber in an amount sufficient to enable the rubber to be processed into tire treads on ordinary equipment, in ordinary times, and using ordinary procedures. That is, no special treatment such as heat softening or long mechanical working would be required. It was previously known that oil could soften rubber, but it was considered that the large amounts necessary to make tough rubber processable without additional treatment would so deteriorate the physical properties of the rubber that it would be useless for tire treads.[26]

(c) a reinforcing agent (carbon black in practice) added to the compound in conventional amounts, considering the rubber-oil mixture as all rubber. This carbon black could be uniformly mixed throughout the oil-rubber tread compound in the same equipment, time, and manner as if using ordinary 50 Mooney rubber. Thus, any deterioration in the starting rubber resulting from this necessary mixing action would be no more than that resulting from the prior art mixing with 50 Mooney rubber. In this combination, the retained superior properties of the high Mooney rubber would more than offset the deteriorating effect of the oil, resulting in a high quality end product at much lower cost.

> DX1001 Alliger C294–95
> Findings 62; 73; 79–83; Weinstock, GX2680, p. 54
> 86–88; 176–77 PX1221, tabs A & B
> PX1114A

96. Blends of rubbers are covered. Some claims are directed specifically to cold rubber (claim 7); to an oil of a particular boiling point (claim 5); to a minimum oil content of 30 parts (e. g., claim 19); to a minimum rubber toughness of 115 Mooney (claim 22); and to a characterization of the rubber toughness based on a test requiring a mixing of oil, rubber, and carbon black (claim 1). These will be analyzed specifically

---

25. It was known that these tough synthetic rubbers could be softened by subjecting them to long periods of mastication (mechanical working), or to long periods of heat softening, or a combination of the two. This procedure destroyed the inherent superior properties of the rubber and required expensive additional equipment and long processing time, however, and was thus not technically advantageous or economically feasible. The result, as pointed out in the patent was that:

"It was reasoned and generally believed that inasmuch as the rubber necessarily had to be plasticized or broken-down for factory processing that one might just as well start with a highly modified or soft rubber in the first instance and obtain the same end product."

26. Large amounts had been added where quality was not important such as in the production of adhesives and cheap molded goods.

in connection with the findings on infringement, but it is not necessary to treat them specifically here since General does not rely upon the narrower claims to distinguish over the prior art.

DX1001

*Infringement*

97. Since December 13, 1960, the date of issuance of the patent in suit, Firestone has made substantial quantities of curable rubber tread stocks from three representative formulas which were designated in this case as Stock A, Blend 2, and Blend 5. These stocks also were applied as the tread portions of pneumatic passenger tires commercially manufactured by Firestone. The three formulas for the stocks expressed in parts by weight are as follows:

| Source of Rubber | Stock A | Blend 2 | Blend 5 |
|---|---|---|---|
| FR–S 184 | 96 | 60 | 82 |
| Diene 35 | — | 20 | — |
| Diene 55 | — | 20 | — |
| FR–S 1500 | — | — | 18 |
| Other Rubber 27 | 4 | — | — |
| Total Parts of Rubber | 100 | 100 | 100 . |
| Parts of Oil Supplied by FR–S 184 | 36 | 23 | 31 |
| Parts of Oil Supplied at Banbury | 0 | 20 | 0 |
| Total Parts of Oil per Hundred Parts of Rubber | 36 | 43 | 31 |
| Parts of Black and Type | 55 ISAF | 68 ISAF | 65 HAF |

The formula for each of the above stocks also contains other ingredients such as sulfur, accelerators and the like. The exact composition and amounts of such ingredients are considered to be trade secrets by Firestone, but disclosure of this detailed information is agreed by Firestone to be not necessary for the purposes of this litigation.

GX2516, par. 33 and 34
GX2681, tab 31(b)

98. The material, FR-S 184, in Stock A, Blend 2, and Blend 5 was (and is) a regular commercial product of Firestone manufactured by copolymerizing, in an aqueous emulsion system at a temperature of about 41° F. (a), a latex of a synthetic rubbery copolymer of butadiene and styrene containing more than 50% by weight of butadiene, and (b) an aqueous emulsion of a hydrocarbon mineral oil obtained from petroleum. The latex and emulsion were (and are) proportioned so that FR-S 184 contained 37.5 parts by weight of such oil and 100 parts of the rubbery copolymer.

GX2516, par. 25 GX2517
DX1288, pp. 57, 74

99. The copolymer contained in FR-S 184 was a "cold" rubber with a relatively long chain molecular structure. It was compatible with hydrocarbon mineral oils. It was substantially gel free as determined by normally used industry tests, and it was non-oil resistant in accordance with the classification usually made in the rubber industry of oil-resistant versus non-oil resistant (based on the relative resistance of vulcanized compounds made from the rubbers to swelling in hydrocarbon oils).

GX2516, par. 25–29
DX1288. p. 251

100. The Mooney viscosity (ML-4 at 212°F.) of the contained copolymer in the latex for FR-S 184 was rigidly controlled by Firestone. Such control included taking regular samples of the latex as it was made, coagulating it (without adding oil) and measuring the Mooney viscosity of the rubber coagulum.

DX1288, pp. 271–2
GX2517

101. As a part of the discovery in the Baltimore case, Firestone supplied General with a representative sample of the copolymer contained in FR-S 184 that had been coagulated without adding the oil. Two measurements of Mooney viscosity were made by General on two different portions of the sample, and the readings were 116 ML-4 and 117 ML-4. Firestone made no Mooney measure-

---

27. Firestone makes no point of the "other rubber" content of any tread stock on the issue of infringement.

ments on a portion of the sample it had retained.

DX1353 Meyer, B11,814–18; 12,309

102. It has been stipulated by the parties that the samples of FR-S 184 latex used for Mooney determinations were coagulated by a method which in fact differed from, but for the purposes of this case may be considered to be the same as, the method used in the commercial co-coagulation of the latex and oil emulsion.

GX2517

103. Firestone has stipulated that the Mooney viscosity readings on at least some of the samples of rubber coagulum from FR-S 184 latex were above 90 ML-4 at 212° F. The evidence as to particular samples ranged from about 95 to 117 ML-4. Firestone's expert witness, Dr. Semon, desired samples of the contained polymer in FR-S 184 for test purposes to be as near 91 ML-4 as possible, but none that low was obtained for him.

GX2517 Meyer, B11,814–18; 12,309
DX1353 Semon, C4274–75; 4456–57
GX2595–97

104. The Mooney viscosity of the FR-S 184 oil masterbatch was never below 40 ML-4. Since FR-S 184 has always contained 37.5 parts by weight of a typical rubber softening oil, the Mooney viscosity of the contained rubber copolymer must always have been above 90 ML-4, according to charts prepared by Firestone's expert, Dr. Semon. The median Mooney range for FR-S 184 specified by Firestone is 45 ML-4, corresponding to a Mooney reading of about 102 for the contained polymer according to the Semon chart. The Court finds that the contained copolymer in FR-S 184 as made by Firestone since December 13, 1960, meets the Mooney requirements of claims 13, 14, 17–19, and 22.

DX1288, p. 74 Semon, C4441–43
FX2865

105. Another portion of the sample of the copolymer in FR-S 184 supplied by Firestone (Finding 101) was mixed by General's personnel with 65 parts by weight of Philblack O (a high abrasion furnace black) and 30 parts by weight of Sundex 53 (a hydrocarbon oil).[28] The mixing procedure used was that described in lines 3 to 30 in column 7 of the patent in suit. Mooney viscosity measurements made by General on the mixture gave values of 80.5 ML-4 and 81 ML-4. No one from Firestone observed the mixing and Mooney measurements, but Firestone made no such mixtures or Mooney measurements itself on this sample of FR-S 184. A series of similar tests run by Dr. Semon for Firestone in 1969–70 on samples of what was alleged to be commercial production runs of the copolymer in FR-S 184, when mixed with high abrasion furnace black and a hydrocarbon oil, resulted in compounds having a ML-4 of 85. The Court finds that the contained polymer in FR-S 184 as made by Firestone since December 13, 1960, met the Mooney requirements of claims 1, 3–5, and 7.

DX1353 Meyer, B11,822–29;
 12,153–54
Semon, C4269–74 Irons, B12,516

106. Diene 35 and Diene 55 in Blend 2 were rubbery polymers of butadiene manufactured by Firestone to have measured Mooney viscosities of 35 and 55 ML-4, respectively. FR-S 1500 in Blend 5 was a cold, butadiene-styrene rubber made by Firestone having a typical Mooney viscosity of 50 ML-4.

GX2516, par. 38

107. 82.7 parts by weight of FR-S 184, 20 parts of Diene 35 and 20 parts of Diene 55 (corresponding to the proportions of the rubber constituents in Blend 2) were mixed by General's personnel with 7 parts of Sundex 53 (23 parts of hydrocarbon oil being present in the 82.7 parts of FR-S 184) and 65 parts of Philblack O as described in lines

28. Claim one (and the claims dependent thereon) characterizes the toughness of the polymer by a test which involves mixing 100 parts of the polymer with 65 parts of a "high abrasion furnace carbon black" and 30 parts of a "hydrocarbon oil." If the mixture has a compound Mooney over 60, the toughness test is met.

3 to 30 in column 7 of the patent in suit except that the oil already contained in FR-S 184, of course, was not added during the mixing. Mooney measurements on the mixture gave readings of 70 ML-4 and 71 ML-4. The FR-S 184 was purchased by General from Firestone through regular commercial channels. No one was present from Firestone during the mixing or taking of measurements nor did Firestone duplicate this test. No contradictory evidence was offered and the Court finds that this blend satisfied the Mooney requirements of claims 1, 3–5, and 7.

DX1359 Meyer, B11,851–66; 12,322–24

108. 110 parts by weight of FR-S 184 and 20 parts of FR-S 1500 (corresponding to the proportions of rubber constituents in Blend 5) were mixed by General's personnel with 65 parts of Philblack O (31 parts of hydrocarbon oil being present in the 110 parts of FR-S 184) as described in lines 3 to 30 in column 7 of the patent in suit except that the oil already contained in FR-S 184, of course, was not added during the mixing. Mooney measurements on the mixture gave readings of 72 ML-4 and 73 ML-4. The FR-S 184 was purchased by General from Firestone through regular commercial channels. While no one from Firestone was present during the mixing and taking of measurements, Firestone itself has not prepared such a mixture nor measured its Mooney viscosity. No contradictory evidence was offered, and the Court finds that this blend satisfied the Mooney requirements of claims 1, 3–5, and 7.

DX1359 Meyer, B11,851–61; 11,869–71; 12,322–24

109. A representative sample of the hydrocarbon mineral oil used in FR-S 184 was produced by Firestone to General during discovery. General's personnel ran a standard boiling point test on a portion of the sample, and it did not boil prior to reaching a temperature of above 450° F. No one from Firestone was present during the test. However, Firestone has not performed this test itself even though a boiling point deter-

mination is a very simple test. The Court finds that said hydrocarbon oil had a boiling point over 450° F.

Meyer, B11,778–85
Alliger, C470

110. The oil used in Blend 2 supplied at the Banbury mixer is a hydrocarbon mineral oil derived from petroleum. Firestone purchased this oil from several suppliers, and it used such oils from different sources interchangeably. The added oil in Blend 2 was not different from that used in FR-S 184 in any respect here material.

Brandau, B10,500–02;
10,519–20; 10,532–33

111. HAF and ISAF are recognized types of carbon blacks that Firestone used in making Stock A, Blend 2 and Blend 5. Firestone used HAF in these tread formulae from several manufacturing sources interchangeably, and the same was true with respect to ISAF, but HAF and ISAF blacks were not used interchangeably. HAF and ISAF were (and are) both reinforcing furnace blacks of very fine particle size.

GX2516, par. 7, 34 & 36

112. The procedure followed by Firestone in compounding Stock A, Blend 2 and Blend 5 is schematically shown in DX1285. This same procedure was employed by Firestone for making tread stocks prior to 1949 when it used normal viscosity rubber of about 50 ML-4 instead of FR-S 184. Stock A, Blend 2 and Blend 5 tread stocks were made in standard equipment and in the usual periods of time.

GX2516, par. 35 B19,058–59
DX1285 Niemeyer, B10,252–55
Brandau, B10,571–74

113. The contained copolymer in FR-S 184 was not worked any longer than that minimum time necessary to incorporate the carbon black and other ingredients into 50 ML-4 rubber prior to the invention, and was thus substantially unmasticated, undegraded, and not substantially broken down.

GX2516, par. 35 Niemeyer, B10,252–55
DX1285 B19,058–59
DX1288, pp. 211, 325

114. Cold FR-S rubbers undergo practically no change in Mooney during working on standard rubber equipment in the usual periods of time.

DX1288, p. 325

115. Firestone has conceded with respect to the issue of infringement that tread stocks designated Stock A, Blend 2 and Blend 5 had Mooney viscosities between 30 and 70 ML-4 (as required by claim 13) and between 40 and 80 ML-4 (as required by claims 14 through 22).

GX2516, par. 39

116. The pneumatic tires manufactured by Firestone having tread portions made in accordance with Stock A formula infringe each of claims 1, 3–5, and 7 of the patent in suit.

117. Curable rubber tread stock manufactured by Firestone in accordance with Stock A formula infringe each of claims 13, 14, 17–19 and 22.

118. The pneumatic tires manufactured by Firestone having tread portions made in accordance with Blend 2 formula infringe each of claims 1, 3–5, and 7 of the patent in suit.

119. Curable rubber tread stocks manufactured by Firestone in accordance with Blend 2 formula infringe each of claims 13, 14, 17–19, and 22.

120. The pneumatic tires manufactured by Firestone having tread portions made in accordance with Blend 5 formula infringe each of claims 1, 3–5, and 7 of the patent in suit.

121. Curable rubber tread stocks manufactured by Firestone in accordance with Blend 5 formula infringe each of claims 13, 14, 17–19, and 22.

## VALIDITY

*The Status of Alleged Prior Art References as Prior Printed Publications.*

122. In its Notice pursuant to 35 U.S. C. § 282(4), Firestone has listed some 162 prior art references, 144 of which have been offered and received in evidence either in Cleveland or Baltimore. The status of 51 of these exhibits as prior printed publications has been challenged by General. Thus, before going further, the Court will consider this question.

(Notice (36,799))

123. During World War II and subsequently, when the U. S. synthetic rubber industry was under the ownership and control of the Government, certain agreements were entered into between the Government and the operators of its synthetic rubber plants which included provisions for the exchange of technical information among the parties to the agreements and, in certain cases, to others who, in the Government's opinion, needed the information in order to carry out the Government programs. These agreements are described in more detail in the findings under "license" *infra*. One means of this exchange of technical information was by way of reports prepared by various participants and known as CD Reports (Copolymer Development). Firestone has designated twenty-seven CD Reports as prior printed publications. These include: PX1034; PX1069; PX1197A (PX1197 Tab H); PX1203; PX1219; PX1564 (FX2815); PX1745 Tabs A-C and Tabs E-H; PX1746; PX1748-50; PX1752; PX1761; PX1821-27; and FX2846.

DX1404 DX1430
PX1202, tab A DX1413B
PX1241, Operating
 Agreement Greer, C696–98

124. The CD Reports were not available to the public. Their distribution was according to a fixed and limited list of recipients and subject to the secrecy and confidentiality provisions of the agreements between the government and participants in the government program. Section 8 of one such agreement (General's Operating Agreement) is illustrative. It provided that:

"All such technical information shall be maintained secret and confidential and Operator shall establish and maintain all reasonable safeguards, including secrecy contracts, to prevent any disclosure thereof to any third parties without the prior written consent of Reserve."

Indeed, not every participant in the rubber program was privy to all technical information. General, for example, though a plant operator, was not authorized to receive certain CD Reports dealing with non-GR-S information, nor was it authorized to receive CR Reports (Copolymer Research). A limited and restricted distribution such as this is not "publication."

| | |
|---|---|
| DX1413B | DX1222–23 |
| DX1430 | PX1241, Operating |
| DX1404 | Agreement |
| FX2546–47 | Greer, C700–05 |
| FX2878 | Soday, C3458–60 |
| DX1605 | Taft, B30,437–39 |
| GX2553 | D'Ianni, B17,774–79 |

125. Another group of government-connected technical documents designated by Firestone consists of AU (Akron University) Reports. They are reports of work done at the government laboratories at Akron University. There is no evidence, however, that these documents enjoyed even the limited circulation of the CD Reports. No distribution list for AU Reports was offered. The AU Reports, in question, PX1197 tab I, PX1747, PX1751, PX1758, were merely found in the files of Rubber Reserve after the initiation of the present law suit. Two other technical reports of Rubber Reserve technical committees, PX1900 (PX1901) and PX1753 (PX1198 tab D), are designated by Firestone. Although circulated to committee members, they contained "technical information" in connection with the operation of the government synthetic rubber program, and hence were subject to the same restrictions of secrecy and confidentiality as the CD Reports. The information contained in the AU and committee reports was not available to the public and the reports were not published.

| | |
|---|---|
| FX2878 | Laundrie, B29,573 |
| | Taft, B30,622–24 |

126. Firestone further relies on six reports of tests conducted by the government Tire Test Fleet as constituting prior printed publications. PX1109 (DX1349), PX1110, PX1111A (PX1111 tab B), PX1114, FX2553, FX2556. Tire Test Reports, like CD Reports, were mimeographed and distributed to a fixed and limited number of participants in the government synthetic rubber program. Like the CD Reports, they were subject to the same restriction of secrecy and confidentiality as set out in Section 8 of General's Operating Agreement (See Finding 124). Further, each textual page of the reports bears the legend "RESTRICTED" at both its top and bottom, and the title page of each report carries the following warning:

"The information and data herein reported are the property of Reconstruction Finance Corporation, Office of Rubber Reserve. This report shall not be copied, duplicated, or its contents in any manner used for sales or advertising purposes. Any abuse will result in the cancellation of the privilege of receiving these reports."

There is no evidence that the contents of these documents were available to the public. They were not published.

| | |
|---|---|
| PX1133 | Blakeney, C4537–38 |

127. A large collection of technical information came into the possession of the United States as a result of its occupation of German territory at the end of World War II. This information included unpublished German and Austrian patent applications and correspondence and reports of German industry. Over 900,000 microfilm frames of these captured documents eventually found their way into the United States Library of Congress. Firestone has designated six pieces of this microfilm technical information—PX1725 (FX2828), PX1727, PX1728 (FX2831), PX1729 (FX2834), PX1930 (FX2826), and PX1946 (FX2848A)—as printed publications. Since reproduction by microfilm is not "printing," these German references fail as printed publications. Even if one were to consider them as being printed, they fail as anticipations because the microfilmed material itself was not publicly distributed. Instead, a list of the titles of the microfilmed material was published as the Bibliography of Scientific and Industrial Reports (BSIR).

The material was so poorly indexed, however, that it was virtually inaccessible to a researcher. Further, many frames of microfilm are poorly made and difficult to reproduce or read accurately. (See, e. g., PX1946.)

PX1908 Green, B34,535–38; 34,558–60

128. Two other German-language documents (FX2851 and 2852) have also been cited as prior printed publications. These unbound materials were allegedly found in folders in an English library some time after the commencement of this litigation. No evidence or testimony as to their authenticity is before the Court. These references are not printed nor is there any evidence that their contents were ever published or made available to the public prior to November 20, 1950. (See Colloquy at C5582–83.)

129. Another group of alleged prior publications is certain sales material of the Wilmington Chemical Company. These documents, PX1973 and FX2717, were distributed to several individuals in the rubber industry. Each, however, was marked "Confidential" and was mimeographed. The Court finds no sufficient evidence that these documents were published, much less made freely available to the public, prior to November 20, 1950.

Osberg, B37,981

*Prior Art Patents, Publications and Alleged Publications.*[29]

130. The Court finds that no one of the 144 or so items of patented or published prior art cited against the patent anticipated General's invention.[30] Separate findings are made hereunder with respect to those items upon which Firestone places primary emphasis. The others have been considered in groups, particularly where, as in many instances, there has been no real controversy as to what is taught by that art.

*The Rostler Art.*

131. This art consists of a British patent, several publications, and alleged publications, sales brochures and advertisements, and an alleged prior use, all involving Dr. Rostler. Dr. Rostler, a chemist, came to this country in 1938 to exploit the thesis he had developed at the University of Vienna. This thesis involved the recovery and use of complex materials derived from petroleum refinery waste products to which he gave the tradename "Naftolen." In 1942, with the financial backing of Francis I. duPont, Rostler formed the Wilmington Chemical Company for the purposes of manufacturing and selling Naftolen.

PX1567 Rostler, C3117–20; 3157
PX1973 (PX1218) PX1990
PX1988 tabs A–F FX2717 (PX1971)

132. Rostler's technical experience and business activity were in the art of oils and oil refining. His chief intended use for Naftolen, however, was as a compounding agent for rubber. It was Rostler's theory that Naftolen, being derived from heavy sludge wastes of petroleum refining, was not a mere softener or plasticizer for rubber, but was of a special rubber-like nature and was capable of co-vulcanizing or chemically combining with rubber. This co-vulcanization theory was disproved by work done at Goodyear, however, and by 1948 the Wil-

---

29. In this section of the Findings, items of cited prior art which the Court has found not to be "printed publications" (hereafter designated with a "D" for "disputed") are nevertheless considered as if they meet those statutory requirements in order to simplify appellate review.

30. The number of references alone is some evidence of invention since the array of references relied upon by Firestone was available to the art but had not brought forth the advance clamed by General. Most of the printed publications here relied upon are from the widely read technical publications of the rubber industry such as Rubber Age, India Rubber World, and Industrial & Engineering Chemistry. Thus, the men skilled in the art had actual as well as constructive knowledge of most of the publications and patents relied upon by Firestone.

mington Chemical Company was bankrupt and out of business.

PX1567, p. 2, lines 5–16
DX1580, pp. 3–4
DX1217, pp. 8–9
GX2608, pp. 7–8
Rostler, C3121
Osberg, B38,239–41; 38,245–47
Irons, B38,180
Baker, B6618–19; 7133–34

133. Rostler's British Patent 586,973 (H. W. K. Jennings declarant for Wilmington Chemical Corporation) issued April 9, 1947.[31] This patent is based upon an American patent application filed by Rostler on January 6, 1943, and later abandoned. In General's suit to obtain the patent (Finding 19), the government cited this patent as its most important reference. Judge Holtzoff said (and this Court agrees):

"There is no doubt that the Jennings patent discloses in a general way the use of oil in the manufacture of synthetic rubber, but it cannot be said to point directly to the invention involved in this case and, therefore, cannot be deemed to be an anticipation. It must be emphasized that the Jennings patent does not refer to tough rubber as being one of the vital elements of the invention. It does not indicate any definite degree of toughness of the rubber to be used, nor is it limited to large quantities of oil. Moreover it does not show any advantages to be derived from the use of a large quantity of oil."

PX1567
PX1587
184 F.Supp. 344, 349

134. British Patent 586,973 deals basically with the method of extracting Naftolen from petroleum sludge. No invention in tires or tire treads is described or claimed. No procedures, times, compositions, or Examples for making a tread compound or any other compound are given. It gives two Examples in which Naftolen is mixed with synthetic rubber. Example one deals with nitrile rubbers and example two with butadiene-styrene rubbers. The patent describes all synthetic rubbers generally as being "dry and tough" [32] compared to Natural rubbers. The rubbers used in Example 2 is described as a "commercial butadiene-styrene copolomer synthetic rubber latex."

135. Firestone argues that because of the single reference to "Buna S" appearing in British Patent 586,973 (page one, line 42) the rubber of the examples must have been high Mooney German rubber. The following facts are contrary to this construction:

(a) The term Buna S is used in the patent as an incidental historical reference, not as a reference to the rubber used.

(2) The rubber used in Example 2 is described as a "commercial" latex. In the context of the patent (which is identified on its face as being based on a communication from the U.S.) this reference is to the commercial U. S. rubber which had a standard Mooney of about 50 and was also known as Buna S at that time. The German commercial latex was called IGETEX, not Buna A.

The Court finds no statement or teaching in the British Patent with respect to the toughness of the rubber to be used, nor with respect to Example 2 the amount of oil to be used. Firestone argues that the oil emulsion used in Example 2 must be the same as that used in Example 1, but this is not stated in the patent; it must be inferred. The British Patent does not anticipate or teach the invention of the patent in suit.

PX1567 GX2516, par. 14
D1752, pp. 1, 27–28 GX2522, p. 956
PX1221, p. 568

"Buna S, as it is available today in the form of GR-S and commercial varieties, is inherently a dry, tough, nontacky polymer, difficult to process."

---

31. Item 1 of the prior art listed in Firestone's 282 notice in this case. These item numbers are those assigned by Firestone in its pre-trial brief.

32. Wilmington Chemical Company's Technical Bulletin No. 3, dated October 8, 1943, states:

136. The other Rostler reference ("D") deserving mention is a Wilmington Chemical Company report dated February 18, 1943, entitled "Report on an Investigation of Naftolen-Modified Rubbers of the Buna S type." [33] This report was used as a sales aid for Naftolen. The reference has all of the defects of the alleged Wilmington prior use, discussed *infra*. It has no disclosure of the Mooney of the rubber or of tire treads having ever been made. It conclusively shows, by Rostler's own test of processibility (p. 4) that the rubber was of such low Mooney that it processed satisfactorily with only 10 parts of oil—the same amount used with 50 Mooney rubber. It could not, therefore, have had any substantially higher Mooney. This document was before Judge Holtzoff, but was not offered as a prior art reference. Even if a publication, this reference does not anticipate or teach the invention of the patent in suit.

> PX1973 (PX1218) Rostler, C3197
> DX1393

137. The Court has considered the various other Firestone references which involve the work of Dr. Rostler. None carry the case any further than those discussed above. The Rostler references do not anticipate or teach the invention of the patent in suit.

*The German Art.*

138. Firestone's primary reliance is placed on a four-part *Summary Report on the Production and Performance of German Synthetic Tires and Other Transportation Items*. Part I appeared in the August, 1945 edition of the widely circulated publication Rubber Age and Part II in the September, 1945 edition.[34] This Summary Report was the end-product of an extensive on-site investigation of captured German plants conducted by teams of technicians from Firestone, Goodyear, U. S. Rubber, Goodrich, and others from the American, Canadian, and English rubber industries. Part I of the Summary Report contained the following general conclusions of the investigating teams:

(a) German Buna S tires are no better and probably not as good as American GR-S tires. (p. 565)

(b) To obtain adequate tire mileage, vehicle loads and speeds had to be reduced. (p. 565)

(c) The German Buna S supplied by the polymerization plants was very tough and required heat softening prior to the mixing of the compounds on mills or in Banburys. (p. 566)

(d) Despite the additional heat softening operation and the use of higher softener, it had been found necessary to decrease mixing equipment speeds and to use longer times of mixing, resulting in extremely low efficiency as compared with American methods. (p. 566)

Among the disadvantages of the German system, it was noted that in addition to the heat softening it was necessary to add larger amounts of softeners despite the fact that "It is known that high softener content adversely affects quality." (p. 569) Another disadvantage noted was that "The workability [of the Buna], however, depends upon long mixing cycles; and it is felt that it could not be adapted to our short batch times." (p. 571)

> PX1221, tab A

139. Part II of the Summary Report referred to in Finding 141 states, at page 692:

"Except for a few special purposes raw Buna as received from the polymerization plants cannot be processed prior to a partial depolymerization or 'heat-softening' operation. Even after this heat softening, larger percentages of softeners are necessary in German compounds than is customary in American practice."

The article then gives a number of tread recipes. The "Continental A" tread stock recipe (Continental Gummi Werke, Han-

---

33. Item 12 in Firestone's 282 Notice.

34. Item 26 in Firestone's 282 Notice.

over, Germany) on page 693 is the only one relied upon by Firestone. The Continental A recipe comprises 40 parts of Buna S-3 rubber of 700 defo, 17.3 parts of 300 defo, 3.5 parts of Buna SS of 700 defo and 39.2 parts of Buna S-3 Crumbs. It is conceded that the Buna rubbers of 300 and 700 defo were heat softened. No Mooney or other toughness value is ascribed to the "crumbs." There is merely a footnote reference to its being "Raw Buna S-3 which has not been sheeted." No other reference to this product is contained in the article.

PX1221, tab B

140. The Court finds that in Germany rubber latex was made into a rubber sheet by coagulating it in the form of a fine crumb slurry and putting the slurry on a moving screen-like belt (as used in paper-making) through which the water drained, leaving a layer of rubber particles that was calendered into a sheet. This sheet was then dried by passing it through a drying oven. The only "crumb" product in this process was the scrap material which did not form a sheet, or which fell through or off the wire, and was swept up from the floor. This scrap material, sold in paper bags, had no specification as to defo or any other property. While there is no evidence that such "crumb" was necessarily the "crumb" in the article, there has been no showing that any other German material met the description in the recipe. Therefore, no toughness value can be read into or inferred from the "crumb" of the recipe contained in Part II of the Summary Report.

GX2522, p. 949 Hormuth, B.31,879–89; 31,998–99

141. The Continental A recipe contained in Part II of the Summary Report referred to in Findings 141–43 shows the presence of 19.6 parts of Naftolen. The mixing procedure in column 1 of page 693 says that the Buna S crumbs and Naftolen were premixed separately in a 2 to 1 ratio in a Banbury. No description is given as to the temperature or time in the Banbury or what happened to the product after it was mixed. Mr. Thiele, who was in charge of forming mixtures

of Buna and Naftolen at Continental at this time, testified that his normal procedure was to mix for 25 to 35 minutes without cooling water. Dr. Semon said that when he mixed an oil-rubber batch for 20 minutes in a Banbury, and with cooling water, there was a 40 point drop in Mooney which he ascribed to degradation of the polymer. Moreover, it was known that the Germans added materials in manufacturing Buna S that accelerated its heat degradation. While such long, hot, and degrading mixing was not specifically referred to in Part II of the Summary Report, there is no evidence that any other type of Banbury mixing procedure was used in Germany. Therefore, an absence of this degrading premix cannot be read into or inferred from the reference.

GX2522, p. 948 Thiele, B32,719–35; 32,941–52
FX2533 Semon, C546–51
FX2514 .
GX2683, tabs 136A, 138, Exhibit C, pp. 2685–92

142. The mixing procedures given in Part II of the Summary Report referred to in Findings 141–44 (exclusive of the Buna-Naftolen premix) show: (1) that the speed of the Banbury had to be reduced by approximately one-third to avoid overheating, and (2) that the mill speeds were reduced approximately 25% for the same reason. While one cannot be sure from the reference just how long the total mixing time was, the specific times given add up to 47 minutes without counting the Banbury mixing and milling of the Buna-Naftolen batch. The German mixing and milling procedure therefore took at east three times as long as conventional American times, and perhaps six (or more) times as long. The practical significance of this fact is that in order for a German factory to process the same amount of rubber as an American factory in a given time it would have to utilize several times the number of Banbury mixers and mills employed by the American factory. In summary, while the Summary Report fails to show the Mooney or defo of the rubber, it does teach that all of the rubber was severely degraded; and that despite this degradation and the addition of oil it was impos-

sible to process the tread stock in anywhere near the conventional manner or times. Furthermore, while this art was available in this country as early as 1945, there is no evidence that anyone followed it. The Court finds that the Summary Report does not anticipate or teach the invention of the patent in suit.

PX1221, tab B
Findings, 49–50

143. Firestone also relies upon a portion of a microfilm reel of captured German documents ("D") containing a report on "Rubber-Saving Tires" prepared by the Austrian rubber company, Semperit.[35] This report describes a tread compound containing admittedly heat softened Buna and a 2:1 Buna S-Naftolen mixture without reference to the toughness of the Buna S except that it is said to be, as a starting ingredient, "not degraded." The report says that the simplest way of adding softener is to pre-mix the Buna and softener in heated internal mixer (Banbury). No further instructions are given in the report. However, another copy of the same report in the same microfilm did have the related mixing instructions attached. These instructions show that the mixture of Buna S and Naftolen was made by mixing for 30 minutes in a Banbury, followed by a milling of the mixture. In other words, the Buna S-Naftolen premix of Semperit was essentially the same as that used by Continental (Finding 141). Firestone may not rely upon that portion of the microfilm it considers favorable and ignore the damaging portion. Both must be read together. The Court finds that even if a publication this Semperit report does not anticipate or teach the invention of the patent in suit.

FX2848A
GX2686A, p. 117291

144. Firestone relies upon another microfilm report ("D") entitled Nafto-

len - Buna - Plastizierung 'Sparbuna' " (February 1944)[36] which is apparently a brochure of a German company attempting to sell Naftolen. In summary, this brochure states:

"The most effective savings of Buna is achieved by combining large additions of plasticiser with gentle mechanical or thermal degradation, in the presence of the plasticiser."

Even if a publication, this article does not anticipate or teach the invention of the patent in suit.

PX1930 (FX2826)

145. Firestone relies upon a microfilm ("D") of an abandoned application S143,078.[37] This is no more than a vague disclosure of adding 20 to 100% of "lanolin, mineral oil or Naftolen" to Buna S for no stated end purpose other than to make hot water bottles. Even if a publication, it does not anticipate or teach the invention of the patent in suit.

PX1725 (FX2828) FX2829

146. Firestone relies upon a microfilm ("D") of an abandoned application 155,-625.[38] This shows the same "economy" tread compound as is described in the Semperit "Rubber-Saving Tires" report[39] (See Finding 143). The method of mixing the Buna S and Naftolen is said to be in a "suitably heated internal mixer." Even if a publication, it does not anticipate or teach the invention of the patent in suit.

PX1728 (FX2831)
FX2848A
GX2686A, p. 117291

147. Firestone relies upon a microfilm ("D") of an abandoned Semperit Austrian patent application S157,457.[40] This application sets out the example (as given in the Semperit report[41] discussed in Finding 143 of how much rubber is saved in using an "economy" tread compound, but does not give the recipe for such compound. No directions are given

35. Contained in item 29 in Firestone's 282 notice.

36. Item 54 in Firestone's 282 notice.

37. Item 55 in Firestone's 282 notice.

38. Item 56 in Firestone's 282 notice.

39. Item 29 in Firestone's 282 notice.

40. Item 56 in Firestone's 282 notice.

41. Item 28 in Firestone's 282 notice.

for mixing other than it be done on a mill or in an internal mixer, "elevated temperatures being necessary only as required by the viscosity of the softener." Even if a publication, it does not anticipate or teach the invention of the patent in suit.

PX1729 (FX2834)
FX2848A
GX2686A, p. 117291

148. The Court has considered the various other German references relied upon by Firestone. Even if publications, none anticipates or teaches the invention of the patent in suit.

*The Government Art.*

149. Firestone has cited several references relating to work done in connection with the government sponsored synthetic rubber program. One of these is a June, 1947 paper ("D") entitled "Summary of Government Tire Testing" by L. A. Woerner of the government entity, Rubber Reserve. This paper [42] presents the problem solved by the patentees, i. e., how could the inherently superior properties of high Mooney rubber be utilized in tire treads. It did not present the solution. In a covering letter to the report, Mr. Woerner said:

"The writer has an honest and sincere conviction that these suggestions stand an excellent chance of eventually resulting in a superior wearing tire, and that processing methods although possibly unorthodox to the rubber industry, can be worked out to allow for the economic handling of these polymers."

It is further apparent that Woerner was not suggesting use of large amounts of oil from his statement that it was:

". . . [Q]uite evident that high Mooney polymers have value if methods of processing can be found which will allow processing without the utilization of plasticization which reduces the tread wear of such polymers to values approaching GR-S."

Even if a publication, this reference does not anticipate or teach the invention of the patent in suit, but rather leads away from it.

PX1900

150. Firestone relies upon the Final Report ("D") of an experimental project, Tire Test 123,[43] carried out on the government tire test fleet and circulated to certain participants in the government synthetic rubber program. Even if a publication, this reference does not anticipate and on its face led away from the invention. The amount of carbon black used is not disclosed. Furthermore, the conclusion of the report is that:

"The outstanding experimental polymer from the standpoint of treadwear was the Cumene-hydroperoxide 50 Mooney, rated 21% superior to control GR-S-10 in this respect."

It is also apparent from the Final Report of Tire Test 123 that the high Mooney tread compounds were not prepared in the ordinary way or in the ordinary times used for the tread compounds made from the regular Mooney rubber. They were given an extra Banbury mixing, which added 25% to the mixing times used for the regular Mooney compounds, not counting the considerable additional recycling delays.

PX1114A

151. Firestone has cited several other tire test reports which the Court has considered, but these reports carry the case no further for Firestone than does Tire Test 123. None is an anticipation of, nor teaches the invention of, the patent in suit.

*The McMillan Art.*

152. The McMillan work is representative of work in this country by major oil companies such as Shell (McMillan's employer) and Phillips, seeking ways to increase their oil sales to the rubber industry. The theory underlying McMillan's work was that the excessive softening resulting from the addition of

42. Item 39 in Firestone's 282 notice.

43. Item 47 in Firestone's 282 notice.

increased amounts of oil to ordinary Mooney rubber (50–60 ML-4) could be compensated for by the addition of excessive amounts of carbon black (which has a stiffening effect). The McMillan work is reported in articles in the July and August, 1947 issues of Rubber Age (dealing with additions of oil and carbon black to hot GR-S rubber) and the March, 1950 issue of Rubber Age (dealing with oil and carbon black additions to cold GR-S rubber). Firestone concedes that Mc-Millan used only 50–60 Mooney rubber but argues that the work made the invention obvious. Apparently it was not obvious to the tire industry, however, since McMillan's theory was not accepted by the tire makers; neither did it lead the industry or Shell to extend the theory to high Mooney rubber. The known adverse effect of the increased black (in ordinary Mooney rubber) on the hysteresis properties of the stock discouraged work along this line. This abandoned theory does not point the way to success; it points away from it.

| | |
|---|---|
| PX1116 | Baker, B4554–66 |
| PX1054 | B19,066–67 |
| GX2682, tab 889–90 | PX1036 |

*The Goodrich Art.*

153. Firestone has cited certain articles pertaining to work reported by Goodrich, one of which is CD 380 entitled "Pilot Plant Development of Laurylamine GR-S." [44] ("D") This report shows that Mooney rubber possesses certain superior properties. However, the report concluded that:

"These polymers are extremely tough and would be difficult to process. Hot air softening [heat degradation] improves the processing characteristics but greatly reduces the flex cracking resistance. . . . It may be possible to develop high black-high softener stocks which are processable."

The basic teaching was that high Mooney rubber showed promise if a way could be found to process it. Oil extension was not recommended by Goodrich.

This reference, even if a publication, does not anticipate or teach the invention of the patent in suit.

PX1564<br>FX2815

154. Firestone also argues that an article by Dr. Yanko of Goodrich entitled "Physical Properties of Fractions of GR-S and Their Vulcanizates," *Journal of Polymer Science*, 1948,[45] points the way to the invention and that it discloses the principle of the invention. Yanko's theoretical work does not anticipate the invention. His work merely showed that regular GR-S of 50 Mooney was made up of some high molecular weight fractions and some law fractions, with a distribution of fractions intermediate. No tire tread or any other compounds are shown or discussed. Firestone now says that if the low fraction is removed, leaving a higher fraction, and replaced with oil, one obtains General's invention. This argument is both hindsight and unsound. Yanko never suggested that this could be done, nor is there any evidence that it could be done. This reference does not anticipate or teach the invention of the patent in suit.

PX1017

155. The Court has considered numerous other references dealing with cold rubber, butyl rubbers, nitrile rubbers, neoprene rubbers, adhesives, mechanical goods, general teachings that high Mooney rubber had superior treadwear properties, and general teachings that oil acts as a softener for rubber. These references do not anticipate or teach the invention of the patent in suit. They were cited to show the state of the art and for the most part do not relate to matters in controversy. They need not be discussed individually.

### ALLEGED PRIOR USES

A. By Wilmington Chemical Corporation.

156. Firestone contends that certain experimental activities carried out in

---

44. Prior art item 24 in Firestone's 282 notice.

45. Prior art item 64 in Firestone's 282 notice.

1942 and 1943 by and in cooperation with the Wilmington Chemical Corporation, then abandoned, amounted to a prior public use of the invention claimed by General. This work, like the Rostler prior art articles discussed *supra*, was based on Rostler's theory of Naftolen co-vulcanization. In fact, the alleged prior art article discussed in Finding 136 purports to be a report of the work here alleged as a prior use. That report has been found to fail as an anticipation. The alleged work itself fares no better for the reasons set out in the following findings.

157. The rubber involved in the Wilmington Chemical Company's alleged use was made in two batches (about two months apart) by the Dewey & Almy Chemical Company at the request of Wilmington Chemical. Rostler and Dr. Mark, then assistant director of research at Dewey and Almy, testified that in oral discussions prior to making the rubber, the Wilmington Chemical people asked for a tough [46] rubber, but there was nothing in contemporaneous documents, including purchase orders and correspondence, to corroborate that testimony. No Mooney measurements were made at any stage of the production of the Dewey and Almy rubber. The vague and uncorroborated oral testimony of Dr. Mark, regarding the Mooney viscosity of other rubbers made much later from "similar" recipes cannot be accepted as clear and convincing evidence of the viscosity of the rubber batches in question. Contrary to usual practice, no preliminary batches were run by Dewey & Almy to determine and predict the toughness of the polymer that would be obtained from a given recipe and raw materials. Dewey & Almy did not have prior experience with the type recipe or conversion used for the Wilmington batches. Their usual recipes called for almost 100% conversion, producing a polymer suitable for gaskets, but not suitable for tires or treads. Rostler testified that Williams plasticity measurements were made, but not where,

when, or by whom. No records of such measurements, contemporaneous or otherwise, have been offered by Firestone. The recipe said to be used to make the two batches of latex at Dewey & Almy is in evidence. It is substantially the same as the recipe then being used in the government plants for $50 \pm 5$ML-4 standard GR-S. The amount of modifier [47] used was the same as for GR-S. The degree of conversion was increased from 72 to 75%, but all other things being equal, this increase would not increase the Mooney viscosity by more than about 5 ML-4 units. The Court finds that the Mooney of the rubber made by Dewey & Almy has not been established and there is no showing that it had, or was intended to have, a Mooney in the vicinity of 90 ML-4.

GX2522, pp. 187, 246 
FX2716 
PX1053, p. 665 
Rostler, C3170–74; 3218–19 
Mark, C3360–65; 3371–73; 3387–92 
Osberg, B37,970–71 
Cooper, B19,225–29 
Baker, B5746–50; 6160–61; 6639–40 
Soday, C3484–93

158. An emulsion of Naftolen was added to the latices prepared by Dewey & Almy and the mixtures were coagulated. No one testified that he had checked himself, or had someone else check the amount of Naftolen in the emulsion, the amount of the emulsion added to the rubber latex, or the amount of Naftolen that was actually retained by the rubber. There were no contemporaneous records offered to show that anyone actually mixed the two materials in any particular ratios. The Court finds that the amount of Naftolen contained in the rubber-Naftolen batches made by Dewey & Almy has not been established.

Rostler, C3180–81; 3301–02 
Osberg, B38,251–52

159. The rubber-Naftolen batches obtained from Dewey & Almy were sent by Wilmington Chemical to various companies for evaluation in mechanical goods compounds, such as heels, and one batch (purportedly containing 20 parts Nafto-

---

46. In 1943–43 a polymer having a Mooney of 60–65 was considered "tough."

47. The toughness of a polymer is controlled by the amount of modifier used. See Finding 26.

len) was sent to Lee Tire & Rubber Company for evaluation in a tread compound. There is no evidence that such a tread was ever made, however. There was no admissible evidence that compounds of any type were ever mixed and cured by anyone, even on a laboratory scale. Dr. Arthur Nellen, chief chemist (compounder) at Lee Tire in 1942 and 1943, had agreed to testify as an expert on behalf of Firestone in Baltimore. However, he was not called or deposed by Firestone.

Rostler, C3195–96
Osberg, B38,002–03; 38,006; 38,292–96

160. Dr. Rostler and others at Wilmington Chemical testified before Judge Holtzoff in support of the same prior use alleged here; many of the same documents were relied upon there and here. Judge Holtzoff found that a prior use had not been established; Firestone has not offered any better evidence here. The Court finds that the activities of Wilmington Chemical Company do not constitute a prior knowledge, invention, or use of the invention of the patent in suit. They were at most unsuccessful, incomplete, and abandoned experiments.

DX1393
184 F.Supp. 344, 349

B. By Phillips, Lake Shore, and the Government Tire Test Fleet (Tire Test 123)

161. Firestone contends that certain experimental activities carried out in 1947 by the Phillips Petroleum Corporation together with the Lake Shore Tire & Rubber Company and the Government test fleet amounted to a prior public use and sale of the invention claimed by General. The final report of Government Tire Test 123 purports to be a report of this alleged prior use. That report, even if a publication, has been found to fail as an anticipation (see Finding 150). The alleged work itself fares no better.

162. The work involved in the Tire Test 123 alleged prior use was experimental, abandoned, and not shown to have been available to the public. The rubbers were made in the Phillips pilot plant at Borger, Texas, as experimental polymers. The compounds were mixed and the tires built in the Lake Shore tire plant at Des Moines, Iowa, experimentally, for testing on the government experimental test fleet at San Antonio, Texas. The tires were said to be "sold" to the government testing fleet, but this was the understanding, pursuant to standard practice of the testing fleet, that the tires would be permanently returned to Lake Shore after the testing, and the tires were so returned. This arrangement did not constitute a commercial sale in fact, nor were the tires "on sale" within the meaning of 35 USC § 102. The transaction was at most a service charge for the experimental production of the tires.

PX1114A
Troyan, C2205–06
Tucker, FX2720, pp. 18–20
Rude, C1390–91; 1393–94; 1584–86
Sperberg, C3561–65; 3610–12
Reynolds, C3721; 3757
Blackeny, C4540–42

163. According to the government final report on Tire Test 123, several groups of tires were made, each tire within a group having the same tread compound and each group being prepared from a rubber which was stated to be of a particular Mooney value (ranging from 45 to 125 ML-4). The fact, however, is that the tread compounds were not shown to have been made from a rubber of a particular Mooney value. The Mooney of the rubber intended to be used in each tread compound was worked out on paper at the Phillips pilot plant at Borger, Texas by combining pilot plant runs of varying Mooney to give the intended average Mooney. There is no evidence, however, that the individual runs of rubbers were in fact combined by Phillips in any way prior to shipment from Borger. Since all of the rubber was formed into 20 pound bales at Borger, the only way the rubbers of the different runs could have been blended would have been by apportioning bales from the different runs in the appropriate ratios. There is no evidence that this was done at Borger or at Des Moines. When the rubber arrived at the Des Moines, Iowa, Lake Shore tire factory, no Mooney

measurements of the rubber were made, and the evidence is that the 20 pound bales needed to make up a Banbury batch of some 400 pounds were selected without regard to their individual Mooney value. There was, in short, no testimony or records showing how much or what proportion of each batch of rubber was used in any particular compound. There is no clear and convincing evidence of the Mooney viscosity of the rubber actually used (as opposed to what was intended) in any tread compound in the test.

PX1822　　　　　　Troyan, C2232–37
FX2669　　　　　　Tucker, FX2720, pp. 21–27;
　　　　　　　　　　　　34–36
Rude, C1505–16;　　Sperberg, C3593–94; 3616
　　1556–59

164. Tire Test 123, in essence, compared experimental tires having treads made from the then recently-developed cold rubber with tires having treads made from the then conventional hot rubbers. The control tread was made from a 50 Mooney hot rubber and 5 parts of oil. One group of experimental treads were made from 50 Mooney cold rubber and 2 parts of oil; the other from purportedly higher than normal Mooney cold rubber (up to 125 ML-4) and variable amounts of oil (up to 20 parts). The experimental tread compounds of Tire Test 123 were mixed in standard factory equipment at Lake Shore, but in every case where the tread compound purportedly contained a rubber of higher than normal Mooney it was not mixed in the usual way or in the usual working times. Each of these allegedly high Mooney compounds was subjected to an added "Remill" step of $2\frac{1}{2}$ or $2\frac{3}{4}$ minutes in a Banbury before its "Final Mix," thereby increasing the Banbury working time by nearly 25% over the compounds containing the normal Mooney rubber.

FX2723　　　　Sperberg, C3563–65;
FX2724　　　　　3677; 3591–96

165. The conclusion drawn from Tire Test 123, as stated in the final report prepared by Rubber Reserve test fleet and approved by Mr. Greer, the head of research and development for the government and one who had followed the test closely, was that:

"The outstanding experimental polymer from the standpoint of treadwear was the Cumene-hydroperoxide 50 Mooney rated 21% superior to control GR-S-10 in this respect."

PX1114A　　　　Blakeney, C4542
Greer, C844

166. The Court finds that the experimental work allegedly involving higher-than-normal viscosity rubbers in Tire Test 123 was abandoned and taught away from, not toward, the invention:

(a) In accordance with the conclusion of the final report on Tire Test 123, 50 Mooney cold rubber went into large scale commercial production thereafter and eventually became the standard rubber for tire treads. In contrast, cold rubber having a Mooney above 65 Mooney was not commercially produced or used for tire treads until after General's invention.

(b) The results of the test itself discouraged further work with high Mooney rubber. It emphasized the 50 Mooney rubber as the outstanding polymer, and it showed that the high Mooney rubbers could not be processed in the ordinary time or manner.

(c) Unfavorable comments on the high Mooney-high oil aspect of the tests were reported by personnel at Phillips.

(d) Unfavorable comments on the high Mooney-high oil compounds were also expressed by Lake Shore personnel. In March, 1951 after General's invention had been announced, an inquiry about the Tire Test 123 work was made of Mr. Roy E. Rude, technical manager at Lake Shore when the tests were made and a major participant in them. He wrote that he was a "low Mooney advocate" and that as a result of Tire Test 123 work, Lake Shore would "not recommend the use or incorporation of over 12 parts of softener." Further, regarding Tire Test 123, he said:

"We discontinued our experimentation on high Mooney GR-S with high oil to work on cold rubber. The better polymers on cold rubber have

shown to be ones with low Mooney but no advantage was seen in the very high Mooney polymers, in particular with the high oil." (GX 2575)

(e) Mr. Greer, in trying to determine what General's invention was, considered the high Mooney-high oil work reported in Tire Test 123, but he concluded General's most likely course was with low Mooney rubber and high amounts of carbon black.

> GX2682, tab 889–890 GX2622
> GX2516, par. 18 GX2575
> PX1114A PX1744, tab C

## C. By Oliver Tire & Rubber Company

167. Firestone contends that the activities of the Oliver Tire Rubber Company in 1949 constitute a prior use and sale of the invention of the patent in suit. The records of this company reflect that in 1949 and 1950, it made camelback containing 18 to 26 parts of oil as a commercial product. The chief chemist of Oliver, Mr. Kettering, testified that he at times orally requested that his supplier of 50 Mooney GR-S furnish him with rubber on the high Mooney side of its specification. There were no records offered to establish that Mr. Kettering got what he requested nor that the specifications involved permitted a viscosity about 55 ML-4 which was the upper limit in GR-S specifications at that time. Consequently, the Court finds that the GR-S rubber employed by Oliver in the alleged prior use had a viscosity not substantially above 50 Mooney. It was not an anticipation of and did not teach the invention of the patent in suit.

> GX2516, par. 14 Kettering, C2320–22

## UNOBVIOUSNESS

168. Firestone has contended that the invention would have been obvious to a person skilled in the art under 35 U.S.C. § 103, even if (as the Court has found) it was not anticipated by the prior art under 35 U.S.C. § 102. In connection with this defense, the Court has given consideration to the determination of who was the hypothetical person having "ordinary" skill in the "art," and what "art" is relevant. It has also given consideration to the subject matter of the invention as a whole and the entirety of the prior art cited by Firestone, all as required by 35 U.S.C. § 103.

169. The man of ordinary skill in the art, to whose mind the question of obviousness is directed, is the tire tread development compounder. (See Finding 46.) Dr. Rostler was not such a man, nor was McMillan, Greer, or Yanko. Nevertheless, as shown by their contemporaneous actions, the invention was not obvious to them. Dr. Semon, Firestone's expert witness, was by no means an ordinary man skilled in the art. His history in the field of rubber chemistry is far above the ordinary. He is the holder of over 100 U. S. patents and was a pioneering inventor in rubber chemistry. At the time of General's invention, he was head of Pioneering Research for Goodrich; yet, the invention was not obvious to him.

> Semon, C498; 3889; 4288–91

170. The reactions to General's invention by those possessing the relevant skill in the art are set out in Findings 80–88. Vogt of Goodyear was such a man; he ridiculed the idea of using as much oil in tire treads. Baker of General was such a man; he was initially a bottleneck to the development of the invention. Torrence of Firestone was such a man; he was surprised that General would advocate the use of so much oil in tire treads. Taylor of Firestone U.K. was such a man; he was surprised and astonished at General's announced invention. In short, the initial reaction of these skilled persons (as well as the executive of U. S. Rubber, who felt compelled to write the president of General that good bourbon should not be cut with water) was disbelief and skepticism. Even General's own inventors were at first afraid that what they were doing would hurt their reputations in the art.

171. This initial skepticism and disbelief was quickly replaced by adoption of the invention, however, as set out in the Findings 84–88. Firestone's own

Synthetic Rubber Facts book, published after the invention but before the patent issued, acknowledged that it had been known for some time that high Mooney rubber had superior treadwear resistance, but that this property could not be exploited because of processing difficulties. It also acknowledged that oil extension solved the problem and resulted in a lower cost, satisfactorily processible tire tread with improved tread wear and crack resistance and improved hysteresis characteristics. In both its Facts Book and its own patent, Firestone also acknowledged (after the invention) that the wear ratings of oil extended tire treads were much higher than would have been predicted from a consideration of the diluting effect of the oil on the rubber.

172. Also relevant to the issue of obviousness is the work of Goodyear and the government in 1951. On November 7, 1950, General's president, W. O'Neil, made the fact of the invention public with an offer of sale to the government and an announcement to the industry of a General development that could make 22% more synthetic rubber available with the then scarce materials and the same equipment as was then being used. He also announced that General had run tire tests showing that treads made according to the invention were better than treads made with GR-S. O'Neil did not disclose further what the invention was, however.

FX2562 Greer, C927

173. O'Neil's announcement (referred to in Finding 175) precipitated an immediate effort on the part of Rubber Reserve and others in the industry, most notably Goodyear, to determine what General's invention was. By November 11, 1950, Goodyear had begun work to ascertain what the invention could be. In November and December, 1950, Goodyear's approach was to try to extend

---

48. "Canadian Synthetic" referred to in the January 17 Goodyear memo was jointly owned by several American rubber companies, including Goodyear, Fire-

---

synthetic rubber with reclaimed (scrap) rubber and with lignin (a filler).

DX1585 Riddle, B17,647–64

174. Then, on January 8, 1951, Mr. Rowzee, a former Goodyear employee who was then manager of Polymer Corporation (General's supplier of high Mooney rubber), visited Goodyear in Akron. Rowzee tstified that he discussed the subject of General's work with Dr. Dinsmore, Goodyear's vice president of research and development, and in response to Dinsmore's questions, informed him that it was true that Polymer Corporation was working with General and that the development was one of substance.

Rowzee, B30,332–34

175. On January 17, 1951, Goodyear began to work on latex mixing of high Mooney rubber with 20–40 parts of plasticizer. A Goodyear research memorandum of that date setting up the large scale project states that:

"The present program was initiated as a result of conversations between Messrs. Osterhof, Clifford, Patterson and D'Ianni, in which were discussed the possible courses General Tire might be following in their alleged production of 'more rubber of high quality without using more monomers.' Information from Canadian Synthetic [48] officials, while lacking in specific details, had indicated that Sarnia was producing the product for General, that the process involved no important new technological innovations, that the materials used were widely available and cheap, and that the product was approximately the quality equivalent of present cold rubber stocks. The current approach was conjectured as one they might likely be taking, and also one on which we have no information of our own."

DX1580 Riddle, B17,665–69
DX1586 Pierson, B17,623–30
DX1587 Rowzee, B30,348–49
GX2683, tab 91

---

stone, Goodrich, and U. S. Rubber. By agreement with Polymer Corporation, Canadian Synthetic operated Polymer's synthetic rubber plant at Sarnia.

176. After January 17, 1951, Goodyear discontinued its efforts to extend rubber with reclaim and lignin and concentrated on high Mooney oil extension. On February 19, 1951, Goodyear's Chairman of the Board issued a press release announcing the results of this work and stating that:

"Research Laboratories of the Goodyear Tire & Rubber Company made an important contribution to the Government rubber program which may have far-reaching effects on future plans for the country's rubber supply. . ."

The release went on to say that this development was being given to the government "free of charge" and that it could "save the government considerable expenditure in making plans for further production of synthetic rubber."

DX1586 DX1611
DX1587

177. O'Neil's announcement of November 7, 1950 (referred to in Finding 175), also caused an immediate search on the part of the government to determine what the invention was. Mr. Greer, Manager of Research and Development for Rubber Reserve, was in overall charge of this effort from the technical aspect. In a series of memoranda between January 5 and February 9, 1951, Greer estimated that General's invention might include the addition of reclaim or lignin (as Goodyear had first thought). He also thought it might involve vulcanizable softeners, the use of low Mooney rubber plus increased carbon black and oil, the use of high Mooney rubber plus oil, the use of tar, asphalts, or natural resins, or adding new materials to the polymerization reactor. In a meeting of the Rubber Reserve staff, including Greer, on January 16, 1951, the suggestions included the use of: high amounts of carbon blacks, lignin, reclaim, vulcanizable oils, saturated oils, low Mooney rubber plus oil and carbon black, high Mooney rubber plus oil, thermoplastic and thermosetting resins, natural resins, thiokol, special rubbers, asphalts, and tars.

PX1744, C, E–I Greer, C675; 1242–44
DX1727

178. Among Greer's many suggestions, the use of high Mooney rubber plus oil appears in his memorandum dated Janury 5, 1951. Firestone looks to this as evidence of obviousness. The reverse is true. Not only is this suggestion for high Mooney rubber plus oil unemphasized, but Greer's memorandum of January 5, 1951 (which lists this among four other suggestions) goes on to pick low Mooney rubber plus extra carbon black and oil as the "most probable" basis of General's invention. On January 25, 1951, Greer instructed the government laboratories to begin work adding oil to regular GR-S in the reactor. On February 7, 1951, he instructed those labs to work on the extension of regular GR-S with resins. Neither of these projects was successful and neither was in the direction of General's invention. No work on high Mooney-high oil compounds could be pointed to by Greer as having been done at the government laboratories in January, 1951.

PX1744 C, G, H Greer, C1264–67

179. On February 6, 1951, Mr. Spencer, a member of another government agency, prepared a memo reporting a telephone conversation he had had that day with Mr. Rowzee of Polymer Corporation. A copy of this memorandum contains the handwriting of Mr. Oberfell, head of production for Rubber Reserve, and was found in his personal files after his death. This memo shows that Rowzee had informed Spencer that Polymer Corporation had been making monthly runs of 50 to 100 thousand pounds of product for General; that General's product was equal to GR–S; that General's claim to conserving 22% of the butadiene and styrene materials was conservative, the amount ranging well in excess of 25%, that no extra equipment was needed except for additional drying and coagulation equip-

ment; and that the Polymer Corporation people were sufficiently sold on General's development that they were installing the added equipment in order to obtain the 25% increase in capacity made possible by the development. In addition, Rowzee gave an example showing that between 125 and 150 pounds of rubber equivalent to GR–S could be obtained from 90 to 95 pounds of butadiene-styrene raw material and, according to Spencer, Rowzee indicated his willingness to consult with any members of the government in connection with General's development.

GX2560 Koontz, C5508–09

180. On February 19, 1951, Goodyear made the announcement of its important discovery and was promptly given authority to begin production of high Mooney-high oil masterbatches. On February 20, 1951, Greer answering Oberfell's memo of February 1, 1951, which asked what was the most promising development in connection with the government work, stated that:

"I am sure you will agree that there is only one answer at present: The use of softening oils as extenders to expand the apparent production of GR–S, which is currently being worked at the Government Laboratories and Goodyear."

DX1611
GX2557

181. The "only one answer" referred to in the preceding Finding is in contrast to Greer's plurality of answers before the date of the Spencer memo and the fact that before November 7, 1950, there is no evidence that the government was thinking of high Mooney oil extended rubber, even as a hypothetical possibility. Although the Korean War (beginning in June, 1950) had created a need for expansion of synthetic rubber production, the RFC Consolidated Research Budget for 1950–51 (dated August 31, 1950) contained no provision for research work on high Mooney oil extended rubber. Greer

worked on the preparation of that budget and did not recall making any requests for research that did not appear in the budget. Neither did Greer make any such recommendation in a memo of November 1, 1950 (six days before O'Neil's announcement [49]) in response to an official request for suggestions on how to increase the rubber supply. In his November 1 memo, Greer commented on various ways of increasing GR–S production, including lower conversion, high temperature, continuous polymerization, more reactors, etc., but did not suggest oil extension as an answer to the problem of expansion of production.

GX2557 Greer, C1218–24
GX2555 DX1901

182. The work of the government and Goodyear in attempting to discover what General's invention was constitutes additional evidence of unobviousness. Their initial work tended away from, not toward, the invention. Their later work, coming as an about face and only after receipt of information from Canada, is not evidence of obviousness.

183. The invention has enjoyed enormous commercial success, as set out in Finding 84. Further, every significant tire producer in this country (other than Firestone) has taken a license under the patent, either directly or by way of settlement of litigation. The subtests of long-felt need, prior attempts and failures, initial disbelief, surprising results, inability to duplicate, as well as commercial success are all present in this case and support the invention.

184. The main test of obviousness likewise supports the invention. The Court has considered all of the prior art references cited by Firestone and the extent to which they were accepted or rejected by the art, not just the mosaic of language selected from the various pieces of prior art and assembled in a manner said to point to the invention. The Court has considered the language pointing away from the invention (often in the same reference, e. g., PX1221, tabs

49. Finding 175.

A & B) as well as that relied upon as allegedly pointing toward the invention. In addition, the Court has considered the deep-seated prejudice among those skilled in the art against the use of large quantities of oil in quality products such as tire treads. Having all these factors in mind, the Court finds that the subject matter of the invention as a whole would not have been obvious at the time of the invention to a person having ordinary skill in the art to which it pertains.

### LICENSE

185. Firestone contends that even if the patent is found to be valid and infringed, there is no liability because it should have a royalty-free license under the patent. It is contended that the government was entitled to such a license because the invention falls within the license-granting provisions of a Research Contract between General and the government and that this alleged government license was later given to Firestone in connection with Firestone's purchase of the government-owned synthetic rubber plant at Lake Charles, Louisiana, to apply to the sale of rubber products then being made at that plant.

> PX1241 "Research Contract" tab 1, par. 7
> PX1241 "Nomination Contract"

186. General's Research Contract is an implementation of and specifically refers to another agreement between General and the government, executed February 2, 1943, for the operation of the government-owned synthetic rubber plant at Baytown, Texas. That agreement (known as the Operating Agreement) refers in turn to an Exchange Agreement, one of several wartime agreements to which the government and others, including Firestone, were parties. In order to place General's contracts with the government in relation to the overall government synthetic rubber program of which they were a part, it is necessary to trace the development of that program and the legislation which affected it.

> PX1241 "Research Contract" tabs 1–8
> PX1241 "Operating Contract" tabs 1–3
> DX1404

187. In June, 1940 the government organized Rubber Reserve Company, a subsidiary of Reconstruction Finance Corporation, for the purpose of stockpiling natural rubber. When it became apparent that stockpiling was not the complete answer to the emergency rubber situation created by hostilities then existing in Asia, the government began to formulate a program for the construction, operation, control, and supervision of synthetic rubber plants and to determine the type of synthetic rubber to make, its specifications, and its raw material requirements. Primary responsibility for this government function was allocated to Rubber Reserve. As a result of various reorganizations, Rubber Reserve Company was succeeded by the RFC Office of Rubber Reserve, later known as the Office of Synthetic Rubber. These various governmental entities will be referred to generally as Rubber Reserve, Reserve, or simply the government.

> 15 U.S.C. § 606b
> 1948 U.S. Code Cong. Serv. p. 1342
> Ex. Order No. 9942, April 1, 1948

188. Beginning in 1941, Rubber Reserve entered into a series of pooling agreements designed to provide the technical information, know-how, and patent rights for the commercial production and compounding of synthetic rubber. The basic pooling agreements were known as the Exchange Agreement, the Compounding Agreement, and the Cross-License Agreement.

> DX1404 DX1413B
> DX1430
> DX1738

189. The Exchange Agreement [50] entered into December 19, 1941, provided for an exchange of technical information among the parties and for cross-licenses under their patents which covered

---

50. This agreement was captioned "Agreement on Exchange and Use of Technical Information."

synthetic rubber, its method and equipment of manufacture, and its utilization in the manufacture of fabricated articles. The parties to this Agreement were Rubber Reserve, the Big Four (Goodyear, Firestone, U. S. Rubber, and Goodrich), who were to operate the first-built government synthetic rubber plants, and Standard Oil, which had exclusive U. S. rights to certain German basic patents relating to synthetic rubber. General was not a party to the Exchange Agreement.

DX1404

190. The Compounding Agreements [51] entered into between the Big Four and Rubber Reserve on July 3, 1942, extended the exchange of technical information and royalty-free cross-licenses to the compounding of synthetic rubber in addition to its manufacture. Compounding was defined in the agreement as any process for converting synthetic rubber into tires and tubes, or into compounds suitable for tires, including the incorporation therein of compounding agents such as softeners, fillers, and vulcanizers. General was not a party to the Compounding Agreement.

DX1430, p. 2

191. The Cross-License Agreement, like the Compounding Agreement, was broader than the Exchange Agreement in that it provided for the exchange of technical information and royalty-free licenses directed not only to synthetic rubber, but also its compounding and vulcanization and to compounds and vulcanizates [end products] thus obtained. It was an open pool permitting companies later choosing to sign it to participate in the exchange of technical information and licenses. It was signed first by signatories to the Exchange Agreement, including Firestone, beginning in September, 1943 and was eventually executed by some 38 companies involved in the rubber program, but not General.

DX1738, pp. 5–7
DX1413B

192. In addition to the basic pooling agreements (the Exchange Agreement, the Cross-License Agreement, and the Compounding Agreement), the government obtained other technical information and rights by way of private license agreements with individual companies. For example, Rubber Reserve executed licenses with Firestone, Goodyear, and U. S. Rubber which called for the government's payment of $3/8$ of a cent per pound for various chemicals (such as antioxidants) manufactured under their patents and used in the production of synthetic rubber.

DX1737, tabs A–C

193. The actual production of synthetic rubber in the plants built and owned by the government was accomplished under agreements known as Operating Agreements entered into by the Big Four, General and others, early in the program. These agreements provided that the companies would operate the synthetic rubber plants as agents for and at the expense and risk of Rubber Reserve. The operator was paid a management fee, based on the amount of on-specification synthetic rubber produced. The management fee was designed to cover executive management, legal, medical, technical, and general services not capable of being charged directly to plant operation and to compensate the operator for providing its experience and know-how.

E.g., PX1241 Operating Contracts, tabs 1 and 2

194. Rubber Reserve indemnified the operators from claims of patent infringement as a result of the plant operations, but it assumed no liability for actions "not pertinent to the manufacture of Synthetic Rubber." This indemnification was protected by the operator's grant to the government of royalty-free licenses under their patents to manufacture, use, and sell synthetic rubber. In the case of the Big Four, these licenses passed to the government by virtue of the

---

[51]. The full name of the agreement was "Agreement on Exchange of Technical Information and Patent Rights Relating to the Compounding of Synthetic Rubber."

Exchange Agreement. General, who was not a party to the Exchange Agreement, granted this license in its Operating Agreement.[52]

PX1241 Operating Contract, tab 1
 Section 8, pp. 10–12
DX1404 Exchange Agreement, Art. II,
 Par. 4, pp. 6–7

195. The confidential exchange of technical information relating to the manufacture of synthetic rubber among the operators of the government plants, through Rubber Reserve, was also provided for by agreement. In the case of the Big Four, this exchange was effected through the Exchange Agreement. General, who was not a party to that agreement, was required to provide such technical information by its Operating Agreement, which also provided that General was to receive reciprocity with respect to certain of this information through arrangements effectuated essentially between Reserve and the other members of the Exchange Agreement. The Operating Agreement provided that:

"All such technical information shall be maintained secret and confidential and operator shall establish and maintain all reasonable safeguards, including secrecy contracts, to prevent any disclosure thereof to any third parties without the prior written consent of Reserve."

Essentially the same requirements of secrecy were set out in and applied to the exchange of information under the Exchange, Compounding, and Cross-License Agreements.

DX1404
Exchange Agreement, Art. II, par. 3, p. 6
 Art. III, pp. 8–10
PX1241
Operating Contract, tab 1, Sec. 8, p. 11
DX1413B
DX1430

196. The Operating Agreements further provided that the operators could be reimbursed by the government for the cost of conducting research and development work relating to processes for the manufacture of synthetic rubber, to the extent approved by the government in advance. The Big Four were credited during their operation of the plants with substantial amounts in reimbursement for research as provided in their Operating Agreements and implemented by other agreements known as "Patent Agreements Relating to Research Work." These Patent Agreements granted Reserve immunity with respect to inventions made in the course of government-reimbursed research in the synthetic rubber field, defined broadly to include not only the manufacture of but also "compounding, vulcanization, use and sale of substitutes for natural rubber." General did not perform any government-reimbursed research under its Operating Agreement, nor did it enter into the Patent Agreements Relating to Research Work, all of which terminated as of March 31, 1949.

PX1241 Operating Contract, tabs 1–2
DX1738, p. 23
DX1655, not executed
DX1413 B
DX1682, tab YY, pp. 2, 3
DX1411 B–1
Wilson, B20,547–48

197. The agreements and procedures set out in Findings 191–199 were the foundation upon which the government chose to establish, control, and maintain the synthetic rubber industry, and they continued in effect throughout the wartime period. During this period General operated the Baytown plant for the government under its Operating Agreement, and it participated in the exchange of technical information relative to the manufacture of synthetic rubber provided for by its Operating Agreement. However, General never became a party to the Exchange Agreement, the Cross-License Agreement, the Compounding Agreement, nor the Patent Agreements

---

52. In its Operating Agreement, General also agreed to offer reasonable royalty-bearing licenses under its patents to manufacture, use, and sell synthetic rubber for commercial operations (as distinguished from government operations) to any operator of a government synthetic rubber plant at Reserve's request, up to 10 years after the end of the National Emergency (April 28, 1962).

Relating to Research Work. Further, General did not perform and was not reimbursed for any research work under its Operating Agreement during this period. In fact, General not only chose to avoid the patent pools, but repeatedly objected to the pooling arrangements as being a damper on incentive. General did pursue private unreimbursed research relating to synthetic rubber, however, including doing research projects with Mathieson Alkali and others.

> Swart, B7258–64
> DX1405C
> DX1405D

198. Following the end of World War II, the entire government synthetic rubber program was re-examined. The Cross-License Agreements expired six months after cessation of hostilities (March 2, 1946), and the Compounding Agreements were to expire at the end of the National Emergency (April 28, 1952). The Exchange Agreements were to terminate in 1951. Further, since the entire program had been handled on a wartime basis, a review of objectives was in order. Such studies were begun soon after the war and culminated in the Rubber Act of 1948 (50 U.S.C. App. § 1921, et seq.) which became effective April 1, 1948.

> Ex. Order No. 2974
> 1948 U.S.Code Cong. Serv., p. 1341 et seq.,
> Legislative History of Rubber Act of 1948

199. The Rubber Act of 1948, which was the controlling expression of national policy with respect to the post-war synthetic rubber industry, recognized that the synthetic rubber industry was not yet in a position to be self-sufficient. Natural rubber was generally considered to be superior to the synthetic then in production; and while natural rubber was subject to wide fluctuations in price depending on supply and demand, the price of synthetic rubber in a competitive economy free of government support was also uncertain. Consequently, in the interests of national security, the Act authorized a temporary continuation of the government powers to allocate, produce, maintain inventory controls, and set specifications for synthetic rubber. It also set a minimum synthetic rubber plant capacity and mandatory consumption requirements for the synthetic rubber produced. The stated objective of the Act, however, was to establish a synthetic rubber industry which would sustain itself in a competitive economy without government support. To this end, the Act set out as national policy that:

> "In order to strengthen national security through a sound industry it is essential that Government ownership of production facilities, Government production of synthetic rubber, regulations requiring mandatory use of synthetic rubber, and patent pooling be ended and terminated whenever consistent with national security, as provided in this Act."

> 1948 U.S. Code Cong. Serv., p. 1343
> Legislative History of Rubber Act
> of 1948.
> 50 U.S.C. App. §§ 1921, 1922

200. It was recognized in the Rubber Act of 1948 that research was a key element in the program, and to that end it specifically called for "continuous and extensive research by private parties and the Government" as being essential. At the same time, the Act directed the President to "effectuate immediate cessation of further accumulation of technical information or rights to patents under the [Exchange Agreement] insofar as practicable and consistent with the purposes of this Act," and to take such action as appropriate with respect to the other wartime patent pooling, licensing, and information exchange agreements.

> 50 U.S.C. App. § 1925
> 50 U.S.C. App. § 1930

201. The Rubber Act of 1948 was directed to the production of synthetic rubber *per se* and its improvement through research. No authority was conveyed to the government to conduct research on the compounding or utilization of synthetic rubber and particularly not on the development of new end-product compositions such as tires or tire treads.

> 50 U.S.C. App. § 1925

202. To effectuate the policies of the Rubber Act, the government began in late 1948 and continued through 1949 to negotiate with the Big Four to replace the remaining pooling, exchange, and cross-license agreements. Production of synthetic rubber continued throughout this period in the government-owned plants under the various Operating Agreements which were not renegotiated. A chief area of concern was with respect to the negotiation of new agreements setting the proper scope of government reimbursed research and the consequent rights therein, while protecting and excluding therefrom the legitimate proprietary rights of private industry in its congressionally encouraged private endeavors.

> DX1653 Wilson, B20,478–86; 20,763
> DX1699, tab B

203. The Rubber Act of 1948, which called for the termination of the Exchange Agreements, created a situation inimical to the exchange of technical information called for by Section 4, Article III of the Exchange Agreement and Section 8 of General's Operating Agreement.[53] Also, the apparent production costs of the Baytown plant were sometimes higher than at other synthetic rubber plants since, under its Operating Agreement, General charged its routine items such as quality control to production while the other operators charged theirs to research. Because of these factors, the government wanted General to take a research agreement with the rest of the operators and, accordingly, Reserve began negotiations for the same.

> DX1404, Exchange Agreement, Art. III, par. 4, p. 9
> PX1241 Operating Contract, tab 1, pp. 10–12
> DX1406
> PX1334
> PX1335
> DX1431
> DX1694, tab P

204. It would serve no purpose to set out in detail the extensive negotiations

referred to in Finding 205. The Court has noted, however, that during the negotiations the government proposed agreements which could have extended the scope of government research and rights into areas of compounding and end products (as had the wartime Compounding and Cross-License Agreements), and that these proposals were rejected by General and the other operators (e. g., PX1349, C-1).

205. On January 17, 1950, General executed a Research Contract with the RFC which recited that it was made and entered into as of January 1, 1949. The whereas clauses of this contract recite that the parties had previously entered into the Operating Agreement for the Baytown plant, which agreement provided for government reimbursement of certain research, experimental, laboratory, development and pilot plant work to the extent approved in advance; that the President, pursuant to the Rubber Act of 1948, had directed RFC to conduct research as authorized by the Act; and that the Agreement was being made to cover any rights resulting from such authorized research which General was to undertake. The reimbursable research was set out as to kind and amount in Paragraph 1 and corresponding Exhibits A and B, the former covering a six-month period ending June 30, 1949, the latter a fiscal year ending June 30, 1950. Thereafter, reimbursable research for each subsequent period was made by amendments to Paragraph 1 of the contract which were in effect new contracts.

> PX1241, Research Contract, tabs 1–8

206. The basic financial arrangements for reimbursement of research performed under General's research contract as well as for the operation of the Baytown plant, are set out in Section 5(d) of an amendment to General's Operating Agreement dated September 1, 1943.

---

53. A cut-off date of March 31, 1949, for the further exchange of such technical information was agreed upon by the Big Four, but General was not a party to this decision. A letter dated September 12, 1949, was prepared by Rubber Reserve to be sent to General informing it that the exchange of such technical information was no longer in effect, but this letter was not sent and General was never so advised.

Reserve provided the working capital for the operation of the plant by depositing an amount in a special account in a commercial bank. General was allowed to draw on this account to pay all costs of operation such as salaries, supplies, equipment, insurance, taxes, and the like. The account was replenished from time to time upon presentation of an appropriate certificate from General. Excess funds could be withdrawn by Reserve, but General was entitled to withdraw only the amounts needed to pay operating costs; the account was government property. Baytown rubber was sold for the account of and at the direction of the government and proceeds were also deposited as needed in the special bank account. General kept appropriate accounting records which were subject to inspection and were audited. Any conflict as to the propriety of a cost charge was, under Section 4 of the Operating Contract, decided by Price Waterhouse & Company, the auditor agreed upon. The management or operating fee was paid directly to General by the government and was not drawn from the special account.

PX1241 Operating Contracts, tabs 1 and 2
Kelly C1811–13, 1824–26

207. No provision was made in the research agreement for any payment to General Tire. The budget provisions of the research agreement merely authorized the doing of work at Baytown for which payment could be made from the special bank account. Thus, salaries of personnel, wages of laborers; cost of materials, and the like were to be paid from the account but no part of these payments went to General Tire as a corporation, nor did General Tire receive any more or less money because of the budgeted research than it would have received without the research agreement. Under either its Operating Agreement or its Research Contract, General was in the same position with respect to materials or services supplied, other than as agent, as any other supplier. For example, tires for Baytown vehicles might be bought from General or Firestone or others, and it made no difference if the vehicles were employed in research or otherwise. The Research Contract and the various amounts fixed from time to time by the extensions of it merely authorized the charging of expenses within those limits in accordance with Section 5(d) of the September 1, 1943, amendment to the Operating Agreement.

PX1241, Research Contract, tab 1
PX1241, Operating Contract, tab 2

208. The scope of research to be conducted under General's Research Contract was set out in Paragraph 3, which reads as follows:

"3. The applied and developmental Research Work to be conducted hereunder shall be directed to the determination of generally accepted principles for, and to the adaptation of such principles to techniques for, the production of rubber-like polymers of butadiene, and of rubber-like copolymers, mixed polymers and inter-polymers of butadiene with styrene; the content of butadiene being within the range of 50% to 100% by weight of the rubber hydrocarbon present. The scope as above indicated excludes any work under or related to Contractor's 'wet smear' invention, covered by Patent No. 2,441,090, but includes carbon black masterbatches and may be further extended by mutual agreement in specific instances."

PX1241, Research Contract, tab 1, par. 3, p. 2

209. In essence, Paragraph 3 of General's Research Contract, defines the area of research as the production of SBR synthetic rubber. In January, 1950 the entire output of the Baytown, Texas synthetic rubber plant operated by General was in the form of carbon black masterbatches. This specific type of masterbatch was also included within the scope of the Contract by the express statement in Paragraph 3 that the scope included carbon black masterbatches.

General's "wet-smear" patent,[54] which related to carbon black masterbatches and had issued prior to the contract, was specifically excluded. Research with respect to oil masterbatches, oil-black masterbatches, or the compounding of synthetic rubber was not within the scope of authorized research, nor was research with respect to tires or tread compounds. While provision was made for extension of the scope of research in specific instances by mutual agreement, the only extension ever made was to broaden the term "styrene" to include "alkylated styrenes."

> DX1491
> PX1241, Research Contract,
> tab 4

210. Paragraph 4 of General's Research Contract provided that written reports covering reimbursed research work done under the contract were to be submitted to RFC by General. No evidence has been produced which indicates or suggests any failure on the part of General to perform under this section. Accordingly, the Court finds that General fully performed this requirement of its Research Contract.

> PX1241, Research Contract, tab 1, par. 4, p. 2

211. Paragraph 5 of General's Research Contract provided that General was to make available to RFC, or its nominees, all information within the scope, as defined in paragraph 3, of research performed, whether reimbursed or not. No evidence has been introduced to indicate any lack of performance under this paragraph.

> PX1241, Research Contract, tab 1, par. 5, p. 3

212. Paragraph 6 of General's Research Contract provided that in addition to the information made available under paragraphs 4 and 5, General, upon request, would make available to RFC, or its nominees, information which was outside the scope of paragraph 3 but which

was necessary to the use of the information of paragraphs 4 and 5 in the production of SBR synthetic rubber. However, paragraph 6 specifically excluded information pertaining to the "subsequent compounding" of synthetic rubber. The production of a tire or tread compound, which is the subject matter of the invention of the patent in suit, involves subsequent compounding of synthetic rubber. Further, there is no evidence that any request was submitted by RFC pursuant to this paragraph or that any necessary information pursuant to this paragraph was withheld. Firestone concedes that by June of 1951 detailed information concerning the subject matter of the patent in suit was published by General Tire in India Rubber World.

> PX1241 Research Contract, tab 1, par. 6, p. 3
> PX1008

213. Paragraph 7 of General's Research Contract set out the license provisions as follows:

"7. Contractor hereby grants to RFC and its nominees (1) a royalty-free license to utilize without limitation any information or invention (whether or not patented) resulting from the research authorized by this contract, including the right to reproduce, disclose to others, and publish all such information or inventions, and including the right to make, use and sell thereunder, and (2) a royalty-free license to use any information or invention to which RFC or its nominees are entitled under the provisions of paragraph 5 above, including the right to reproduce, disclose to others, and publish all such information or inventions, but limited to the utilization of the same in the production, use or sale of general purpose synthetic rubber suitable for use in the manufacture of transportation items such as tires or camelback, and (3) a royalty-free license with respect to any information or in-

---

54. General's "wet-smear" patent (DX1793) had been conceived and reduced to practice prior to March 13, 1949, the cut-off date for exchange of information under the Exchange Agreement (and therefore General's Operating Agreement). DX-1694, tab P.

vention made available under the provisions of paragraph 6 above, limited to the utilization of the same in the manufacture, use or sale of rubber-like polymers, copolymers, mixed polymers and interpolymers of the compositions defined in paragraph 3 above."

The Court finds that the invention of the patent in suit did not result from research authorized by the contract or performed thereunder by General; that no information to which RFC was entitled under paragraph 5 relates to tires or tire treads; that the information to which RFC was entitled under paragraph 6 did not relate to tires or tire treads; and, accordingly, that Firestone is not licensed to practice the invention claimed by the patent in suit.

PX1241 Research Contract, tab 1, par. 7, pp. 3–4

214. In addition to the specific language of General's Research Contract, its entire history contradicts any extension of research or rights into the field of compounding or end products. This history can be expressed succinctly as follows: During the war and thereafter until changed by the effect of the Rubber Act of 1948, the Cross-License Agreement, Compounding Agreement, and Patent Agreements Relating to Research Work[55] did extend government license rights into the field of compounding and end products (Findings 193–194 and 199); and this was done by explicit language. After the war, the national rubber policy was set by the Rubber Act of 1948. This Act did not authorize government-sponsored research in the field of compounding or end uses; it was limited to research designed to improve synthetic rubber *per se* (Finding 201). After passage of the Act, a renegotiation of research contracts specifically omitted any reference to research to be done or rights to be acquired in the fields of com-

pounding tires, treads, tread compounds, or other end products.

cf. DX1682, tab YY
DX1738, p. 23
DX1413B
DX1430
DX1404

215. Firestone has placed great emphasis on the fact that the major use of oil-extended rubber and synthetic rubber generally is in tires.[56] It argues from this that even if the language of General's Research Contract does not give a license with respect to tires or treads, a license should be implied. Firestone says it is inconceivable that the government would have been satisfied with a mere license to synthetic rubber or masterbatches *per se* without the right to use it for its main intended purpose. The Court finds that while the major use of synthetic rubber is in tires, there are other substantial uses for synthetic rubber, including oil-extended rubber (See Finding 28). The Court also finds that there is no evidence, in the Research Contract or elsewhere, that the government intended either to authorize research with respect to end uses such as tire treads or to acquire any rights therein.

216. A further bar to Firestone's implied license argument (referred to in Finding 218) is the fact that a license may not be implied when it is specifically negated by the agreement, understanding, and conduct of the parties. That it was so negated in this case is apparent not only from the face of the Agreement as set out above, but also from the negotiations which immediately preceded the Agreement and which formed a part of the understanding of the parties.

217. On December 7, 1949, Mr. Knowlton, General's chief negotiator and General Counsel, wrote to Mr. Hadlock, the government's negotiator and Executive Director of Rubber Reserve, regard-

---

55. General was not a party to these agreements.

56. About 60% of the rubber in an average passenger tire is in the tread portion.

ing the meaning of paragraph 7 (the license paragraph) of the government's proposed Research Agreement furnished with Hadlock's letter of November 23, 1949. Messrs. Hadlock and Knowlton discussed the letter by phone on December 9, 1949, and each made notes—Hadlock's on the original and Knowlton's on the retained copy of the December 7 letter. In addition, Knowlton made a separate memorandum on December 9, wrote a letter to Mr. McCoy (General's outside counsel) on December 13, and wrote a confirming letter to Hadlock on December 16. The clear intent of both parties is summarized in the December 16 letter, which stated that the words "without limitation" in paragraph 7(1) [57] of the Agreement refer:

> ". . . to the kind of use that RFC may make of the invention and the resulting information relative to production [of synthetic rubber] and do not refer to the subsequent use of the product in other patentable combinations."

Thus, the plain meaning of the terms of the Agreement conforms to the understanding of the parties to it. The Court finds that General's Research Contract excludes any license to use synthetic rubber in a patentable combination [end product] such as that covered by the patent in suit.

DX1424A–C
DX1425
DX1427
DX1428A–B
Knowlton, B15,035–53; 15,059–63;
 15,066–71
McCoy, B21,371–73
Hadlock, B27,496–98

218. Other facts contradict Firestone's argument that a license should be implied (Finding 215). These are set out briefly as follows:

(a) At one stage of the negotiations for the Research Contract, the draft contained language which could have extended coverage to compounding. This draft was rejected, and the disputed language was removed from the final draft. The government is now estopped to imply coverage into areas specifically excluded during negotiations.

(b) At about the same time that General's Research Contract was being executed, the modification of the Exchange Agreement was signed by the Big Four, RFC, and others. This modification had the effect of modifying that pooling arrangement in certain significant respects *ab initio* and of terminating it retroactively to March 31, 1949. [58] Approval for such modifications and the various agreements which followed had been given by the RFC Board of Directors on December 23, 1949. This approval made clear the fact that the RFC considered the Research Contracts to be narrower than the Exchange Agreement and to exclude information to compounding. The approval stated that:

"Signatories to the [Exchange] Agreement conducting research sponsored by R.F.C. (Goodyear, Firestone, U.S. Rubber, Goodrich, and Phillips) have executed, effective March 31, 1949, research agreements which narrow the scope of the research, provide for disclosure to R.F.C. (with limited rights of user) of information within the scope which may be developed privately by the company after March 31, 1949, and during the remaining term of the research arrangements and provide for the availability to R.F.C. (with limited right of user) of information in the possession of the company after March 31, 1949, and during the remaining term of the research arrangement, which is outside the

---

**57.** There was no question about the license-granting provisions of paragraphs 7(2) and 7(3) which on their face limit any license to synthetic rubber *per se* and do not extend to end products.

**58.** The modification limited the licenses granted by the Exchange Agreement to inventions conceived and reduced to practice prior to March 31, 1949, and set that date as a cut-off of any further accumulation of technical information.

scope of the research conducted for R. F.C., but which is necessary in connection with the use of the information resulting from the R.F.C. sponsored research work, excluding compounding and the preparation of raw materials, catalysts or other ingredients used in the manufacture of synthetic rubber."

(c) The government has never asserted any license rights to General's invention, nor to the oil masterbatch *per se.*[59]

RFC did not request information concerning the invention or the oil masterbatch from General under any of the provisions of the Research Contract, even after the fact of the invention had been announced.

(d) The standard representations made by the government in the sale of synthetic rubber also show that the government was interested only in synthetic rubber *per se.* Its General Sales and Distribution Circular provided:

"Rubber Reserve warrants that the standard types of synthetic rubber sold by it conform to the aforementioned specifications, but makes no representation or warranty of any kind, express or implied, as to their use, or the results to be obtained from such use."

Similar disclaimers were made in connection with the sale of the government synthetic rubber plants.

(e) A memo prepared by Firestone's counsel on March 17, 1961, shows that the government had taken a positive position that it was not interested in General's patent covering tires and tire tread stocks. That memo refers to a proposed "approach to Attorney General to reverse position of Justice Department in respect to whether General Tire patent is within General Tire research contract." This statement is not considered as evidence of the legal issue of whether the patent is licensed to the government but rather as evidence that no license can be implied from the conduct or statements of the parties.

(f) During the disposal of the government-owned synthetic rubber plants, no bidder for a plant listed a patent on tires or tire tread stocks in its claim of right, made pursuant to instructions that each bidder set out the rights it claimed relative to the operation of the plants. (See Findings 229–234 for details.) Firestone specifically said it knew of no one's patents that it needed in order to operate Lake Charles or sell its products. Nor did it state any contingency as to its ability to sell oil-extended rubber for tires, as required by Section (h) of the bidding instructions. General listed a number of patents it said might be needed for operating Baytown and offered to pay reasonable royalties thereunder.

| | | | |
|---|---|---|---|
| (a) | DX1420 | (e) | DX1752, pp. 3 & 20 |
| | DX1682 MM | (f) | DX1840 |
| (b) | DX1694, tab P | | FX2638 |
| (c) | DX1684B | | FX2649 |
| (d) | DX1699, Tab B | | |

219. Firestone also argues that General did work on evaluation of Baytown synthetic rubbers in oil masterbatches and that therefore the language of General's Research Contract should be construed to give the government a license not only to the oil masterbatch but to its manufacture, use, and sale, including its use in tire treads. This contention fails for a number of reasons:

(a) The specific inclusion of "black masterbatches" in scope paragraph 3 necessarily excludes "oil masterbatches" or "oil-black masterbatches." As previously found, oil masterbatches are not within the scope of paragraph 3 of the Research Contract.

(b) Even if oil masterbatches were included within the scope of paragraph 3, no invention, much less the invention of the patent in suit, is alleged or shown to have resulted from any research authorized or carried out under

59. General has never asserted the patent in suit against manufacturers of the oil masterbatch *per se* or the synthetic rubber industry.

the Research Contract, either with respect to oil masterbatches, tire treads, or tread compounds.

(c) Even if the government were entitled to a license on the oil masterbatch, it would not extend to its use in other patentable combinations (such as the invention of the patent in suit). The right to "use" an oil masterbatch (in the grant to "make, use or sell") refers to the use of the masterbatch itself so long as it retains its separate identity. It does not retain its separate identity when mixed with other ingredients to form a tread compound and extruded to form a tread stock or tire tread.

Wilson B20,659–61

220. This Court finds that the government was not entitled to a license, expressed or implied, under the patent in suit, nor to the subject matter of General's invention.

221. Since the Court finds no license in the government, it is not necessary to reach the question of whether Firestone derived such a license from the government. For purposes of appeal, however, the Court makes the following Findings 222 to 226 with respect to this question.

222. Firestone contends that it stands in the government's shoes with respect to license by virtue of the fact that it was made a nominee at the time it purchased the government-owned synthetic rubber plant at Lake Charles, Louisiana which had been operated for the government by Firestone. This nomination consists of a document dated April 22, 1955, whereby the government Rubber Producing Facilities Disposal Commission granted Firestone whatever rights the government had under some 75 government contracts going back to and including the Exchange and Cross-License Agreements and including therein General's Research Contract, as amended.

PX1241 Nomination Contract

223. The nomination recites that it was made at Firestone's request and that it was considered by the Commission to be necessary or appropriate to effectuate the purposes of the Disposal Act (50 App. U.S.C. § 1941) enacted August 7, 1953. That Act, in turn, sets out its purpose as being the sale of the government-owned synthetic rubber plants to private industry to effectuate the policy of the Rubber Act of 1948 with respect to the development of a free, competitive synthetic rubber industry in the United States.

224. The nomination agreement, under which Firestone makes its claim of license, is limited in two respects. First, it is limited specifically to the purposes of the Disposal Act of 1953; and, secondly, it is limited specifically to rights arising from General's Research Contract (which was amended several times) "as amended and extended." The amendments to the Research Contract, which are significant here, are as follows:

(a) An amendment of paragraph 3 to include "alkylated styrenes." Inasmuch as such styrenes are not involved here, this amendment is important only to show that the scope of paragraph 3 was never significantly changed.

(b) Exhibits A, B and C to paragraph 1 of the Research Contract were not a part of that Contract after June 30, 1950, and especially not at the time of Firestone's nomination in 1955 to the Agreement as amended.

(a) PX1241 Research Contract, tab 4
(b) PX1241 Research Contract, tabs 1 & 2

225. The Court finds that even if the government were entitled to a license under the patent in suit (contrary to Finding 220) this license was neither necessary nor appropriate to the operation of the synthetic rubber plants purchased from the government by Firestone and, therefore, it was not within the policy of the Disposal Act or authority of the Disposal Commission to grant this license to Firestone. No consideration was given for such a license by Firestone; it was not a portion of the consideration passing to the government for the rubber plants; and it cannot be implied that it was the intent, nor was

it a fact, that such license was granted to Firestone by way of the nomination of April 22, 1955.

## WAIVER

226. Firestone contends that even if it is not entitled to a license under the patent General has waived its right to enforce the patent against Firestone by virtue of alleged misleading statements made in its bid to purchase the Baytown, Texas plant. A certain amount of background is necessary to the examination of this defense.

227. By 1953, cold rubber and oil-extended rubber had become widely accepted, and Congress enacted the Rubber Producing Facilities Disposal Act, announcing that the disposal of the government-owned synthetic rubber plants was consistent with national security and the policy of the Rubber Act of 1948. A Commission created by the Act to carry out the sale of those plants to private industry advertised for, and received, bids for their purchase; and by 1955 most had been sold.

> 50 U.S.C. App. § 1941 et seq.

228. The Disposal Commission issued instructions to prospective bidders for the synthetic rubber plants, setting forth certain requirements. Of relevance to the issue of waiver was subparagraph 3(f) of these instructions which has been referred to as the "claim of right" section and which provided as follows:

"f. In the event that a prospective purchaser claims, or intends to claim, directly or indirectly, any 'right' as defined below, with respect to any process, device, or product presently in use in any rubber-producing facility, or which is necessary to permit the use of any such facility for the purpose for which it was designed and constructed, he shall include in proposal to purchase a statement of the basis of his claims. As used in this paragraph, the term 'right' means right to a royalty or license fee, or right to exclusive proprietary interest, or power to grant immunity, or right to

disclose technical information or trade secrets."

> FX2638 Appendix-Release No. 1, par. 3(f)

229. The instructions referred to in Finding 232 also required:

"(h). A clear statement, where a proposal is submitted subject to any conditions or contingencies, spelling out fully and separately each such condition or contingency."

> FX2638 Appendix-Release No. 1, par. 3(h)

230. General submitted two bids for the Baytown, Texas plant. The first was submitted on about May 25, 1954, and the second in April, 1955. Neither was accepted. Firestone also submitted bids for the Lake Charles, Louisiana and Akron plants it had been operating for the government. These bids were submitted about May 20, 1954, and were accepted. The contracts for purchase by Firestone were executed December 22, 1954.

> FX2639, pp. 41–50, 58–64
> FX2650
> FX2651
> 50 U.S.C. App. § 1941w(a)
> Kuykendall C 1932–41

231. General did not make a "claim of right" with respect to the application for the patent in suit (which was then pending in the Patent Office) in either of its bids for the Baytown plant. Pursuant to Section (h) of the instructions to bidders, pertaining to conditions, General did make reference to the application for the patent in suit, which previously had been assigned to a Brazilian subsidiary, Pneus General.

> FX2639, pp. 58–64

232. In November, 1954, the Disposal Commission abstracted the "claim of rights" section from all of the bids it had received for the synthetic rubber plants and circulated this compilation among the various bidders. Firestone's copy is date-stamped December 6, 1954. The abstract from General's bid reads as follows:

"f. The Company is the owner of the U. S. Patent 2,441,090 relating to a method of making a mix of carbon

black and synthetic rubber polymer of a conjugated diolefin. This process is also known as 'wet smear' or 'black masterbatch.'

"The Company also must make satisfactory arrangements with owners of inventions upon which applications for patent may be pending which cover various phases of the operation of the facilities. One of these inventions is the oil-extended rubber process owned by Pneus General S.A., Rio de Janeiro, Brazil."

The first section of this abstract was taken from the "claim of rights" section (f) of General's first bid. The second section was taken from the section pertaining to "further" conditions.[60]

> PX1306 tab N
> FX2649
> FX2639, pp. 58–64
> PX1001

233. Firestone's bid for the Lake Charles rubber plant made the following statement under Section (f) of the instructions to bidders:

"We know of no rights under patents or technical information which our Company or any other lessee or owner of (Plancor 1056) would be required to purchase in order to properly operate (as currently conducted) and dispose of the products of said plants, for private benefit. Therefore (Firestone) does not claim nor intend to claim, directly or indirectly, any 'right' with respect to any process, device, or product presently in use in the rubber producing facility, of which is necessary to permit the use of any such facility for the purpose for which it was designed and constructed. The term 'right' means right to a royalty or license fee, or right to exclusive proprietary interest or power to grant immunity, or right to disclose technical information on trade secrets."

Under Section (h) of the instructions, Firestone spelled out no contingency relative to tires or tire treads, nor did Firestone include as a condition that any pending patent application might interfere, if issued as a patent, with its operations at Lake Charles.

> PX1306 tab N
> FX2649

234. From the facts set forth in Findings 230–37, Firestone contends that General misled it and the government by not making a "claim of right" in its bids for the Baytown plant to the application which later issued as the patent in suit; that Firestone relied upon this failure to make a "claim of right" in submitting its bids for the government plants; and that General has therefore waived its right to assert the patent against Firestone. The Court finds that this contention fails for several reasons:

(a) At the time of its bids, General did not have a "right" in its invention as that term was used in paragraph 3(f) of the instructions to bidders. The development was included in a then unenforceable application, which in fact did not issue as a patent until 1960, five years after the government plants were sold and then only after suit brought against the Commissioner of Patents. No claim in the issued patent is the same as any claim in the application of 1954. Moreover, as shown by the abstract circulated by the Disposal Commission, no bidder made a claim of right with respect to a patent application, nor with respect to any patents covering tires, tread stocks, or other end products.

(b) General has not been shown to have asserted the issued patent or any "claim of right" against Firestone arising from its operation of, nor any activities associated with, its synthetic rubber plants. Therefore, Firestone was neither misled in fact, nor damaged.

(c) There is no credible evidence that Firestone inquired about, relied upon, was misled, or was damaged by the fact that General did not make a claim of right with respect to the application for the patent in suit. In fact, Firestone's

---

60. At the time of General's bids, its application for patent contained claims directed to oil-extended rubber, *per se*.

bids were submitted before General's and before knowledge of what was contained in General's bids, so far as the record shows (Finding 234). Firestone had received the abstract of General's first bid on December 6, 1954, before it executed its contract to purchase the Lake Charles plant on December 22, but no changes were shown to have been made by Firestone as a result thereof.

(d) General was under no legal duty to make a claim of right with respect to its invention or forever waive it. Its bids, and the claims or lack of claims made therein, were refused by the government and General never did purchase the Baytown or any other government plant. It built its own plant at Odessa, Texas. General's claims, like those submitted by other bidders, were distributed by the Commission to all bidders with the statement that they did not "constitute any representation whatsoever by the Commission." They constituted no representation to Firestone by General that it would not enforce a then non-existent patent (if ever obtained) against tire makers, nor could it be reasonably concluded that General had made any such representation.

> PX1001 FX2649
> DX1001 GX2682, tab 47

## ESTOPPEL AND UNCLEAN HANDS

235. Firestone also contends that even if there is no license to the government and no waiver on General's part as discussed in the above findings, nevertheless General is estopped from enforcing the patent against Firestone. This estoppel argument is founded on the allegation that General was guilty of unclean hands in essentially two forms: One, the transfer of the U. S. patent application to General's Brazilian subsidiary Pneus General in 1951 and the re-transfer to General in 1959, said to be an effort to avoid General's obligations under the Research Contract; and, two, the allegation that General was careful to separate its private research from the work it was doing under its Research Contract, said to be a breach of its

fiduciary obligations to the government as agent for the operation of the Baytown plant.

236. The Court finds the contention set forth in Finding 239 is without merit. General began work on its invention, and the same was conceived, before it entered into any research agreement with the government or accepted any government reimbursement for research. All of the work leading to the invention was private research paid for by General. General had a duty to preserve these rights and not intentionally or carelessly to throw them away. It would, therefore, have been improper for General not to take steps to preserve this private work for itself and separate it from other research work being done for the government. Such steps were taken immediately by General, and it so informed the government watchdog for their Research Contract, Price Waterhouse. General did everything possible to keep this invention separate. Such activities do not constitute unclean hands; they represent a carrying out of the policy of the Rubber Act of 1948 to encourage private as well as government research. Further, it is not General's intent, motives, or objectives that are relevant; rather, it is what was within the coverage of the license provision of its Research Contract.

> DX1001
> Findings 66–78
> DX1943 (Plant Memo Feb. 1, 1950
> copy to Price Waterhouse)
> 50 U.S.C. App. § 1921 et seq.

237. Firestone's estoppel defense has no independent standing apart from the alleged main license defense. Either the government was entitled to a license or it was not. If it were so entitled, that would settle the license issue so far as the government and General are concerned. If it were not entitled to a license or information under the Research Contract (and the Court finds that it was not), then General was well within its rights and duty in refusing to disclose its privately-owned invention to the government and in taking steps to keep it separate from the government research.

General's separation of its private work could not (and did not) create a government right where none existed under the Research Contract.

238. General's transfer of its patent application to Pneus General and its subsequent re-transfer to General are also irrelevant. General does not contend that the transfer had any effect on the government's alleged right to a license. If the government had such right, the right would exist irrespective of the transfer. If it did not, and the Court finds it did not, the transfer is irrelevant.

239. The Court finds that the invention of the patent in suit is not license to the government or Firestone, that General has not waived its right to assert the patent, and that it is not estopped by its conduct from so doing.

## MISCELLANEOUS DEFENSES

240. Firestone has asserted that the patent is invalid for failure to comply with 35 U.S.C. § 112. It says that the patent does not describe the invention clearly enough to enable one skilled in the art to practice the invention and that the patent does not distinctly claim the subject matter of the invention. There is no evidence that anyone skilled in the art has had any difficulty in practicing the invention as described in the patent. There is no evidence that the claims fail to distinctly define the invention or that a man skilled in the art, acting in good faith, could not determine whether his product is within the claimed invention.

241. Firestone's contentions with respect to its 35 U.S.C. § 112 defense are semantical and without substance. For example, Firestone argues that General's claims are defective because one cannot measure the Mooney of the rubber in a tire after it is vulcanized or in a tread stock after it has been made. There is no difficulty in measuring the Mooney of the rubber before it is compounded, however, and it is not reasonable to assume that one skilled in the art would contemplate any other means of measurement, reading General's claims. Indeed, Firestone was shown to have used the same form of claim in its own patent applications.

DX2032 GX2523
B34,774–81; 34,791–94; 34,800–02; 34,807–09

242. Illustrative of Firestone's semantical approach to the claims is the series of tests performed for Firestone by Dr. Semon and designed to show that the polymer characterization test of Claim 1 is indefinite. Approximately 100 trial runs were made by Dr. Semon in an attempt to find types of oils and carbon black which would give widely differing results when used in performing the Mooney test of the claim. Some of the oils used were specifically stated by their manufacturer to be unsuitable for use in tire tread compounds. Dr. Semon admitted that these oils (which included Quaker State motor oil) had never been used in tire tread compounding before to his knowledge. The carbon blacks used were not of the type called for by Claim 1, and two of the three used (HAF-HS and HAF-LS) were admitted to be new types of carbon black not even in existence at the time the patent issued.[61] The third type, high modulus furnace black, is not a high abrasion furnace black as called for in the Claim 1 test. These tests do not support Firestone's contention that the Claim 1 test is indefinite. In tests which used a high abrasion furnace black called for in the Claim 1 test, the results were not only definite, certain, and reproducible, but also supported General's charge of infringement. In short, there is no evidence that the Claim 1 test or any of their other alleged instances of indefiniteness would cause any difficulty to one of ordinary skill, seeking success instead of failure. The patent is addressed to the former.

GX2588 Semon, C4267–68;
GX2589 4287–88; 4321
GX2521, p. 17
DX1288, p. 245
FX2530

---

61. For this reason, those tests were stricken by the Court.

243. Firestone alleges that the patent is invalid because General fraudulently procured the patent. There is no evidence to support this allegation. The Court finds that no fraud was committed or attempted by General.

244. Firestone also alleges that the patent is unenforceable because of an alleged misuse by General. This issue was first raised by Firestone's motion to dismiss and determined adversely to Firestone by the Court in its Memorandum and Order of June 22, 1970. That Memorandum constitutes the Court's findings and conclusions with respect to the issue of misuse. At the trial, Firestone offered some evidence in addition to the settlement agreements which it had relied upon in its motion to dismiss. This evidence has been considered by the Court, but it does not support the charge of misuse, nor add in substance to the evidence previously considered.

245. In view of the findings of fraud set out in the Court's Memorandum and Order of June 22, 1970, the Court finds that the Baltimore case, C 67-206, is an exceptional case within the meaning of 35 U.S.C. § 285; a decision on whether to award reasonable attorneys' fees and the punitive damages claimed will be reserved until a hearing following the report of the master in this case.

246. Any finding of fact entered herein which may be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under the Conclusions of Law herein.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and subject matter of Civil Actions Nos. 36,799 and C 67-206. Venue lies in this district.

2. United States Patent No. 2,964,083 was duly and lawfully issued December 13, 1960. It is and at all material times has been owned by The General Tire & Rubber Company (hereafter, General).

3. Claims 1, 3-5, 7, 13, 14, 17-19, and 22 of U. S. Patent No. 2,964,083, the representative claims here in issue, are in all respects valid and enforceable.

4. Stock A, Blend 2, and Blend 5, the representative infringing tread stocks here in issue, infringe each of representative Claims 13, 14, 17-19, and 22; and, when applied as the vulcanized tread portion of a pneumatic tire, they infringe each of representative Claims 1, 3-5, and 7.

5. The subject matter of the representative claims in issue is not and has never been licensed to The Firestone Tire & Rubber Company (hereafter, Firestone) nor to the government, either expressly or impliedly.

6. General is entitled to an injunction restraining further infringement of the patent in suit by Firestone.

7. General is entitled to an accounting to determine damages and loss of profits arising from Firestone's infringement of the patent in suit, both as to the representative products here found to infringe and all other products.

8. General is entitled to an award of costs in Civil Actions Nos. 36,799 and C 67-206.

9. Any finding of fact entered herein which may be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth as a conclusion of law herein.